UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTLY JOHNSON, individually;

      Plaintiff,

                                 No.

-v-                                  Hon.

CATHERINE ADAMS, in her individual
capacity; and BARBARA SIMON, in her
individual capacity;

      Defendants.

_____

## <u>COMPLAINT AND JURY DEMAND</u>

NOW COMES the Plaintiff, JUSTLY JOHNSON, individually by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files his Complaint against the Defendants in this civil action, stating unto this Court as follows:

1.     This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1998, and the Fourth and Fourteenth Amendments to the United States Constitution, against Defendants, CATHERINE ADAMS ("ADAMS"), in her individual capacity, and BARBARA SIMON ("SIMON"), in her individual capacity.

2.     Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3.     Forum is proper based on the situs of the incident, which occurred in the City of Detroit.

4.     At all pertinent times Plaintiff, JUSTLY JOHNSON, was a United States citizen.

5.     At all pertinent times, Defendant, ADAMS, was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the City of Detroit, and was acting under color of law.

6.     At all pertinent times, Defendant, SIMON, was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the City of Detroit, and was acting under color of law.

7.     ADAMS and SIMON, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

## GENERAL ALLEGATIONS

8.     On Mother's Day, May 9, 1999, shortly after midnight, Lisa Kindred was shot and killed in her minivan in front of her three young children, including 8-year-old Charmous "CJ" Skinner, Jr.

9.    Earlier that night, on the evening on May 8, Ms. Kindred and her husband, Will Kindred, had seen a drive-in movie in Dearborn with their three young children, including the 10-day-old baby.  Mr. Kindred had convinced Lisa to go to the movie despite her having delivered a baby just ten days earlier and despite the fact that they lived in the City of Roseville, 45 minutes away from Dearborn.  The family purportedly saw the movie "Life."

10.    Following the movie, at approximately 11:30 p.m., Will Kindred announced that instead of driving home to Roseville, he needed to visit his brother-in-law on the east side of Detroit to discuss selling the man his motorcycle.

11.    The family arrived at Will Kindred's brother-in-law's house at approximately midnight.  Will Kindred parked the minivan on the street across from his brother-in-law's house and went inside the house to discuss the sale of the motorcycle.  He left Lisa, CJ, and his two other children, including the infant, in the vehicle.

12.    When Will Kindred did not come out of the house for approximately 30 minutes, Lisa Kindred left the vehicle and knocked on the door.  Will responded that he would be out shortly.  Lisa returned to the vehicle on the deserted street.

13.    Shortly after Lisa returned to the minivan, an unknown individual walked up to the vehicle's driver side door and, without saying a word, fired a

single shot into Lisa Kindred's chest.  The shooting was witnessed by young CJ, who had climbed into the front seat.

14.     After the lone assailant ran off, Lisa Kindred was able to put the vehicle into gear and drove off.  She made it to a nearby gas station, where she exited, fell to the ground, and died.  Autopsy results would later reveal that Lisa Kindred died of a single gunshot wound to the heart from a .22-caliber gun.

15.     Nothing was taken from Lisa Kindred.

16.     While in the house, Will Kindred heard a noise he would later describe as a car door slamming.  He went to the front door and saw Lisa's vehicle speeding away.  Instead of trying to locate Lisa, Will Kindred claimed that he saw a man running away through a field and gave chase.  He did not catch the unknown individual.

17.     While investigating the murder scene on Bewick, police saw two men, Raymond Jackson and Kendrick Scott, nearby and arrested them, despite having no probable cause for the arrest.  This was an illegal, yet widespread, custom and practice in the DPD that led to federal government oversight of the department in *United States v. City of Detroit*, No. 03-72258 (E.D. Mich. June 12, 2003).

18.     Combing through the neighborhood at approximately 8:30 a.m., the police found Antonio Burnette sleeping in Kendrick Scott's car outside Scott's house.  They put Burnette in handcuffs and took him to police headquarters

although they had no probable cause to suspect he was involved in the Lisa Kindred murder.

19.     Antonio Burnette was interrogated by police for hours on May 9. ADAMS and SIMON told Burnette that he would face murder charges for Lisa Kindred's death if he did not implicate others, despite ADAMS' and SIMON's knowledge and belief that Burnette and Raymond Jackson were not involved with the murder.  Burnette was also punched in the face by a male police officer while ADAMS, the Officer-in-Charge of the investigation, and SIMON, watched.

20.     Subjected to the physical abuse and threats of being charged with Lisa Kindred's murder, Burnette wrote a police statement at 2:20 p.m., telling police that he saw "Snoop" (Scott) and "Stank" (Johnson) at approximately 2:30 a.m., on May 9 and "Snoopy said he shot the lady while trying to get some money.  He had a phone bill to pay.  Stank said Snoopy shot the lady too."  He then added that Johnson and Scott said they planned to "kidnap this bitch named Lisa" because she owed "Snoop" (Scott) some money for drugs.

21.     ADAMS, as OIC of the investigation, knew that Lisa Kindred did not use or buy drugs.  ADAMS had no evidence that Lisa Kindred had any connection to Justly Johnson or Kendrick Scott; therefore, she had no evidence to suggest that Burnette's statement was true.

22.    ADAMS also knew that Burnette's story could not be true because she knew Scott had been taken into police custody at 1300 Beaubien long before 2:30 a.m.

23.    In fact, Burnette's statement was not true, since it had been manufactured by ADAMS and SIMON to obtain probable cause for the arrest warrant.

24.    Burnette was shown a handwritten statement and told to sign his name at the bottom of each page.  Burnette, a 16-year-old middle school dropout who was illiterate, told the officers he could not read.  The officers told Burnette to sign the pages anyway.  Burnette complied.

25.    On May 9, 1999, at 5:10 a.m., Raymond Jackson, who had been with Kendrick Scott when Scott was arrested, gave his first statement to police.  Jackson told police that he had been drinking heavily and had smoked a large amount of marijuana.  He stated that he had seen Scott on that night and that Scott told him he had seen two men in the neighborhood with guns.

26.    On May 10, police again brought Jackson in for more "interrogation." This time, however, ADAMS and SIMON, along with Sgt. Arlie Lovier, accused Jackson of the murder and told him that he would be charged unless he implicated Scott and Johnson.

27.     ADAMS and SIMON then supplied Jackson with "facts" they invented to provide probable cause to arrest Johnson and Scott, including that Jackson "saw" Scott hand something long and wrapped in clothing to Scott's then-girlfriend, Falyn Kenner, the implication being that it was a long gun.

28.     Faced with the possibility of being falsely accused of murder, Jackson changed his story and gave another statement to police.  The statement, made at 6:00 p.m. on May 10, 1999, 36 hours after the first statement, began *"Yesterday morning, you gave a statement regarding the shooting on Bewick.  Is there anything you want to add to that statement?"*  Jackson's ensuing statement, made as a result of threats and coercion from ADAMS and SIMON, included facts supplied to him by ADAMS and SIMON, including that Jackson had seen Mr. Scott hand something long and wrapped in clothing to Scott's girlfriend on the night of the murder.  Jackson's statement also included the "fact" that Justly Johnson came to his house and stated that he and Scott had *"did a lick last night and I fucked up and had to shoot."*

29.     During their interrogation of Johnson and Scott, the DPD homicide detectives went so far as to admit they were going to charge the two men whether they were guilty or not.  Homicide detective, SIMON, threatened Justly Johnson with murder charges if he didn't confess: *"I don't care if you did it or not.  We will charge you with murder anyway.  The mayor is putting pressure on my boss, who*

is putting pressure on us.  *No jury in America won't convict a black kid for killing a white woman!"*

30.    At the time Johnson and Scott were arrested, ADAMS knew the following evidence:

        a.    That there was only a single shooter;

        b.    That Lisa Kindred died of a single gunshot wound to the chest;

        c.    That Jackson's second statement had Justly Johnson confessing to the shooting;

        d.    That Burnette's statement had Scott confessing to the shooting;

        e.    That Scott was already in police custody when Burnette said he met with Johnson and Scott at 2:30 a.m.;

        f.    That both Jackson and Burnette had both admitted to drinking heavily and consuming drugs in the evening of May 8 and early morning hours of May 9;

        g.    That Jackson and Burnette's statements were fabricated, having been the result of threats, assault, and coercion by DPD members including ADAMS and SIMON.

31.    Johnson and Scott were tried separately.  Johnson elected a bench trial; Scott chose to be tried before a jury.

32.     ADAMS, the OIC, sat at the prosecutor's table throughout the duration of both trials.

33.     ADAMS deliberately chose not to tell the prosecutor, Elizabeth Walker, that Lisa Kindred's sister, Jodi Gonterman, an Albuquerque, New Mexico,

police officer, had told ADAMS shortly after the killing that her sister, Lisa, told Jodi that if anything bad happened to her, the culprit would be Will Kindred.

34.     Had ADAMS disclosed this exculpatory and impeachment ("*Brady*") evidence to the prosecutor, the prosecutor would have turned the evidence over to defense counsel, as she had a constitutional obligation to do so.

35.     ADAMS also deliberately chose not to tell the prosecutor the fact that the Burnette and Jackson statements and testimony were fabricated, having been the result of physical violence, threats and coercion.  Such evidence would have destroyed the credibility of the entire investigation, including the testimony of the prosecution's star witnesses.  It would have destroyed the State's theory of the crime; namely, that the murder was the result of a "robbery gone bad."

36.     The Jodi Gonterman statement would have been apparent *Brady* evidence to any reasonable detective as it would have been exculpatory evidence that would point the blame at an alternative suspect, i.e., Will Kindred.

37.     Had the Jodi Gonterman statement been disclosed, any reasonable defense attorney would have researched the marital history of Will and Lisa Kindred and discovered the 17 domestic violence police calls over the two-year period before the murder, each involving Will Kindred's violence against Lisa Kindred and Charmous "C.J." Skinner, Jr., Lisa's eight-year-old son with Charmous Skinner, Sr.

38.     The Gonterman statement would have led any reasonable defense attorney to seek legal filings between the couple in Macomb County Circuit Court, which would have revealed Lisa Kindred's 1998 divorce complaint and personal protection order issued against Will Kindred one year before the murder.

39.     The Gonterman statement and Roseville PD domestic violence calls would have led any reasonable attorney to question Charmous Skinner, Sr., about the domestic violence incidents involving Will Kindred and Charmous' son, C.J.  This would have led to Charmous Skinner, Sr.'s statement that Lisa Kindred also told him that if anything happened to Lisa, Will Kindred would be the responsible party.  Such a statement would have been apparent exculpatory evidence to any reasonable police officer, as it would have pointed to Will Kindred as the true suspect in a "murder for hire" scenario.

40.     The Gonterman statement and Roseville PD domestic violence calls would have led any reasonable attorney to question C.J. Skinner, Jr., about the domestic violence incidents involving Will Kindred and C.J.'s recollection of the events of May 9, 1999, when his mother was shot to death in front of him.

41.     Questioning young C.J. Skinner would have led to the exculpatory testimony from C.J. Skinner that eluded Johnson and Scott for almost two decades.

42.     The DPD detectives, including ADAMS and SIMON, having coerced Burnette and Jackson to implicate JOHNSON and SCOTT, deliberately chose not

to investigate Will Kindred, the marital relationship, or Kindred's background. Instead, they cleared him as a suspect within three hours of the murder.

43.    Clearing Will Kindred as a suspect allowed Kindred to collect on his wife's life insurance policy within six weeks of her death.

44.    At a recent deposition in connection with Plaintiff's exoneration, Will Kindred, through his attorney, asserted his Fifth Amendment privilege against self-incrimination for anything connected to his wife's death.

45.    The Burnette and Jackson statements were manufactured to simply close the case, as FBI statistics from that time period showed the DPD Homicide Section closed less than half of the murders in the City of Detroit, near the bottom for any large city in America.

46.    "Closing the case," a statistic measured by the DPD for crime statistic purposes, meant obtaining a confession or getting an arrest warrant signed by the prosecutor.  Manufacturing probable cause to obtain signed arrest warrants would enable a case to be "closed" for police purposes, thereby increasing the Homicide Section's success rate.

47.    Manufacturing probable cause to close a case "by any means necessary" was a widespread custom and practice in the Homicide Section of the DPD.

48.     The prosecutor's <u>entire case</u> was dependent upon the manufactured testimony of Burnette and Jackson, as there was no physical evidence linking the men to the murder, no eyewitness identifications, and no confessions.

49.     In *People v Scott*, the prosecutor, Elizabeth Walker, stressed the importance of Burnette and Jackson's credibility in her closing argument, claiming they were the key witnesses who had not been coerced:

> We have the testimony of Raymond Jackson and Antonio Burnette and it's no secret.  I told you at the beginning those were going to be some of the key players, some of the key witnesses in this case.
>
> Though Antonio and Raymond may not be the nicest people you've ever seen, the question you have to ask is whether or not the testimony they have given to you is reliable and credible.  Now, if you find that it is, then there's not going to be a whole lot of talk.  If so then it means he's telling you the truth about Snook – they're telling you the truth about what Snook and Stank said. Now, why would they say it if it wasn't so. *They're not under any compulsion. This is not some TV type police rubber hose interrogation out of a 1930 late night movie.* These are people (Johnson and Scott) talking to their friends in what they believe is a safe and secured environment.
> (*People v Scott*, 6-1-00, pp. 26; 34-35) (emphasis added)

50.     In *People v Johnson*, Prosecutor Walker stressed in her closing argument that the two witnesses had not been coerced or forced into giving their testimony:

> Now, what's curious is, both Antonio Barnett and Raymond Jackson, who don't appear to have any connection with each other whatsoever other than through Snoop and Stank, both say these individuals hit a lick or told them that they had, and that there was a shooting that occurred in connection with hitting that lick. Both these individuals make reference to the statements being made after the shooting on

Bewick, the evening, early morning hours of the shooting and the next one the next day after the shooting. *That's the crux of this case, that's what connects this defendant to the shooting on Bewick, his own lips, his own words he says to friends of his under circumstances which he has no reason to lie to them. It's not a question of any kind of police coercion*, nobody's forced him to make these statements. He's talking to people that he believes for one reason or another he can trust. Why would he say this if it wasn't so?

(*People v. Johnson,* 1-12-00, p. 11) (emphasis added).

51.     Judge Prentis Edwards, the trier-of-fact in the Johnson trial, also stressed the importance of Burnette and Jackson's testimony and their credibility: "The question here is of credibility. And again, the key witnesses are Jackson and Barnett." (*People v. Johnson,* 1-12-00, p. 28)

52.     Burnette and Jackson's false testimony, both of whom claimed that Plaintiff admitted to them Lisa Kindred's death was the result of a botched robbery, was the result of threats and coercion by Defendants, ADAMS and SIMON.

53.     Because ADAMS deliberately withheld from prosecutor Walker that the Burnette and Jackson statements were manufactured, Walker unwittingly stressed that there was no "*TV type police rubber hose interrogation out of a 1930 late night movie.*" However, the United States Supreme Court has recognized for at least 78 years *"that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the*

13

*efficiency of the rack and the thumbscrew can be matched, given the proper*

*subject, by more sophisticated modes of 'persuasion.'" Blackburn v. Alabama*, 361

U.S. 199, 206 (1960) (citing *Chambers v. Florida*, 309 U.S. 227 (1940)).

54.     On January 12, 2000, following a bench trial in front of the Hon.

Prentis Edwards, Justly Johnson was found guilty of one count of Felony Murder;

one count of Assault with Intent to Rob While Armed; and one count of Felony

Firearm.

55.     On January 26, 2000, Johnson was sentenced to spend the rest of his

life in prison without the possibility of parole.

56.     On June 1, 2000, a Wayne County jury convicted Kendrick Scott of

one count of Felony Murder; one count of Assault with Intent to Rob While

Armed; and one count of Felony Firearm.

57.     On June 21, 2000, Kendrick Scott was given a life sentence without

the possibility of parole.

## POST-CONVICTION EVENTS

58.     Following years of unsuccessful appeals, the University of Michigan

Innocence Clinic took over the case and filed a motion to set aside the verdict.  The

trial court, having already pre-determined the outcome, denied Plaintiff's motion

for relief from judgment, which was affirmed by the Court of Appeals.  The

Michigan Supreme Court, however, overturned the Court of Appeals' decision

14

supporting the trial court's denial of the motion for relief from judgment.  The case was remanded for an evidentiary hearing.

59.     The trial court held an evidentiary hearing in the spring of 2015. Newly discovered evidence presented to the judge included Lisa Kindred's now-adult son, C.J. Charmous, Jr., who testified that he would could not forget the face of the man who shot his mother and that he was sure that Justly Johnson and Kendrick Scott were not the shooters.

60.     C.J. testified that he was never contacted by anyone regarding the shooting until years later, when former WXYZ and Fox 2 investigative reporter, Scott Lewis, contacted him.  He testified that the police had never contacted him.

61.     Other newly-discovered evidence included the affidavit of Jodi Gonterman, the victim's sister, who stated in her affidavit that Lisa told Jodi if anything ever happened to Lisa, Will Kindred would be responsible.

62.     One of the original trial's star-witnesses, Antonio Burnette, testified at the evidentiary hearing.  He recanted his prior identification, saying he was threatened by the police into falsely implicating Johnson and Scott.

63.     Burnette stated that he was locked up for 3-4 days and wasn't given any water or food for over one day while being interrogated, although he was supposedly not a suspect.  He has stated that he was physically assaulted and

threatened with being charged with the Lisa Kindred murder if he didn't implicate Johnson and Scott.

64.     Another piece of newly-discovered evidence was the affidavit of C.J. Charmous, Sr., who stated in his affidavit that Lisa Kindred told him if something bad should befall her, Will Kindred would be responsible.

65.     Police records from the City of Roseville were entered into the evidentiary hearing record, as well as Lisa Kindred's divorce Complaint filed one year before her murder.  The documents painted a dark picture of domestic violence perpetrated by Will Kindred on his wife, leading her to file for divorce and seek a Personal Protection Order.

66.     Following the hearing, the trial court denied relief from judgment.  The trial court, however, concluded that the murder was likely the result of a planned "hit" set up by Will Kindred, not the "armed robbery gone bad" proffered by the prosecutor.[1]  The trial judge also discredited CJ Skinner, Jr's testimony, finding that CJ was likely asleep and that he could not have seen the outside of the minivan where the shooter stood because the dome light was illuminating the interior of the vehicle.

---

[1]  In a lawsuit brought by the Plaintiff to secure compensation under Michigan's Wrongful Imprisonment Compensation Act, MCL 691.1751 et seq., Will Kindred asserted his 5th Amendment right against self-incrimination and refused to answer any questions about the murder of his wife.

67.     On May 31, 2016, the Court of Appeals affirmed the trial court's denial of relief from judgment.

68.     The Supreme Court accepted leave and, in an opinion authored by Justice Richard Bernstein on July 23, 2018, reversed the lower courts and vacated the convictions, granting a new trial based on the newly discovered evidence.

69.     On November 28, 2018, the Wayne County Prosecutor's Office dismissed criminal charges against Justly Johnson and Kendrick Scott.  From the date of their arrests on May 9, 1999 to their exoneration on November 28, 2018, each man had spent **7,144 days, or 19 years, 6 months, and 20 days**, in jail or prison for a murder neither man committed.

70.     But for Defendants' conduct, as set forth below, there would have been no probable cause for an arrest warrant, much less a trial and conviction.

71.     Due to the conduct of Defendants, ADAMS and SIMON, as set forth below, Plaintiff, Justly Johnson, suffered the following injuries and damages:

> a.     Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over nineteen years, including significant time spent in solitary confinement;
>
> b.     Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with first-degree murder and felony-firearm, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;
>
> c.     Physical manifestations of emotional distress including, but not

17

limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e.  Loss of enjoyment of daily activities;

f.  Not being able to attend the funerals of several family members;

g.  Physical injuries suffered in prison;

h.  Loss of employment opportunity, past income, and future earning capacity;

i.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

j.  Many of Plaintiff's injuries and damages are likely to be permanent;

k.  Other damages which may be revealed through discovery.

## COUNT I

## 4th and 14th AMENDMENT "FABRICATION OF EVIDENCE" BY DEFENDANTS ADAMS AND SIMON

72.  Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

73.  At all times, Plaintiff had a constitutional right, secured by the 4th and

14th Amendments, not to be seized and deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigative capacity.

74.     At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of fabrication of evidence by a government officer, including a police officer, acting in an investigative capacity.

75.     Plaintiff's constitutional 4th Amendment and due process rights to be free from illegal seizure and continued detention based upon fabrication of evidence by a governmental official acting in an investigatory capacity was clearly established before May 9, 1999, the earliest possible date for Defendants' conduct in this case.  *Albright v. Oliver*, 510 U.S. 266, 274; 114 S.Ct. 807; 127 L.Ed.2d 114 (1994) (malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment, citing cases back to the 1940s); *See also Napue v. Illinois*, 360 U.S. 264, 269; 79 S.Ct. 1173 (1959) (14th Amendment right not to be deliberately subjected to trial based on "false evidence" is "implicit in any concept of ordered liberty.")

76.     ADAMS and SIMON deliberately and knowingly fabricated evidence in order to manufacture probable cause and secure a conviction.  ADAMS' and SIMON's fabrication of evidence included securing false witness identification by

Raymond Jackson and Antonio Burnett by using physical beatings, threats and coercion.

77.     ADAMS' and SIMON's deliberate and knowing fabrication of evidence to manufacture probable cause for Johnson's arrest resulted in his pre-conviction deprivation of liberty and continued detention from his arrest on May 9, 1999, to his conviction on January 12, 2000; a period of 249 days, or 8 months and 4 days.

78.     ADAMS' and SIMON's deliberate and knowing fabrication of evidence to continue Johnson's detention caused a violation of his right to be free from illegal seizure and continued detention and resulted in his wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months and 17 days.

79.     Plaintiff's total time spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days**.

80.     Plaintiff's cause of action for fabrication of evidence became complete when the criminal case against him was terminated in his favor with charges being dismissed on November 28, 2018.  *See McDonough v. Smith*, -- U.S. --; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

## COUNT II

## 4TH AMENDMENT MALICIOUS
## PROSECUTION BY DEFENDANTS

81.     Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

82.     At all times, Plaintiff had a clearly-established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence and knowingly-made false statements or material omissions by a government officer, including a police officer, acting in an investigative capacity in order to manufacture probable cause.  *Franks v. Delaware*, 438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d 667 (1978); *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.")

83.     Defendants, ADAMS and SIMON, influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly fabricated evidence to secure Plaintiff's arrest and continued detention.  ADAMS further influenced the prosecution by falsely stating on the Investigator's Report/Warrant Request that Jackson and Burnette identified Plaintiff as the murderer, which was material to a finding of probable cause.

84.     ADAMS further influenced or participated in the initiation of criminal

prosecution and Plaintiff's continued detention when she knowingly omitted material facts (that the Burnette and Jackson statements implicating Plaintiff were the result of physical violence, threats and coercion) in her warrant request to the warrant prosecutor and judge who signed the arrest warrant.

85.  But for Defendants' fabrication of evidence and ADAMS' false statements and material omissions on the Warrant Request, statements to prosecutors and the judge who signed the arrest warrant, and at the Preliminary Exam, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment.

86.   Plaintiff suffered a deprivation of liberty in excess of 19 years because of Defendants' conduct.

87.   Plaintiff's cause of action for federal malicious prosecution became complete when the criminal case against him was terminated in his favor with charges being dismissed on November 28, 2018.

88.   Plaintiff's constitutional right to be free from illegal seizure and continued detention without probable cause based upon fabrication of evidence, knowingly-made false statements and/or omissions of materials facts by a governmental official acting in an investigatory capacity, including police officers, was clearly established before May 9, 1999, the earliest possible date for police misconduct. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n

officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").

89.    Defendants' deliberate false statements and deliberate and/or reckless omissions of material facts was not intended to bring to justice the true perpetrator of the crime.  Instead, Defendants' conduct was intended to secure Plaintiff's arrest and conviction to improve the homicide closure rate, which was abysmally low, and to escape the pressure being put on the DPD by the mayor's office.

90.    Defendants' intentional and/or reckless conduct was a direct and proximate cause of Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on May 9, 1999, to his conviction on January 12, 2000; a period of 249 days, or 8 months and 4 days.

91.    Defendants' intentional and/or reckless conduct was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months, and 17 days.

92.    Plaintiff's total time spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days**.

## COUNT III

### 14TH AMENDMENT DUE PROCESS
### *"BRADY"* VIOLATIONS BY DEFENDANT ADAMS

93.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

94.    At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

95.    Defendant, ADAMS, deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence in her files to the prosecutor in violation of her constitutional obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

96.    ADAMS deliberately and knowingly chose not to disclose to the prosecutor or defense before trial that she fabricated evidence by manufacturing the Antonio Burnette and Raymond Jackson statements, which were material to a finding of probable cause.

97.    ADAMS deliberately and knowingly chose not to disclose to the prosecutor or defense before trial that she knew Jodi Gonterman made a statement

to police that Lisa Kindred said if anything bad happened to her, Will Kindred would be the culprit.

98.     Plaintiff's right to *Brady* evidence, and the police officer's constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before January of 2000, when he was tried and convicted. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

99.     ADAMS' knowing and intentional due process violations resulted in Plaintiff's wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months, and 17 days.

100.   The total time Plaintiff spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days**.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff, JUSTLY JOHNSON, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a. Past and future compensatory damages against all defendants in a minimum amount of Fifty Million Dollars (**$50,000,000.00**);

b. Punitive damages as to Defendant, ADAMS, in a minimum amount of Thirty Million Dollars (**$30,000,000.00);**

c.  Punitive damages as to Defendant, SIMON, in a minimum amount of Twenty Million Dollars **($20,000,000.00);**

d.  Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

e.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

f.  Such other and further relief as appears just and proper.

_s/Wolfgang Mueller_
MUELLER LAW FIRM
Attorney for Plaintiff
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated: August 6, 2019

26

# **JURY DEMAND**

Plaintiff demands a jury trial in the above-captioned matter.


*s/Wolfgang Mueller*
MUELLER LAW FIRM
Attorney for Plaintiff
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)


Dated: August 6, 2019