# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KENDRICK SCOTT,<br><br>                    Plaintiff,<br><br>        -against-<br><br>DETROIT POLICE DEPARTMENT ("DPD") SERGEANT WAYNE PRITCHETT; DPD OFFICER CATHERINE ADAMS; DPD OFFICER BARBARA SIMON; and DPD OFFICER ANTHONY JACKSON,<br><br>                    Defendants. | No. 19 Civ. 12718<br><br>**AMENDED COMPLAINT AND JURY DEMAND**<br><br>Paul D. Borman<br>United States District Judge<br><br>Elizabeth A. Stafford<br>United States Magistrate Judge |

Plaintiff Kendrick Scott, by and through his attorneys, Emery Celli Brinckerhoff & Abady LLP and Goodman, Hurwitz & James, P.C., for his Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      Kendrick Scott spent nearly 20 years in jail for a crime he did not commit. He was innocent. But the police framed him. Police officers beat up an illiterate, intoxicated sixteen-year-old boy to force him to falsely inculpate Mr. Scott. They threatened another teenager, who had a history of mental illness, to do the same. They concealed evidence that pointed to the true culprit. They threw Mr. Scott in jail, then they threw away the key.

2. There was no evidence that connected Mr. Scott to the crime. He had an alibi. He had no motive. There were no eyewitnesses who said he was involved. There was no DNA. There was no forensic evidence. There was nothing. Nothing but police abuse and coercion.

3. This case is brought to vindicate Mr. Scott's civil rights. It is brought to shine the light on police abuse. It is brought to remedy an injustice that began in 1999.

4. On May 9, 1999, Lisa Kindred, a thirty-five-year-old white woman, was shot and killed late one night in the east side of Detroit.

5. Any reasonable police officer would have immediately focused on her husband, Will Kindred, as the natural suspect. Over the two years before her murder, Lisa had called in seventeen domestic violence reports about Will. Just months before her murder, Lisa had obtained a personal order of protection and had begun divorce proceedings. On two separate occasions in the months before she was killed, Lisa had specifically told those close to her that if something were to happen to her, police should suspect Will. And just six weeks after Lisa's murder, Will collected a substantial payment on Lisa's life insurance policy.

6. But Detroit Police Department Officers Catherine Adams, Barbara Simon, Wayne Pritchett, and Anthony Jackson are not reasonable officers. Instead of following the trail of evidence pointing squarely at Will, they cleared

2

him as a suspect within three hours of the murder. They decided instead to frame

Kendrick Scott and his friend, Justly Johnson, two innocent young men who had

the bad luck of being picked up by the police during a sweep they made through

the neighborhood after the shooting.

       7.     The police fabricated evidence to convict Kendrick Scott and

Justly Johnson. First, they beat up an illiterate, intoxicated teenager named Antonio

Burnette whom they had also picked up in their sweep. Burnette was only sixteen

years old, but the police interrogated him without his parents. They forced him to

falsely say that Mr. Scott and Mr. Johnson had confessed to the shooting. Then,

they threatened and coerced a mentally ill teenager named Raymond Jackson into

providing similarly false testimony.

       8.     The police lied about the circumstances under which Burnette

and Jackson were interrogated. They lied about the violence and coercion they

applied to secure Burnette's and Jackson's statements. They concealed the

evidence that Lisa had expressed fear that Will would kill her. They failed to

interview an eyewitness who was *in the car* when Lisa was shot. They did not

investigate the long history of domestic violence between Will and Lisa. They

engaged in this extensive cover-up because they knew Kendrick Scott's

prosecution was a sham that could not be justified based on the truth.

9.     Because of the officers' fabrication and concealment of evidence, Kendrick Scott was convicted of felony murder, assault, and criminal possession of a firearm on June 1, 2000, and sentenced to life in prison. He spent the next eighteen and a half years in prison.

10.     In 2015, however, the truth finally began to come to light. For the first time, the eyewitness to the shooting testified under oath that Mr. Scott was not the shooter. Lisa's sister and her ex-husband both submitted sworn testimony that Lisa had feared Will would kill her.

11.     Free from police violence and threats, Burnette recanted his testimony and testified that he had no actual knowledge of who killed Lisa. He explained, for the first time, the police officers' physical and psychological abuse that pervaded his interrogation, culminating in his agreement to sign a false statement. Jackson had passed away by this time, but his cousin submitted an affidavit confirming that he had also been threatened by the police into providing false testimony inculpating Mr. Scott and Mr. Johnson in Lisa's murder.

12.     Based on the totality of the new evidence, the Supreme Court of Michigan vacated Mr. Scott's conviction on July 23, 2018. On November 28, 2018, the charges against him were finally dismissed. Nearly twenty years after being arrested, Mr. Scott was finally a free man.

4

13.     Detroit Police Department officers stole nearly twenty years of Mr. Scott's life by fabricating inculpatory witness statements and hiding exculpatory ones. This action is brought pursuant to 42 U.S.C. § 1983 to vindicate Mr. Scott's constitutional rights. It is time for this decades-long injustice to end.

## THE PARTIES

14.     Plaintiff Kendrick Scott is a citizen of the United States and at all relevant times was a resident of Detroit, Michigan.

15.     Defendants Sergeant Wayne Pritchett, Officer Catherine Adams, Officer Barbara Simon, and Officer Anthony Jackson (collectively, "Defendant Officers" or "Officers"), at all times relevant to this Complaint, were police officers with the Detroit Police Department ("DPD"), and as such were employed by the City of Detroit. In this role, the Officers were duly appointed and acting officers, servants, employees and/or agents of the City of Detroit. At all relevant times, they were acting in the scope of their employment and under color of state law.

## JURISDICTION AND VENUE

16.     This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §§ 1983 and 1988.

17.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§

1331 and 1343(a)(3) and (4).

      18.    The acts complained of occurred in the Eastern District of

Michigan, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

      19.    Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

### *Lisa Kindred is Murdered in East Detroit*

      20.    On the evening of May 8, 1999, Lisa Kindred went to see a

movie with her husband, Will Kindred, and their young children—two they had

together (including the then-ten-day-old infant Dakota Kindred), and one from

Lisa's previous marriage.

      21.    After the movie ended, Will announced they had to drive into

Detroit to meet with his brother-in-law. They arrived shortly after midnight on

May 9, 1999. Will parked the car in front of his brother-in-law's house, then went

in, telling Lisa and the three children to stay outside, alone in the car.

      22.    Lisa moved into the driver's seat of the car, and her eight-year-

old son from her prior marriage, Charmous Skinner, Jr. ("C.J."), moved to the front

passenger seat.

      23.    Will stayed in the house for over half an hour. At one point,

Lisa got out of the car and walked up to Will's brother-in-law's house, asking

when they would be able to go home. Will responded that he would be done soon.

24.     Lisa walked back to the car. As she opened the driver's side door to get in, the interior light went on, illuminating the car's immediate surroundings.

25.     In the light, C.J. could clearly make out a figure behind his mother. It was a man in his early thirties, with a wide nose and an unruly beard.

26.     At the time, Kendrick Scott was twenty years old and clean-shaven. Justly Johnson was twenty-four and clean-shaven.

27.     C.J. then heard a single gunshot ring out. It shattered the driver's side window and struck Lisa in the chest. The man who had fired the shot walked quickly away.

28.     Lisa, though injured, managed to start the car and drive a few blocks to a nearby gas station. There, she collapsed in the parking lot and died.

29.     From inside the house, Will claimed he heard what he described as a car door slamming, prompting him to walk out onto the sidewalk. He claimed he observed Lisa "speeding" off. But he did not follow her.

30.     Instead, Will claimed to have seen a figure running off into a field. Will supposedly chased the figure briefly, but could not identify any of the figure's features, or even its approximate height. Will could not even confirm whether the figure was a man or a woman.

7

31.     The killer took nothing from Lisa; as the police report made clear, Lisa's wallet, cash, checks, and gift cards remained untouched. There was no evidence of any robbery or attempted robbery.

### Detroit Police Officers Decide to Frame Kendrick Scott and Justly Johnson

32.     Detroit Police Officers Frank Scola and Willie Soles were the first to respond to the scene, closing off the area.

33.     Neither Officer Scola nor Officer Soles attempted to speak with C.J., who had witnessed the shooting.

34.     As Officer Scola waited for the evidence unit and other officers to arrive, he wandered over to nearby Bewick Street, where he saw Kendrick Scott and Raymond Jackson walking down the street. Based on nothing more than their proximity to the scene of the shooting, Officer Scola placed both Mr. Scott and Mr. Jackson under arrest shortly after 1:00 a.m.

35.     Sergeant John Falk and Sergeant Arlie Lovier arrived on the scene shortly after to take over the investigation. They questioned Will, who right away lied and told them that he had only been in his brother-in-law's house "for a few minutes."

36.     Down at the precinct, meanwhile, multiple officers interrogated Mr. Jackson and Mr. Scott separately over the course of the next several hours. Mr. Scott was interrogated by several officers, including Officer Monica Childs.

8

Officer Childs continued her questioning even after Mr. Scott requested the opportunity to speak with a lawyer.

37.    Mr. Scott told the officers that he had been waiting outside his girlfriend's house when he observed two men walking near Will's brother-in-law's house. One of them was carrying a rifle. Mr. Scott's girlfriend corroborated him.

38.    Mr. Jackson also corroborated Mr. Scott. In a statement recorded by Sergeant Falk, he told the officers that he had been sleeping when he woke up to the sound of a gunshot. He walked outside and saw Mr. Scott standing in front of his girlfriend's house; when he asked Mr. Scott what happened, Mr. Scott told him that two men with a rifle had just walked by.

39.    Witnesses Lakenya Hicks and Quentin Billingslea both gave Mr. Scott an alibi: he was with them at the moment they heard the shot.

40.    Frustrated that they may have been wrong to suspect Mr. Scott but unwilling to reconsider the course of their investigation, the officers decided to fabricate evidence where there was none.

41.    Both Mr. Scott and Mr. Jackson had mentioned that they had spent part of the previous evening with Antonio Burnette and Justly Johnson.

42.    At approximately 8:00 a.m. on May 9, 1999—just a few hours after both Mr. Scott and Mr. Jackson gave their initial statements—investigating officers found Antonio Burnette, then sixteen years old, sleeping in Mr. Scott's car,

9

and placed him under arrest. Mr. Burnette was drunk and high, having spent the previous night consuming a significant quantity of alcohol and smoking several ounces of marijuana.

43.     At around the same time, officers found and arrested Justly Johnson as well.

44.     Over the next six hours, between 8:00 a.m. and 2:00 p.m., Officer Adams, Officer Simon, and Sergeant Pritchett, along with other DPD officers, forcefully interrogated Mr. Burnette.

45.     Neither Mr. Burnette nor Mr. Johnson had any knowledge of Lisa's murder. When asked about it at first, Mr. Burnette responded, "What the hell are you talking about?" But Sergeant Pritchett, Officer Adams, and Officer Simon refused to accept that. They continued the interrogation.

46.     The police, including Officer Adams, Officer Simon, and Sergeant Pritchett, knew Mr. Burnette was a minor; in fact, they believed he was just fourteen years old. But when he asked for his parents, the police refused to call them.

47.     Mr. Burnette's mother independently called the precinct late in the morning to ask about her son's whereabouts; DPD officers lied and told her Mr. Burnette was not in their custody.

48.     The officers began screaming at Mr. Burnette to start naming

names, threatening that if he failed to give them the identity of the killer, they would be "putting this murder on [him]." Their meaning was clear: talk, or the witch hunt would have a new target.

49.     At some point, the officers presented Mr. Burnette with a statement written by Sergeant Pritchett, which inculpated Mr. Scott and Mr. Johnson, and directed Mr. Burnette to sign it. When Mr. Burnette told the officers he couldn't read, Sergeant Pritchett "threatened [him] with prison time for the rest of [his] life if [he] d[idn't] sign these statements."

50.     As the interrogation became more and more coercive, Sergeant Pritchett and Officer Simon edited and rewrote the statement—still without explaining to Mr. Burnette what it said.

51.     When threats were not enough, the police turned to physical abuse. Sergeant Pritchett and Officer Simon began "roughing [Mr. Burnette] up," including by "throwing [him]" and "chok[ing] [him] up." Officer Adams stood by and watched. She did nothing to stop the beating or protect Mr. Burnette.

52.     Overwhelmed by the beating, the threats, and the stress of a multi-hour interrogation, and in fear for his life and liberty, Mr. Burnette agreed to sign the statement he could not read.

53.     During this same time, the officers brought Mr. Jackson (who had been released) back in and began re-interrogating him.

54.    The playbook was familiar: Officer Adams, Officer Simon, and Sergeant Lovier accused Mr. Jackson of committing the murder, and threatened to charge him with the crime if he did not inculpate Mr. Scott and Mr. Johnson.

55.    After several hours of being intimidated and threatened with life in prison, Mr. Jackson—who had a history of struggling with mental illness—agreed to change his story. He signed a new, false statement, prepared by Sergeant Lovier, that implicated Mr. Scott and Mr. Johnson in the murder.

### The Officers Concealed Evidence of Kendrick Scott's Innocence

56.    Mr. Burnette's and Mr. Jackson's statements were obviously false.

57.    The fabricated statements indicated that Mr. Johnson and Mr. Scott had set out to commit a robbery on the evening of May 8, 1999. But not a single possession of Lisa Kindred's was taken and there was no evidence of any attempted robbery.

58.    Mr. Burnette's statement indicated that Mr. Scott and Mr. Johnson had planned to kidnap Lisa because of an unpaid drug debt. But Lisa Kindred did not use drugs, Mr. Scott and Mr. Johnson did not know Lisa, and Mr. Scott and Mr. Johnson did not know the Kindred family would be in Detroit that evening.

59.    Mr. Burnette's statement claimed that Mr. Scott had confessed

12

to the killing at approximately 2:30 a.m. on May 9, 1999. But Mr. Scott was already in police custody by 2:30 a.m. on May 9, 1999.

60.    Both statements indicated that both Mr. Scott and Mr. Johnson were present at the scene when Lisa was shot. But C.J., who was sitting in the front seat of the car in which Lisa was murdered, only saw one man at the scene—who did not look like Mr. Scott or Mr. Johnson.

61.    Mr. Burnette's statement claimed that Mr. Scott had confessed to the shooting. But Mr. Jackson's statement claimed that Mr. Johnson had confessed to the shooting.

62.    Mr. Burnette later testified at trial that he saw Mr. Scott put a gun in the car at 7:00 or 8:00 a.m., the morning after the shooting.  But Mr. Scott was in custody at that time, as corroborated by Investigator Rodney Jackson's statement at trial that he saw Mr. Scott at the police precinct when he arrived for work at around 8:00 that morning.

63.    If these inconsistencies alone were not enough, Lisa's sister Jodi Gonterman, herself a police officer in Albuquerque, New Mexico, spoke to the DPD detectives on the case on May 10, 1999. She told the officers that, just a few months prior, Lisa told her that "if anything ever happened to [Lisa] she wanted [Jodi] to look at Will as a suspect."

64.    This should have been the end of the officers' campaign of

13

harassment of Mr. Scott and Mr. Johnson: only fabricated testimony linked them to the crime, while *Lisa herself* had pointed the finger at Will.

65. But instead of refocusing their investigation, the officers told Jodi "that they had already found out who killed [Lisa], and that Will did not have anything to do with it."

66. Officer Anthony Jackson wrote a statement for Jodi that omitted any mention of Lisa's warning about Will, and directed her to sign it.

67. The police concealed Jodi Gonterman's evidence.

68. Upon information and belief, not a single officer involved in the investigation revealed the true extent of Jodi Gonterman's knowledge to any prosecutor or defense attorney.

### *Lisa and Will's Marriage Was Marred by Domestic Violence and Abuse*

69. The domestic violence and Lisa's fear of Will should have been particularly important in pointing the investigation towards Will.

70. Studies have shown that approximately 55% of murders of women are committed by current or former romantic partners.[1]

71. Will had a well-documented history of abusing Lisa and their children. C.J., then just a child, saw Will beat Lisa regularly, often choking her.

---

[1] *See* Petrosky, et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003-2014*, Ctr. for Disease Control Morbidity & Mortality Weekly Report 66(28), 741-46 (July 2017), *available online at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6628a1.htm?s_cid=mm6628a1_w.

72.     In the two years before the murder, Lisa had called in seventeen domestic violence complaints about Will to the Roseville Police Department.

73.     In 1999, just months before her murder, Lisa had obtained a personal protection order against Will and had filed for divorce.

74.     Around that same time, Lisa expressed fear of Will to her ex-husband Charmous. She warned him just as she warned her sister Jodi: "Lisa also said that if anything ever happened to her, [Charmous] should not let the police exclude Will Kindred as a suspect."

75.     At a recent deposition in an action brought pursuant to Michigan's Wrongful Imprisonment Compensation Act, Will invoked his Fifth Amendment privilege against self-incrimination, refusing to answer any questions about Lisa's murder.

### The Detroit Police Department's Constitutional Violations Were Pervasive

76.     As shocking as DPD officers' conduct during their investigation of Lisa's murder was, it was far from an aberration; rather, it was emblematic of how the Department operated as a matter of course during this period of time.

77.     As Officer Adams confirmed under oath in a recent deposition, DPD had a practice at the time of "rounding up witnesses, arresting them, keeping them even though there might not be probable cause for their arrest." As Officer

Adams explained: "if people were at a crime scene, they were generally rounded up, arrested, interrogated or interviewed down at the squad headquarters."

78.     In 2000—the year after Lisa's murder—the federal Department of Justice opened an investigation into DPD's use of force, its arrest practices, and its treatment of material witnesses.

79.     The investigation found a "pattern or practice by DPD officers that deprives persons of rights, privileges, and immunities secured or protected by the Constitution or laws of the United States . . . ."

80.     In 2003, that investigation culminated in a civil enforcement action against the City of Detroit for DPD's pattern and practice of violating individuals' constitutional rights.

81.     On July 18, 2003, the civil enforcement action resulted in a consent decree in which DPD agreed to reform its arrest practices, interrogation techniques, and incident documentation protocols under the supervision of an independent monitor. This consent decree remained in place for over eleven years, ending in August 2014.

***The Officers Push for the Prosecution of Mr. Scott Based on False Evidence***

82.     Armed with nothing more than their fabricated witness statements, and with the inconvenient fact of Jodi Gonterman swept neatly under the rug, DPD officers presented the case to the Wayne County Prosecutor's Office.

83.     On May 12, 1999, the prosecution charged Mr. Scott and Mr.

Johnson with the murder of Lisa Kindred. Mr. Scott was also charged with assault

with intent to rob while armed, and felony firearm possession.

84.     Mr. Scott and Mr. Johnson were tried separately. Mr. Scott

elected to proceed to a jury trial, which commenced on May 30, 2000. Officer

Adams sat at the prosecutor's table during his trial.

85.     Trial lasted just two days; the prosecution's *only* evidence

connecting Mr. Scott to the murder was the coerced and fabricated testimony of

Mr. Burnette and Mr. Jackson.

86.     During the trial, the prosecutor had to repeatedly "refresh" Mr.

Burnette's "memory" with his fabricated statement.

87.     After deliberating for less than 90 minutes, the jury convicted

Mr. Scott on June 1, 2000. On June 21, 2000, Mr. Scott was sentenced to life in

prison. He would spend nearly twenty years in prison for a crime he did not

commit.

***Years of Postconviction Investigation Reveal the Fabrication and Suppression***

88.     From the beginning, Mr. Scott maintained his innocence. In

2011, he contacted the University of Michigan Innocence Clinic, which began to

further investigate Lisa's murder.

89.     Attorneys with the Innocence Clinic spent years locating

17

Antonio Burnette. When they finally found him, he told them about the violent and coercive interrogation that led to his false statement.

90.     The Innocence Clinic learned that Raymond Jackson had also recanted his testimony to his cousin Lameda Thomas before he died.

91.     The Innocence Clinic lawyers spoke with C.J., who reviewed a photo lineup and unequivocally stated that the man who shot his mother was neither Mr. Scott nor Mr. Johnson.

92.     The Innocence Clinic also spoke with Jodi Gonterman, who revealed the full nature of her statement to the police, rather than the false, abridged one she signed.

93.     Armed with a trough of new evidence, Mr. Scott filed a motion to vacate his conviction in December 2011.

94.     Over four days in 2015, the trial court held an evidentiary hearing on Mr. Scott's motion, which it went on to deny on August 7, 2015. The Michigan Court of Appeals affirmed this decision on May 31, 2016.

95.     In an opinion and order dated July 23, 2018, the Michigan Supreme Court reversed the Court of Appeals, finding that "[a]n examination of trial testimony alone indicates that the defendants' convictions were based on shaky grounds."

96.     On November 28, 2018, the Wayne County Prosecutor's Office

dismissed all charges against Mr. Scott and Mr. Johnson.

### *Mr. Scott, Though Free, Has Been Injured Beyond Measure*

97.     Although Mr. Scott has finally been vindicated, his victory rings hollow in the face of the twenty years of life he lost.

98.     In this case, justice delayed is truly justice denied. Mr. Scott spent, in total, approximately nineteen years and six months in prison for a crime he did not commit.

99.     Mr. Scott entered prison at the age of 20. He walked out at the age of 40, having missed the opportunity to finish school, have a career, or have meaningful family relationships. He is just now starting his life—twenty years behind his peers.

100.    It is simply too late for Mr. Scott to repair many of the social and familial relationships he had before his conviction. The mere fact that he was accused and convicted was enough to sour the majority of his relationships.

101.    While in prison, Mr. Scott was forced to live in inhumane conditions—he was denied privacy and subjected to daily humiliation and harsh treatment. He suffered greatly knowing he was in prison even though he was innocent. He spent long periods in solitary confinement.

102.    Mr. Scott continues to suffer from extreme emotional distress and anguish as a result of his unjust and unlawful conviction. He has nightmares

about his experience in prison, and cries frequently about how much of his life he
has lost.

103.   The stress of his twenty-year wrongful incarceration worsened
Mr. Scott's preexisting mental illnesses, which he continues to struggle with to this
day. Instead of receiving steady treatment and developing a care plan for his
mental health needs, Mr. Scott was denied access to proper medication and
consistent therapy, and his condition predictably worsened.

104.   As a direct result of the police fabricating and suppressing
evidence, Mr. Scott was denied the most basic of his constitutional and
fundamental human rights: his liberty.

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth/Fourteenth Amendments
Malicious Prosecution
(Against All Defendant Officers)

105.   Plaintiff repeats and realleges the above paragraphs as if the
same were fully set forth at length herein.

106.   Defendant Officers maliciously and without justification
commenced criminal proceedings against Plaintiff.

107.   Defendant Officers charged Plaintiff with crimes falsely,
maliciously, in bad faith, and without probable cause.

108.   Defendant Officers knew they lacked probable cause to
prosecute Plaintiff because of the evidence provided by Jodi Gonterman that Will

Kindred had committed the murder, which they suppressed, and because they fabricated Antonio Burnette's and Raymond Jackson's statements.

109. No reasonable detective or officer would have believed there was probable cause to prosecute Plaintiff under these circumstances.

110. All charges against Plaintiff were terminated in Plaintiff's favor upon the November 28, 2018 dismissal of the indictment against Plaintiff.

111. Defendant Officers acted under pretense and color of state law. Said acts by Defendant Officers were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendant Officers acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendment to the United States Constitution.

112. Defendant Officers' conduct was willful, wanton, and reckless.

113. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Denial of Due Process: Fabrication of Evidence
(Against Defendant Officers Pritchett, Adams, and Simon)

114. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

115. Defendant Officers Pritchett, Adams, and Simon initiated, or

21

caused the initiation of, criminal proceedings against Plaintiff.

116.  Defendant Officers Pritchett, Adams, and Simon created false information and fabricated evidence likely to influence the jury, including the fabricated testimony and witness statements of both Antonio Burnette and Raymond Jackson, which were procured through threats, coercion, and physical assault.

117.  The conduct of Defendant Officers Pritchett, Adams, and Simon in fabricating evidence proximately caused Plaintiff's detention and loss of liberty.

118.  Defendant Officers Pritchett, Adams, and Simon acted under pretense and color of state law. Said acts by Defendant Officers Pritchett, Adams, and Simon were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendant Officers Pritchett, Adams, and Simon acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendment to the United States Constitution.

119.  Defendant Officers Pritchett, Adams, and Simon acted willfully, wantonly, and recklessly.

120.  As a direct and proximate result of the conduct of Defendant Officers Pritchett Adams and Simon in fabricating evidence, Plaintiff sustained the

22

damages hereinbefore alleged.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fifth/Fourteenth Amendment
*Brady* Violation: Withholding Material Exculpatory Evidence
(Against All Defendant Officers)

121.   Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

122.   The full statement made by Jodi Gonterman was and is material exculpatory evidence. Had it been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at trial.

123.   Defendant Officer Jackson was aware of Jodi Gonterman's statement that Lisa Kindred had specifically feared being killed or injured by Will Kindred. He had a duty to accurately record this information and give this material, exculpatory evidence to the prosecutor so that it could be disclosed to the defense.

124.   Officer Jackson did not record Jodi Gonterman's full statement. Instead, Officer Jackson recorded a partial statement that omitted any reference to Lisa's fear of Will and produced that to the prosecution.

125.   Sergeant Pritchett, Officer Adams, and Officer Simon were all aware that they had assaulted, threatened, and coerced Antonio Burnette into signing his statement. They all had a duty to report the true circumstances of Antonio Burnette's interrogation to the prosecutor so that it could be disclosed to the defense.

23

126.   Sergeant Pritchett, Officer Adams, and Officer Simon did not

document the circumstances surrounding Antonio Burnette's interrogation,

including the coercion he was subjected to. They did not inform the prosecutor of

the threats, physical assault, and coercion that had led Antonio Burnette to sign the

statement implicating Mr. Scott and Mr. Johnson.

127.   Officer Adams, and Officer Simon were all aware that they had

threatened and coerced Raymond Jackson into signing his statement. They all had

a duty to report the true circumstances surrounding Raymond Jackson's

interrogation to the prosecutor so that it could be disclosed to the defense.

128.   Officer Adams, and Officer Simon did not document the

circumstances surrounding Raymond Jackson's interrogation, including the

coercion he was subjected to. They did not inform the prosecutor of the threats and

coercion that had led Raymond Jackson to sign the statement implicating Mr. Scott

and Mr. Johnson.

129.   Defendant Officers under pretense and color of state law.

Defendant Officers acted beyond the scope of their authority and jurisdiction to

willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights.

130.   As a direct and proximate result of Defendant Officers'

misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore

alleged.

## FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Failure to Intervene
(Against All Defendant Officers)

131. Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

132. To the extent that any Defendant Officer was not directly responsible for the withholding of exculpatory evidence, the fabrication of evidence, or the malicious prosecution described above, such Defendant Officers all had a realistic opportunity to intervene and prevent misconduct by the other Defendant Officers that caused preventable harm to Plaintiff.

133. Any reasonable officer in the position of the Defendant Officers would have known that Plaintiff's constitutional rights were being violated by the fabrication of evidence, withholding of exculpatory evidence, and/or the prosecution of Plaintiff without probable cause.

134. Not one Defendant Officer took a single step to intervene and prevent any of the constitutional violations suffered by Plaintiff.

135. Defendant Officers acted under pretense and color of state law. Defendant Officers acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights.

136. As a direct and proximate result of Defendant Officers' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore

25

alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against

Defendants as follows:

   a. Compensatory damages against all Defendants in an amount to

be determined at trial;

   b. Punitive damages against Defendant Officers in an amount to

be determined at trial;

   c. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §

1988; and

   d. Such other and further relief as this Court may deem just and

proper.

Dated: Detroit, Michigan
     November 18, 2019

          EMERY CELLI BRINCKERHOFF
          & ABADY LLP

          By: _____ /s/ _____

             Zoe Salzman
             Nick Bourland[2]

             600 Fifth Avenue, 10th Floor
             New York, NY 10020
             (212) 763-5000


          GOODMAN, HURWITZ & JAMES,
          P.C.

          By: _____ /s/ _____

             William Goodman

             1394 E. Jefferson Ave.
             Detroit, MI 48207
             (313) 567-6170

          *Attorneys for Plaintiff Kendrick Scott*

---

[2] Attorney Salzman is admitted to the Eastern District of Michigan; Attorney Bourland's admission is pending.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTLY JOHNSON, individually;

      Plaintiff,

                                No.

-v-                                 Hon.

CATHERINE ADAMS, in her individual
capacity; and BARBARA SIMON, in her
individual capacity;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, JUSTLY JOHNSON, individually by and

through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and

files his Complaint against the Defendants in this civil action, stating unto this

Court as follows:

      1.     This is an action for damages brought pursuant to 42 U.S.C. §§1983

and 1998, and the Fourth and Fourteenth Amendments to the United States

Constitution, against Defendants, CATHERINE ADAMS ("ADAMS"), in her

individual capacity, and BARBARA SIMON ("SIMON"), in her individual

capacity.

      2.     Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3.     Forum is proper based on the situs of the incident, which occurred in the City of Detroit.

4.     At all pertinent times Plaintiff, JUSTLY JOHNSON, was a United States citizen.

5.     At all pertinent times, Defendant, ADAMS, was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the City of Detroit, and was acting under color of law.

6.     At all pertinent times, Defendant, SIMON, was employed as a Sergeant by the Detroit Police Department ("DPD"), a department of the City of Detroit, and was acting under color of law.

7.     ADAMS and SIMON, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated, in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

## GENERAL ALLEGATIONS

8.     On Mother's Day, May 9, 1999, shortly after midnight, Lisa Kindred was shot and killed in her minivan in front of her three young children, including 8-year-old Charmous "CJ" Skinner, Jr.

9.    Earlier that night, on the evening on May 8, Ms. Kindred and her
husband, Will Kindred, had seen a drive-in movie in Dearborn with their three
young children, including the 10-day-old baby.  Mr. Kindred had convinced Lisa to
go to the movie despite her having delivered a baby just ten days earlier and
despite the fact that they lived in the City of Roseville, 45 minutes away from
Dearborn.  The family purportedly saw the movie "Life."

10.    Following the movie, at approximately 11:30 p.m., Will Kindred
announced that instead of driving home to Roseville, he needed to visit his brother-
in-law on the east side of Detroit to discuss selling the man his motorcycle.

11.    The family arrived at Will Kindred's brother-in-law's house at
approximately midnight.  Will Kindred parked the minivan on the street across
from his brother-in-law's house and went inside the house to discuss the sale of the
motorcycle.  He left Lisa, CJ, and his two other children, including the infant, in
the vehicle.

12.    When Will Kindred did not come out of the house for approximately
30 minutes, Lisa Kindred left the vehicle and knocked on the door.  Will responded
that he would be out shortly.  Lisa returned to the vehicle on the deserted street.

13.    Shortly after Lisa returned to the minivan, an unknown individual
walked up to the vehicle's driver side door and, without saying a word, fired a

single shot into Lisa Kindred's chest. The shooting was witnessed by young CJ, who had climbed into the front seat.

14.     After the lone assailant ran off, Lisa Kindred was able to put the vehicle into gear and drove off. She made it to a nearby gas station, where she exited, fell to the ground, and died. Autopsy results would later reveal that Lisa Kindred died of a single gunshot wound to the heart from a .22-caliber gun.

15.     Nothing was taken from Lisa Kindred.

16.     While in the house, Will Kindred heard a noise he would later describe as a car door slamming. He went to the front door and saw Lisa's vehicle speeding away. Instead of trying to locate Lisa, Will Kindred claimed that he saw a man running away through a field and gave chase. He did not catch the unknown individual.

17.     While investigating the murder scene on Bewick, police saw two men, Raymond Jackson and Kendrick Scott, nearby and arrested them, despite having no probable cause for the arrest. This was an illegal, yet widespread, custom and practice in the DPD that led to federal government oversight of the department in *United States v. City of Detroit*, No. 03-72258 (E.D. Mich. June 12, 2003).

18.     Combing through the neighborhood at approximately 8:30 a.m., the police found Antonio Burnette sleeping in Kendrick Scott's car outside Scott's house. They put Burnette in handcuffs and took him to police headquarters

although they had no probable cause to suspect he was involved in the Lisa
Kindred murder.

19.     Antonio Burnette was interrogated by police for hours on May 9.
ADAMS and SIMON told Burnette that he would face murder charges for Lisa
Kindred's death if he did not implicate others, despite ADAMS' and SIMON's
knowledge and belief that Burnette and Raymond Jackson were not involved with
the murder. Burnette was also punched in the face by a male police officer while
ADAMS, the Officer-in-Charge of the investigation, and SIMON, watched.

20.     Subjected to the physical abuse and threats of being charged with Lisa
Kindred's murder, Burnette wrote a police statement at 2:20 p.m., telling police
that he saw "Snoop" (Scott) and "Stank" (Johnson) at approximately 2:30 a.m., on
May 9 and "Snoopy said he shot the lady while trying to get some money. He had
a phone bill to pay. Stank said Snoopy shot the lady too." He then added that
Johnson and Scott said they planned to "kidnap this bitch named Lisa" because she
owed "Snoop" (Scott) some money for drugs.

·  21.     ADAMS, as OIC of the investigation, knew that Lisa Kindred did not
use or buy drugs. ADAMS had no evidence that Lisa Kindred had any connection
to Justly Johnson or Kendrick Scott; therefore, she had no evidence to suggest that
Burnette's statement was true.

22.    ADAMS also knew that Burnette's story could not be true because she knew Scott had been taken into police custody at 1300 Beaubien long before 2:30 a.m.

23.    In fact, Burnette's statement was not true, since it had been manufactured by ADAMS and SIMON to obtain probable cause for the arrest warrant.

24.    Burnette was shown a handwritten statement and told to sign his name at the bottom of each page.  Burnette, a 16-year-old middle school dropout who was illiterate, told the officers he could not read.  The officers told Burnette to sign the pages anyway.  Burnette complied.

25.    On May 9, 1999, at 5:10 a.m., Raymond Jackson, who had been with Kendrick Scott when Scott was arrested, gave his first statement to police.  Jackson told police that he had been drinking heavily and had smoked a large amount of marijuana.  He stated that he had seen Scott on that night and that Scott told him he had seen two men in the neighborhood with guns.

26.    On May 10, police again brought Jackson in for more "interrogation."  This time, however, ADAMS and SIMON, along with Sgt. Arlie Lovier, accused Jackson of the murder and told him that he would be charged unless he implicated Scott and Johnson.

6

27.     ADAMS and SIMON then supplied Jackson with "facts" they invented to provide probable cause to arrest Johnson and Scott, including that Jackson "saw" Scott hand something long and wrapped in clothing to Scott's then-girlfriend, Falyn Kenner, the implication being that it was a long gun.

28.     Faced with the possibility of being falsely accused of murder, Jackson changed his story and gave another statement to police. The statement, made at 6:00 p.m. on May 10, 1999, 36 hours after the first statement, began *"Yesterday morning, you gave a statement regarding the shooting on Bewick. Is there anything you want to add to that statement?"* Jackson's ensuing statement, made as a result of threats and coercion from ADAMS and SIMON, included facts supplied to him by ADAMS and SIMON, including that Jackson had seen Mr. Scott hand something long and wrapped in clothing to Scott's girlfriend on the night of the murder. Jackson's statement also included the "fact" that Justly Johnson came to his house and stated that he and Scott had *"did a lick last night and I fucked up and had to shoot."*

29.     During their interrogation of Johnson and Scott, the DPD homicide detectives went so far as to admit they were going to charge the two men whether they were guilty or not. Homicide detective, SIMON, threatened Justly Johnson with murder charges if he didn't confess: *"I don't care if you did it or not. We will charge you with murder anyway. The mayor is putting pressure on my boss, who*

7

*is putting pressure on us. No jury in America won't convict a black kid for killing a white woman!"*

30.    At the time Johnson and Scott were arrested, ADAMS knew the following evidence:

      a.    That there was only a single shooter;

      b.    That Lisa Kindred died of a single gunshot wound to the chest;

      c.    That Jackson's second statement had Justly Johnson confessing to the shooting;

      d.    That Burnette's statement had Scott confessing to the shooting;

      e.    That Scott was already in police custody when Burnette said he met with Johnson and Scott at 2:30 a.m.;

      f.    That both Jackson and Burnette had both admitted to drinking heavily and consuming drugs in the evening of May 8 and early morning hours of May 9;

      g.    That Jackson and Burnette's statements were fabricated, having been the result of threats, assault, and coercion by DPD members including ADAMS and SIMON.

31.    Johnson and Scott were tried separately.  Johnson elected a bench trial; Scott chose to be tried before a jury.

32.    ADAMS, the OIC, sat at the prosecutor's table throughout the duration of both trials.

33.    ADAMS deliberately chose not to tell the prosecutor, Elizabeth Walker, that Lisa Kindred's sister, Jodi Gonterman, an Albuquerque, New Mexico,

police officer, had told ADAMS shortly after the killing that her sister, Lisa, told

Jodi that if anything bad happened to her, the culprit would be Will Kindred.

34.     Had ADAMS disclosed this exculpatory and impeachment ("*Brady*")

evidence to the prosecutor, the prosecutor would have turned the evidence over to

defense counsel, as she had a constitutional obligation to do so.

35.     ADAMS also deliberately chose not to tell the prosecutor the fact that

the Burnette and Jackson statements and testimony were fabricated, having been

the result of physical violence, threats and coercion.  Such evidence would have

destroyed the credibility of the entire investigation, including the testimony of the

prosecution's star witnesses.  It would have destroyed the State's theory of the

crime; namely, that the murder was the result of a "robbery gone bad."

36.     The Jodi Gonterman statement would have been apparent *Brady*

evidence to any reasonable detective as it would have been exculpatory evidence

that would point the blame at an alternative suspect, i.c., Will Kindred.

37.     Had the Jodi Gonterman statement been disclosed, any reasonable

defense attorney would have researched the marital history of Will and Lisa

Kindred and discovered the 17 domestic violence police calls over the two-year

period before the murder, each involving Will Kindred's violence against Lisa

Kindred and Charmous "C.J." Skinner, Jr., Lisa's eight-year-old son with

Charmous Skinner, Sr.

9

38.   The Gonterman statement would have led any reasonable defense attorney to seek legal filings between the couple in Macomb County Circuit Court, which would have revealed Lisa Kindred's 1998 divorce complaint and personal protection order issued against Will Kindred one year before the murder.

39.   The Gonterman statement and Roseville PD domestic violence calls would have led any reasonable attorney to question Charmous Skinner, Sr., about the domestic violence incidents involving Will Kindred and Charmous' son, C.J. This would have led to Charmous Skinner, Sr.'s statement that Lisa Kindred also told him that if anything happened to Lisa, Will Kindred would be the responsible party. Such a statement would have been apparent exculpatory evidence to any reasonable police officer, as it would have pointed to Will Kindred as the true suspect in a "murder for hire" scenario.

40.   The Gonterman statement and Roseville PD domestic violence calls would have led any reasonable attorney to question C.J. Skinner, Jr., about the domestic violence incidents involving Will Kindred and C.J.'s recollection of the events of May 9, 1999, when his mother was shot to death in front of him.

41.   Questioning young C.J. Skinner would have led to the exculpatory testimony from C.J. Skinner that eluded Johnson and Scott for almost two decades.

42.   The DPD detectives, including ADAMS and SIMON, having coerced Burnette and Jackson to implicate JOHNSON and SCOTT, deliberately chose not

to investigate Will Kindred, the marital relationship, or Kindred's background. Instead, they cleared him as a suspect <u>within three hours of the murder</u>.

43.     Clearing Will Kindred as a suspect allowed Kindred to collect on his wife's life insurance policy within six weeks of her death.

44.     At a recent deposition in connection with Plaintiff's exoneration, Will Kindred, through his attorney, asserted his Fifth Amendment privilege against self-incrimination for anything connected to his wife's death.

45.     The Burnette and Jackson statements were manufactured to simply close the case, as FBI statistics from that time period showed the DPD Homicide Section closed less than half of the murders in the City of Detroit, near the bottom for any large city in America.

46.     "Closing the case," a statistic measured by the DPD for crime statistic purposes, meant obtaining a confession or getting an arrest warrant signed by the prosecutor. Manufacturing probable cause to obtain signed arrest warrants would enable a case to be "closed" for police purposes, thereby increasing the Homicide Section's success rate.

47.     Manufacturing probable cause to close a case "by any means necessary" was a widespread custom and practice in the Homicide Section of the DPD.

48.     The prosecutor's <u>entire case</u> was dependent upon the manufactured testimony of Burnette and Jackson, as there was no physical evidence linking the men to the murder, no eyewitness identifications, and no confessions.

49.     In *People v Scott*, the prosecutor, Elizabeth Walker, stressed the importance of Burnette and Jackson's credibility in her closing argument, claiming they were the key witnesses who had not been coerced:

> We have the testimony of Raymond Jackson and Antonio Burnette and it's no secret. I told you at the beginning those were going to be some of the key players, some of the key witnesses in this case.
>
> Though Antonio and Raymond may not be the nicest people you've ever seen, the question you have to ask is whether or not the testimony they have given to you is reliable and credible. Now, if you find that it is, then there's not going to be a whole lot of talk. If so then it means he's telling you the truth about Snook – they're telling you the truth about what Snook and Stank said. Now, why would they say it if it wasn't so. *They're not under any compulsion. This is not some TV type police rubber hose interrogation out of a 1930 late night movie.* These are people (Johnson and Scott) talking to their friends in what they believe is a safe and secured environment.
> (*People v Scott*, 6-1-00, pp. 26; 34-35) (emphasis added)

50.     In *People v Johnson*, Prosecutor Walker stressed in her closing argument that the two witnesses had not been coerced or forced into giving their testimony:

> Now, what's curious is, both Antonio Barnett and Raymond Jackson, who don't appear to have any connection with each other whatsoever other than through Snoop and Stank, both say these individuals hit a lick or told them that they had, and that there was a shooting that occurred in connection with hitting that lick. Both these individuals make reference to the statements being made after the shooting on

Bewick, the evening, early morning hours of the shooting and the next
one the next day after the shooting. *That's the crux of this case, that's
what connects this defendant to the shooting on Bewick, his own lips,
his own words he says to friends of his under circumstances which he
has no reason to lie to them. It's not a question of any kind of police
coercion,* nobody's forced him to make these statements. He's talking
to people that he believes for one reason or another he can trust. Why
would he say this if it wasn't so?

(*People v. Johnson*, 1-12-00, p. 11) (emphasis added).

51.     Judge Prentis Edwards, the trier-of-fact in the Johnson trial, also

stressed the importance of Burnette and Jackson's testimony and their credibility:

"The question here is of credibility. And again, the key witnesses are Jackson and

Barnett." (*People v. Johnson*, 1-12-00, p. 28)

52.     Burnette and Jackson's false testimony, both of whom claimed that

Plaintiff admitted to them Lisa Kindred's death was the result of a botched

robbery, was the result of threats and coercion by Defendants, ADAMS and

SIMON.

53.     Because ADAMS deliberately withheld from prosecutor Walker that

the Burnette and Jackson statements were manufactured, Walker unwittingly

stressed that there was no *"TV type police rubber hose interrogation out of a 1930*

*late night movie."* However, the United States Supreme Court has recognized for

at least 78 years *"that coercion can be mental as well as physical, and that the*

*blood of the accused is not the only hallmark of an unconstitutional inquisition. A*

*number of cases have demonstrated, if demonstration were needed, that the*

13

*efficiency of the rack and the thumbscrew can be matched, given the proper*

*subject, by more sophisticated modes of 'persuasion.'" Blackburn v. Alabama*, 361

U.S. 199, 206 (1960) (citing *Chambers v. Florida*, 309 U.S. 227 (1940)).

54.     On January 12, 2000, following a bench trial in front of the Hon.

Prentis Edwards, Justly Johnson was found guilty of one count of Felony Murder;

one count of Assault with Intent to Rob While Armed; and one count of Felony

Firearm.

55.     On January 26, 2000, Johnson was sentenced to spend the rest of his

life in prison without the possibility of parole.

56.     On June 1, 2000, a Wayne County jury convicted Kendrick Scott of

one count of Felony Murder; one count of Assault with Intent to Rob While

Armed; and one count of Felony Firearm.

57.     On June 21, 2000, Kendrick Scott was given a life sentence without

the possibility of parole.

## POST-CONVICTION EVENTS

58.     Following years of unsuccessful appeals, the University of Michigan

Innocence Clinic took over the case and filed a motion to set aside the verdict. The

trial court, having already pre-determined the outcome, denied Plaintiff's motion

for relief from judgment, which was affirmed by the Court of Appeals. The

Michigan Supreme Court, however, overturned the Court of Appeals' decision

14

supporting the trial court's denial of the motion for relief from judgment. The case was remanded for an evidentiary hearing.

59.     The trial court held an evidentiary hearing in the spring of 2015. Newly discovered evidence presented to the judge included Lisa Kindred's now-adult son, C.J. Charmous, Jr., who testified that he would could not forget the face of the man who shot his mother and that he was sure that Justly Johnson and Kendrick Scott were not the shooters.

60.     C.J. testified that he was never contacted by anyone regarding the shooting until years later, when former WXYZ and Fox 2 investigative reporter, Scott Lewis, contacted him. He testified that the police had never contacted him.

61.     Other newly-discovered evidence included the affidavit of Jodi Gonterman, the victim's sister, who stated in her affidavit that Lisa told Jodi if anything ever happened to Lisa, Will Kindred would be responsible.

62.     One of the original trial's star-witnesses, Antonio Burnette, testified at the evidentiary hearing. He recanted his prior identification, saying he was threatened by the police into falsely implicating Johnson and Scott.

63.     Burnette stated that he was locked up for 3-4 days and wasn't given any water or food for over one day while being interrogated, although he was supposedly not a suspect. He has stated that he was physically assaulted and

15

threatened with being charged with the Lisa Kindred murder if he didn't implicate Johnson and Scott.

64.     Another piece of newly-discovered evidence was the affidavit of C.J. Charmous, Sr., who stated in his affidavit that Lisa Kindred told him if something bad should befall her, Will Kindred would be responsible.

65.     Police records from the City of Roseville were entered into the evidentiary hearing record, as well as Lisa Kindred's divorce Complaint filed one year before her murder.  The documents painted a dark picture of domestic violence perpetrated by Will Kindred on his wife, leading her to file for divorce and seek a Personal Protection Order.

66.     Following the hearing, the trial court denied relief from judgment.  The trial court, however, concluded that the murder was likely the result of a planned "hit" set up by Will Kindred, not the "armed robbery gone bad" proffered by the prosecutor.[1]  The trial judge also discredited CJ Skinner, Jr's testimony, finding that CJ was likely asleep and that he could not have seen the outside of the minivan where the shooter stood because the dome light was illuminating the interior of the vehicle.

---

[1]  In a lawsuit brought by the Plaintiff to secure compensation under Michigan's Wrongful Imprisonment Compensation Act, MCL 691.1751 et seq., Will Kindred asserted his 5th Amendment right against self-incrimination and refused to answer any questions about the murder of his wife.

16

67.    On May 31, 2016, the Court of Appeals affirmed the trial court's denial of relief from judgment.

68.    The Supreme Court accepted leave and, in an opinion authored by Justice Richard Bernstein on July 23, 2018, reversed the lower courts and vacated the convictions, granting a new trial based on the newly discovered evidence.

69.    On November 28, 2018, the Wayne County Prosecutor's Office dismissed criminal charges against Justly Johnson and Kendrick Scott. From the date of their arrests on May 9, 1999 to their exoneration on November 28, 2018, each man had spent **7,144 days, or 19 years, 6 months, and 20 days**, in jail or prison for a murder neither man committed.

70.    But for Defendants' conduct, as set forth below, there would have been no probable cause for an arrest warrant, much less a trial and conviction.

71.    Due to the conduct of Defendants, ADAMS and SIMON, as set forth below, Plaintiff, Justly Johnson, suffered the following injuries and damages:

      a.    Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over nineteen years, including significant time spent in solitary confinement;

      b.    Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with first-degree murder and felony-firearm, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew he did not commit;

      c.    Physical manifestations of emotional distress including, but not

17

limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.    Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e.    Loss of enjoyment of daily activities;

f.    Not being able to attend the funerals of several family members;

g.    Physical injuries suffered in prison;

h.    Loss of employment opportunity, past income, and future earning capacity;

i.    Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

j.    Many of Plaintiff's injuries and damages are likely to be permanent;

k.    Other damages which may be revealed through discovery.

## COUNT I

### 4th and 14th AMENDMENT "FABRICATION OF EVIDENCE" BY DEFENDANTS ADAMS AND SIMON

72.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

73.    At all times, Plaintiff had a constitutional right, secured by the 4th and

18

14th Amendments, not to be seized and deprived of liberty as a result of fabrication

of evidence by a government officer acting in an investigative capacity.

74.    At all times, Plaintiff had a constitutional right, secured by the 14th

Amendment, not to be deprived of due process as a result of fabrication of

evidence by a government officer, including a police officer, acting in an

investigative capacity.

75.    Plaintiff's constitutional 4th Amendment and due process rights

to be free from illegal seizure and continued detention based upon

fabrication of evidence by a governmental official acting in an investigatory

capacity was clearly established before May 9, 1999, the earliest possible

date for Defendants' conduct in this case. *Albright v. Oliver*, 510 U.S. 266,

274; 114 S.Ct. 807; 127 L.Ed.2d 114 (1994) (malicious prosecution of an

individual and continued detention of an individual without probable cause

clearly violate rights afforded by the Fourth Amendment, citing cases back

to the 1940s); *See also Napue v. Illinois*, 360 U.S. 264, 269; 79 S.Ct. 1173

(1959) (14th Amendment right not to be deliberately subjected to trial based

on "false evidence" is "implicit in any concept of ordered liberty.")

76.    ADAMS and SIMON deliberately and knowingly fabricated evidence

in order to manufacture probable cause and secure a conviction. ADAMS' and

SIMON's fabrication of evidence included securing false witness identification by

Raymond Jackson and Antonio Burnett by using physical beatings, threats and coercion.

77.    ADAMS' and SIMON's deliberate and knowing fabrication of evidence to manufacture probable cause for Johnson's arrest resulted in his pre-conviction deprivation of liberty and continued detention from his arrest on May 9, 1999, to his conviction on January 12, 2000; a period of 249 days, or 8 months and 4 days.

78.    ADAMS' and SIMON's deliberate and knowing fabrication of evidence to continue Johnson's detention caused a violation of his right to be free from illegal seizure and continued detention and resulted in his wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months and 17 days.

79.    Plaintiff's total time spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days.**

80.    Plaintiff's cause of action for fabrication of evidence became complete when the criminal case against him was terminated in his favor with charges being dismissed on November 28, 2018. *See McDonough v. Smith,* -- U.S. --; -- S.Ct. --; 2019 WL 2527474 (June 20, 2019).

## COUNT II

### 4TH AMENDMENT MALICIOUS
### PROSECUTION BY DEFENDANTS

81.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

82.    At all times, Plaintiff had a clearly-established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence and knowingly-made false statements or material omissions by a government officer, including a police officer, acting in an investigative capacity in order to manufacture probable cause. *Franks v. Delaware*, 438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d 667 (1978); *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.")

83.    Defendants, ADAMS and SIMON, influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly fabricated evidence to secure Plaintiff's arrest and continued detention. ADAMS further influenced the prosecution by falsely stating on the Investigator's Report/Warrant Request that Jackson and Burnette identified Plaintiff as the murderer, which was material to a finding of probable cause.

84.    ADAMS further influenced or participated in the initiation of criminal

21

prosecution and Plaintiff's continued detention when she knowingly omitted

material facts (that the Burnette and Jackson statements implicating Plaintiff were

the result of physical violence, threats and coercion) in her warrant request to the

warrant prosecutor and judge who signed the arrest warrant.

85.  But for Defendants' fabrication of evidence and ADAMS' false

statements and material omissions on the Warrant Request, statements to

prosecutors and the judge who signed the arrest warrant, and at the Preliminary

Exam, probable cause would have been lacking; such conduct constituting a claim

of federal "malicious prosecution" under the 4th Amendment.

86.     Plaintiff suffered a deprivation of liberty in excess of 19 years because

of Defendants' conduct.

87.     Plaintiff's cause of action for federal malicious prosecution became

complete when the criminal case against him was terminated in his favor with

charges being dismissed on November 28, 2018.

88.     Plaintiff's constitutional right to be free from illegal seizure and

continued detention without probable cause based upon fabrication of evidence,

knowingly-made false statements and/or omissions of materials facts by a

governmental official acting in an investigatory capacity, including police officers,

was clearly established before May 9, 1999, the earliest possible date for police

misconduct. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n

officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").

89.     Defendants' deliberate false statements and deliberate and/or reckless omissions of material facts was not intended to bring to justice the true perpetrator of the crime.  Instead, Defendants' conduct was intended to secure Plaintiff's arrest and conviction to improve the homicide closure rate, which was abysmally low, and to escape the pressure being put on the DPD by the mayor's office.

90.     Defendants' intentional and/or reckless conduct was a direct and proximate cause of Plaintiff's pre-conviction deprivation of liberty and continued detention from his arrest on May 9, 1999, to his conviction on January 12, 2000; a period of 249 days, or 8 months and 4 days.

91.     Defendants' intentional and/or reckless conduct was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months, and 17 days.

92.     Plaintiff's total time spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days**.

Case 2:19-cv-12331-PDB-EAS   ECF No. 1   filed 08/06/19   PageID.24   Page 24 of 27

## COUNT III

### 14TH AMENDMENT DUE PROCESS
### *"BRADY"* VIOLATIONS BY DEFENDANT ADAMS

93.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

94.    At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

95.    Defendant, ADAMS, deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence in her files to the prosecutor in violation of her constitutional obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process *"Brady* violation"* under the 14th Amendment.

96.    ADAMS deliberately and knowingly chose not to disclose to the prosecutor or defense before trial that she fabricated evidence by manufacturing the Antonio Burnette and Raymond Jackson statements, which were material to a finding of probable cause.

97.    ADAMS deliberately and knowingly chose not to disclose to the prosecutor or defense before trial that she knew Jodi Gonterman made a statement

24

to police that Lisa Kindred said if anything bad happened to her, Will Kindred would be the culprit.

98.     Plaintiff's right to *Brady* evidence, and the police officer's constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before January of 2000, when he was tried and convicted. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

99.     ADAMS' knowing and intentional due process violations resulted in Plaintiff's wrongful conviction and imprisonment from January 12, 2000, to his exoneration on November 28, 2018; a period of 6,896 days, or 18 years, 10 months, and 17 days.

100.   The total time Plaintiff spent behind bars in jail and prison totaled **7,144 days, or 19 years, 6 months, and 20 days.**

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff, JUSTLY JOHNSON, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a. Past and future compensatory damages against all defendants in a minimum amount of Fifty Million Dollars **($50,000,000.00)**;

b. Punitive damages as to Defendant, ADAMS, in a minimum amount of Thirty Million Dollars **($30,000,000.00)**;

c.  Punitive damages as to Defendant, SIMON, in a minimum amount of Twenty Million Dollars (**$20,000,000.00**);

d.  Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

e.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

f.  Such other and further relief as appears just and proper.


                              *s/Wolfgang Mueller*
                              MUELLER LAW FIRM
                              Attorney for Plaintiff
                              41850 W. 11 Mile Road, Ste. 101
                              Novi, MI 48375
                              (248) 489-9653
                              wolf@wolfmuellerlaw.com
                              (P43728)

Dated: August 6, 2019

## JURY DEMAND

Plaintiff demands a jury trial in the above-captioned matter.

_s/Wolfgang Mueller_
MUELLER LAW FIRM
Attorney for Plaintiff
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated: August 6, 2019