# EXHIBIT 10

**SIMON, OFFICER BARBARA JEAN**
07/20/2020                                                             Pages 1–4

---

**Page 1**

```
 1        IN THE DISTRICT COURT OF THE UNITED STATES
 2          FOR THE EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   KENDRICK SCOTT,
 6                    Plaintiff,
 7          vs.              Case No. 19-Civ.12718 (PDB)
 8                           Hon. Paul D. Borman
 9   DETROIT POLICE DEPARTMENT
10   ("DPD") SERGEANT WAYNE
11   PRITCHETT; DPD OFFICER
12   CATHERINE ADAMS; DPD OFFICER
13   BARBARA SIMON; and DPD
14   OFFICER RODNEY JACKSON,
15                    Defendants.
16   -----------------------------------/
17   JUSTLY JOHNSON, Individually,
18                    Plaintiff,
19        -against-        Case No. 19 Civ 12331 (PDB)
20                         Hon: Paul D. Borman
21   CATHERINE ADAMS, in her
22   individual capacity; and
23   BARBARA SIMON, in her individual
24   capacity;
25                    Defendants.
```

---

**Page 2**

```
 1                        /
 2
 3
 4          The Remote Deposition of
 5          OFFICER BARBARA JEAN SIMON,
 6          REMOTE PROCEEDING,
 7          Commencing at 10:21 a.m.,
 8          Monday, July 20, 2020,
 9          Before Sabrina Smith, CSR-2129.
10
11   REMORE APPEARANCES:
12
13   NICK BOURLAND
14   ZOE SALZMAN
15   Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP
16   600 Fifth Avenue
17   10th Floor
18   New York, New York 10020
19   212.763.5000
20   nbourland@ecbalaw.com
21   zsalzman@ecbalaw.com
22        Appearing on behalf of the Plaintiff
23        Kendrick Scott.
24
25
```

---

**Page 3**

```
 1
 2   WOLFGANG MUELLER
 3   Mueller Law Firm
 4   41850 W. 11 Mile Road
 5   Suite 101
 6   Novi, Michigan 48375
 7   248.489.9653
 8   wolf@wolfmuellerlaw.com
 9        Appearing on behalf of the Plaintiff
10        Justly Johnson.
11
12   MICHAEL M. MULLER
13   City of Detroit Law Department
14   2 Woodward Avenue
15   Suite500
16   Detroit, Michigan 48226
17   313.237.5052
18   mullm@detroitmi.gov
19        Appearing on behalf of the Defendants.
20
21
22
23
24
25
```

---

**Page 4**

```
 1                  TABLE OF CONTENTS
 2
 3   WITNESS                              PAGE
 4   OFFICER BARBARA JEAN SIMON
 5
 6   EXAMINATION
 7   BY MS. SALZMAN:                        6
 8   EXAMINATION
 9   BY MR. MUELLER:                      106
10   EXAMINATION
11   BY MR. MULLER:                       115
12   RE-EXAMINATION
13   BY MS. SALZMAN:                      120
14
15                  EXHIBITS
16
17   EXHIBITS                             PAGE
18   (Exhibits retained.)
19
20   DEPOSITION EXHIBIT 61                 37
21   DEPOSITION EXHIBIT 85                 52
22   DEPOSITION EXHIBIT 64                 63
23   DEPOSITION EXHIBIT 65                 65
24   DEPOSITION EXHIBIT 66                 71
25   DEPOSITION EXHIBIT 67                 80
```

---

SIMON, OFFICER BARBARA JEAN
07/20/2020

**Page 5**

```
1   DEPOSITION EXHIBIT 60              89
2   DEPOSITION EXHIBIT 63              95
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

```
1   Oakland County, Michigan
2   Monday, July 20, 2020
3   10:21 a.m.
4              THE COURT REPORTER:  The attorneys
5      participating in this deposition acknowledge that I am
6      not physically present in the deposition room and that
7      I will be reporting this deposition remotely.  They
8      further acknowledge that, in lieu of an oath
9      administered in person, the witness will verbally
10     declare her testimony in this matter is under penalty
11     of perjury.  The parties and their counsel consent to
12     this arrangement and waive any objections to this
13     manner of reporting.
14              Please indicate your agreement by stating
15     your name and your agreement on the record.
16              MS. SALZMAN:  On behalf of the plaintiff,
17     Kendrick Scott, this is Jodi Salzman, and we agree.
18              MR. MULLER:  On behalf of the defense, Mike
19     Muller, Consent.
20              OFFICER BARBARA JEAN SIMON,
21     Was thereupon called as a witness herein, and after
22     having first been duly sworn to testify to the truth,
23     the whole truth and nothing but the truth, was
24     examined and testified as follows:
25              EXAMINATION
```

**Page 7**

```
1   BY MS. SALZMAN:
2   Q.  Good morning, Ms. Simon.
3   A.  Good morning.
4   Q.  My name is Zoe Salzman.  I'm a lawyer in a law firm
5       called Emery, Celli, Brinckerhoff, Abady, Ward and
6       Maazel, and with me on the deposition today is my
7       colleague, Nick Bourland.  We represent a man named
8       Kendrick Scott who is the plaintiff on this matter.
9       Also one the line is --
10              MR. MULLER:  Before you go any further, can
11      I just put something on the record?
12              MS. SALZMAN:  Sure.
13              MR. MULLER:  Last night we received
14      deposition exhibits.  My colleague, Pat Cunningham,
15      got an email giving him deposition exhibits, one of
16      which is a deposition transcript from the Sanford
17      case, which is like 350 pages long.  My client has not
18      had an opportunity to review that 350 pages, and
19      neither have I, having just received it this morning.
20      So I just want the record to be clear regarding that
21      and that we object to that being used as an exhibit.
22              MS. SALZMAN:  Okay.  Well, for the record,
23      we're doing this deposition remotely, which is why
24      exhibits were emailed to you in advance.  And if we
25      were doing this in the traditional format and I was in
```

**Page 8**

```
1       the room with you, you wouldn't have received any of
2       the exhibits in advance, so your objection is noted
3       for the record, but I don't believe it has any
4       foundation.
5   BY MS. SALZMAN:
6   Q.  Also on the line, Ms. Simon, is Wolf Mueller who
7       represents a man named Justly Johnson who's the other
8       plaintiff in this case.  I'm going to start by asking
9       you some questions and then Mr. Mueller may ask some
10      questions as well, okay?
11  A.  Okay.
12  Q.  Now, you've been sued before, Ms. Simon, correct?
13  A.  Yes.
14  Q.  In your capacity as a DPD officer, am I right that
15      you've been sued at least 16 times for civil rights
16      violations?
17  A.  I don't know how many.
18              MR. MULLER:  Alleged civil rights
19      violations.
20              THE WITNESS:  And I don't know how many
21      times.  I don't know.
22  BY MS. SALZMAN:
23  Q.  You don't have any way of keeping track of those?
24  A.  No, ma'am.
25  Q.  Okay.  Does that sound about right to you, though, 16
```

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 9–12

Page 9

1       times?
2  A.  I don't know.
3  Q.  Have you ever sued anyone before?
4  A.  Have I ever sued anyone?
5  Q.  Correct.
6  A.  No.
7  Q.  Okay.  How many times have you given a deposition like
8       this?
9  A.  Two times, I believe.
10  Q.  Were both those times in connection with your work as
11      a DPD officer?
12  A.  Yes.
13  Q.  And were both those times in cases where you were
14      alleged to have committed civil rights violations in
15      your work as a DPD officer?
16  A.  Yes.
17  Q.  So you understand that you took an oath to tell the
18      truth today, correct?
19  A.  I just did, ma'am.
20  Q.  Pardon me?
21  A.  I just did.
22  Q.  Okay.  And you understand that oath has the same
23      effect as if you were testifying in court, correct?
24  A.  I realize that, yes.
25  Q.  Okay.  Is there any reason, sitting here today, why

Page 10

1       you can't testify truthfully?
2  A.  No.
3  Q.  Have you ever testified in court before?
4  A.  Of course.
5  Q.  How many times?
6  A.  Dozens of times, ma'am.  I don't keep a record of how
7      many times I went to court.
8  Q.  Was that all in your capacity as a DPD officer?
9  A.  Yes, ma'am.
10  Q.  Okay.  Have you ever testified in court other than in
11      your capacity as a DPD officer?
12  A.  I don't think so.  I don't recall.
13  Q.  Have you ever been found to have provided untruthful
14      testimony under oath?
15  A.  No, ma'am.
16  Q.  What'd you do to prepare for today's deposition,
17      Ms. Simon?
18  A.  What'd you mean, what'd I do to prepare?
19  Q.  What did you do to prepare for today's deposition?
20  A.  Came down here for the deposition.
21  Q.  Did you meet with your attorneys before the
22      deposition?
23  A.  No, ma'am.  Well, this morning, I'm sorry, this
24      morning I did.  I'm sorry.
25  Q.  How long did you meet with your attorneys this

Page 11

1       morning?
2  A.  About a half an hour.
3  Q.  Other than this morning, have you met with your
4      attorneys on any other occasion to prepare for today's
5      deposition?
6  A.  No, ma'am.
7  Q.  Did you review any documents to prepare for the
8      deposition?
9  A.  I have no documents, ma'am.
10  Q.  All right.  Leaving aside whether you have any
11      documents in your personal possession, have you
12      reviewed any documents to prepare for today's
13      deposition?
14  A.  I reviewed one, yes.
15  Q.  What was that?
16  A.  It was a witness statement that was dated for
17      5-10-1999.
18  Q.  Who gave that --
19  A.  I just --
20  Q.  I'm sorry, go ahead, ma'am.
21  A.  Justin Johnson.
22  Q.  Justly Johnson?
23  A.  Justly, Justly Johnson, I'm sorry.
24  Q.  Is that a witness statement you filled out?
25  A.  Yes, ma'am.

Page 12

1  Q.  And is that a witness statement that you filled out
2      the top portion and the rest of it is blank?
3  A.  That's correct.
4  Q.  So we're going to take a look at that document later
5      today, but for now let me just ask you:  Other than
6      that witness statement, are there any other statements
7      you prepared to give a deposition today?
8  A.  No, ma'am.
9  Q.  Have you ever been arrested, Ms. Simon?
10  A.  No, ma'am.
11  Q.  Have you ever pled guilty to a crime?
12  A.  No ma'am.
13  Q.  Have you ever been convicted of a crime?
14  A.  No, ma'am.
15  Q.  What is your highest level of education?
16  A.  Associate' degree.
17  Q.  When did you earn that?
18  A.  Oh, I don't know.  Years ago, ma'am.
19  Q.  What did you get the degree in?
20  A.  Law enforcement.
21  Q.  Where did you get it, what school?
22  A.  Wayne County Community College.
23  Q.  Did you get that degree before you started working for
24      DPD?
25  A.  Yes, ma'am.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 13–16

**Page 13**

1  Q.  Did you go to the police academy?
2  A.  Yes.
3  Q.  When was that?
4  A.  July 18, 1977.
5  Q.  1977?
6  A.  Yes, ma'am.
7  Q.  Okay.  Is that when you graduated?
8  A.  That's when I started the academy.
9  Q.  When did you graduate?
10  A.  I think it was 8 and a half weeks later.  I don't
11      remember.
12  Q.  Was this the Detroit Police Department Academy?
13  A.  Yes.
14  Q.  And your best recollection is that training at the
15      academy was about 8 and a half weeks, is that correct?
16  A.  I believe it was 8 and a half weeks, ma'am.
17  Q.  Did you go straight from the academy to working for
18      the Detroit Police Department?
19  A.  Yes.
20  Q.  Have you ever applied to work in any other law
21      enforcement agency?
22  A.  Yes.
23  Q.  When was that?
24  A.  When I retired from DPD.
25  Q.  Okay.  We'll talk about that in a second.

**Page 14**

1       So did you join DPD in 1977 then?
2  A.  Yes.
3  Q.  So by the time of the Lisa Kindred homicide in 1999,
4      you'd been on the force about 22 years, is that right?
5  A.  Yes.
6  Q.  So you were a very experienced officer by that time?
7  A.  Yes.
8  Q.  Okay.  Give me a chronology, if you can, of the
9      positions you've held at the Detroit Police Department
10      starting when you first joined in 1977, your rank and
11      where you were stationed.
12  A.  Police officer.  I believe when I first started I was
13      walking the beat from the 1st Precinct, and then I
14      went to the 13th precinct.  I got laid off.  I think
15      when I came back, I think I went to 10 for, I don't
16      know how long I was at 10.  Then I went back to 13.
17      Then I went to Sex Crimes.  I got promoted to
18      investigator.  I went to Number 4, left Number 4 and
19      went to Homicide.
20  Q.  When did you go to Homicide?
21  A.  I don't remember the year, ma'am.
22  Q.  Do you remember approximately when it was?
23  A.  No.
24  Q.  Is there anything that would refresh your
25      recollection?

**Page 15**

1  A.  Not as I can recall.
2  Q.  Okay.  What was your rank when you went to Homicide?
3  A.  Investigator.
4  Q.  Did you stay with Homicide until you retired?
5  A.  Yes.
6  Q.  Did you ever get promoted above investigator?
7  A.  No.
8  Q.  Did you ever apply for promotion and get denied?
9  A.  No.  Let me go back.  Once we -- they were making
10      investigators sergeants, but, you know, you had the
11      title but we didn't have the rank, you know, to run a
12      precinct or a squad or anything, so, and I was still
13      at Homicide.
14  Q.  So were you made a sergeant?
15  A.  No.  It was just on paper, you know.
16  Q.  So on paper you were made a sergeant?
17  A.  I was the investigator, but we were getting sergeant's
18      pay, let me put it that way.
19  Q.  Understood.  When was that?
20  A.  I can't recall.
21  Q.  Okay.  Have you ever been demoted while working for
22      the Detroit Police Department?
23  A.  No.
24  Q.  Now, you testified a moment ago that you retired from
25      the DPD, is that correct?

**Page 16**

1  A.  That's correct.
2  Q.  When did you retire?
3  A.  2010.
4  Q.  Was it your decision to retire or were you asked to
5      retire?
6  A.  It was my decision to retire.
7  Q.  Why'd you retire?
8  A.  I retired.  I retired.
9  Q.  Did you get a pension?
10  A.  Yes.
11  Q.  Did you retire as soon as you were eligible for the
12      pension?
13  A.  No.
14  Q.  So what prompted you to retire in that specific year?
15  A.  I retired, ma'am.  I was, wanted to do something else,
16      so I retired and I went to work for the Attorney
17      General.
18  Q.  So when I asked you earlier if you ever applied to
19      work for another law enforcement agency, was that your
20      work for the Attorney General?
21  A.  That's correct.
22  Q.  When did you start working for the Attorney General?
23  A.  January of 2011.
24  Q.  Are you still working there today?
25  A.  Yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Pages 17–20

| | Page 17 |
|---|---|
| 1 | Q.   And what is your position? |
| 2 | A.   **Special agent.** |
| 3 | Q.   Have you been a special agent since 2011? |
| 4 | A.   **Yes.** |
| 5 | Q.   How tall are you, Ms. Simon? |
| 6 | A.   **5'7 and a half.** |
| 7 | Q.   Okay.  Fair to say you were the same height back in |
| 8 | May, 1999? |
| 9 | A.   **I guess, yes.** |
| 10 | Q.   Most of us don't grow too much at our age, right? |
| 11 | A.   **True.** |
| 12 |         MR. MULLER:  We do shrink. |
| 13 |         MS. SALZMAN:  That is true, Mike.  I |
| 14 | haven't gotten there yet myself. |
| 15 |         MR. MULLER:  I hope not. |
| 16 | BY MS. SALZMAN: |
| 17 | Q.   How much did you weigh in May, 1999 Ms. Simon? |
| 18 | A.   **I have no idea.** |
| 19 | Q.   Can you give me an approximation? |
| 20 | A.   **I don't remember, ma'am.** |
| 21 | Q.   Did you weigh more or less than you do now? |
| 22 | A.   **Probably more.** |
| 23 | Q.   Ms. Simon, did you hear me? |
| 24 | A.   **I answered you.  Did you hear me?** |
| 25 | Q.   I did not hear you.  Could you say it again? |

| | Page 18 |
|---|---|
| 1 | A.   **I said probably more.** |
| 2 | Q.   And how much do you weigh now? |
| 3 | A.   **I don't know.  I haven't got on the scale in a while.** |
| 4 | **I have no idea.** |
| 5 | Q.   Were there any other black female officers in the |
| 6 | Homicide Department in 1999 who had the approximate |
| 7 | same height and weight as you? |
| 8 | A.   **I'm quite sure.  I'm quite sure.  It was black females** |
| 9 | **there.  Now, we didn't go around asking how much you** |
| 10 | **weigh and all that.** |
| 11 | Q.   But from what you saw, from what you observed with |
| 12 | your own eyes, were there any other black female |
| 13 | officers in the Homicide Department in 1999 who had |
| 14 | approximately the same weight as you? |
| 15 | A.   **I'm going to put it this way:  There was black female** |
| 16 | **officers in 1999 that was in Homicide.  I don't know** |
| 17 | **how much they weighed or -- I can't answer that.  I** |
| 18 | **don't know.** |
| 19 | Q.   Okay.  What were the names of these black female |
| 20 | officers? |
| 21 | A.   **Kari Russell, Monica, I can't remember her last name.** |
| 22 | Q.   Is that Monica Childs? |
| 23 | A.   **Yes.  I believe Sherri Oliver.** |
| 24 | Q.   Say that name again for me? |
| 25 | A.   **Sherri Oliver.** |

| | Page 19 |
|---|---|
| 1 | Q.   Sherri Oliver, okay? |
| 2 | A.   **I can't, I can't recall all of them, ma'am.** |
| 3 | Q.   What about Beryl Curry, do you recall her? |
| 4 | A.   **What.** |
| 5 | Q.   Beryl Curry? |
| 6 | A.   **I don't recall.** |
| 7 | Q.   Were you in Squad -- sorry, go ahead. |
| 8 | A.   **I don't recall.  I don't recall her.  I don't know.** |
| 9 | Q.   Were you in Squad 7 at Homicide, Ms. Simon? |
| 10 | A.   **Yes.** |
| 11 | Q.   Were any of these other female officers you just named |
| 12 | for me in Squad 7? |
| 13 | A.   **I don't, I don't remember.  I don't think so.  I don't** |
| 14 | **remember.** |
| 15 | Q.   Do you think you were the only female black officer in |
| 16 | Squad 7 in May, 1999? |
| 17 | A.   **I don't know, ma'am.** |
| 18 | Q.   Can you think of any other black female officers who |
| 19 | were in Squad 7 with you in May, 1999? |
| 20 | A.   **Not offhand, no.** |
| 21 | Q.   Would you say that back in May, 1999, that you weighed |
| 22 | more or less than Kari Russell? |
| 23 | A.   **I have no idea.** |
| 24 | Q.   All right.  Would you say that in May, 1999, you |
| 25 | weighed more or less than Monica Childs? |

| | Page 20 |
|---|---|
| 1 | A.   **I have no idea.** |
| 2 | Q.   And would you say in May of 1999, you weighed more or |
| 3 | less than Sherri Oliver? |
| 4 | A.   **No idea.** |
| 5 | Q.   Would you describe any of those women as tall and |
| 6 | slim, either Kari Russell, Monica Childs or Sherri |
| 7 | Oliver? |
| 8 | A.   **I believe that, I think Sherri Oliver was tall.  I** |
| 9 | **believe she was tall.** |
| 10 | Q.   Was she slim as well? |
| 11 | A.   **Possible.** |
| 12 | Q.   Now, Catherine Adams was also in Squad 7, right? |
| 13 | A.   **Yes.** |
| 14 | Q.   And was she the only white female officer in Squad 7 |
| 15 | in May, 1999? |
| 16 | A.   **I believe so.  I'm not for sure.  I believe so.** |
| 17 | Q.   So back in May, 1999, was Squad 7 your regular |
| 18 | assignment? |
| 19 | A.   **I was assigned to Squad 7, yes.** |
| 20 | Q.   How many years were you in Squad 7? |
| 21 | A.   **I have no idea.** |
| 22 | Q.   Any approximation? |
| 23 | A.   **No.** |
| 24 | Q.   Did you work with a regular partner in Squad 7? |
| 25 | A.   **No, we was just a squad that you might work with one** |

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                     Pages 21–24

Page 21

1      person one day, another person the next day, so.
2   Q.  Who else was in Squad 7 with you in May, 1999?
3   A.  If I'm not mistaken, I believe Billy Jackson was the
4       officer in charge of Squad 7.  I believe James Fisher,
5       Terry Shaw, Cathy Adams.  It was several more.  I
6       don't remember.  Henry, I don't remember his last
7       name.
8   Q.  Ellis?
9   A.  Yes.
10  Q.  What was --
11  A.  I don't remember --
12  Q.  I'm sorry, go ahead.
13  A.  I don't remember anyone else, ma'am.
14  Q.  Anytime I cut you off like that, you just let me know.
15      I want to make sure you complete your answer, and
16      likewise I'll ask you to let me finish my question
17      before you begin answering.  It'll make the Court
18      Reporter's job much easier.
19             Now, let me ask you -- did you have
20      something you wanted to say?
21  A.  No.
22  Q.  It's a little bit weird on this Zoom platform, right?
23      There's a little bit of delay sometimes.
24             Let me ask you, Monica Childs, the officer
25      you mentioned before, she wasn't in Squad 7?

Page 22

1   A.  She could have been.  I don't, I don't know.
2   Q.  Now, Billy Jackson was the lieutenant, right?
3   A.  Yes.
4   Q.  What'd he look like?
5   A.  What'd you mean, what'd he look like?
6   Q.  What was his physical appearance?
7   A.  Black male.  I don't know how tall he was.  I don't
8       know how much he weighed.
9   Q.  Hair style?
10  A.  Low cut Afro.
11  Q.  Now, when you --
12  A.  Medium complexion.
13  Q.  Now, when you tell me you don't know, you don't have
14      any idea how tall someone was or how much someone
15      weighed, you're a trained Homicide investigator,
16      correct?
17  A.  Yes.
18  Q.  And one of the jobs of a Homicide investigator is to
19      provide witness and subject descriptions, correct?
20  A.  Yes.
21  Q.  So when I ask you to give me an approximate height or
22      weight, you're not able to do that for these folks you
23      worked with for all those years?
24  A.  No, ma'am.  Do you know how long that's been?  I did
25      not go around asking them, "Well, how much you weigh,"

Page 23

1      you know, no.  I'm quite sure you can't tell me the
2      weight of everybody you worked with in 1999.
3   Q.  I'm not being deposed here today, ma'am, so I'll ask
4      the questions and you'll do your best to answer them.
5   A.  I just answered.  I don't remember, ma'am.
6   Q.  All right.  What about James Fisher, what was his
7      physical description?
8   A.  Black male, medium complexion, and I think, I don't
9      know for sure, I think he wore glasses.  I don't know
10     for sure.
11  Q.  What about his hair style?
12  A.  I think he had an Afro, I believe.
13  Q.  Was he a tall man?
14  A.  I don't know.  Medium height for a man.  I'm going to
15     stay 5'9, 5'10.  I don't know.
16  Q.  Was he a well-built, muscled man?
17  A.  He could have been.  No, I don't think he was well
18     built.  I don't think he was husky or nothing like
19     that.  I don't remember him being husky.
20  Q.  What about Terry Shaw, what did he look like?
21  A.  Black male, light complexion, kind of curly hair.
22     Medium, well, like I said for a man, medium height,
23     5'9, I believe.  Medium built, I think.
24  Q.  What about Henry Ellis, what did he look like?
25  A.  Black male.  I remember, I remember Henry was tall.

Page 24

1      Medium built, I believe.  And crewcut, Afro crewcut.
2      I don't know.
3   Q.  Did you work with an officer named Wayne Pritchett?
4   A.  Yes, Pritchett was assigned to Homicide.
5   Q.  Was he in Squad 7?
6   A.  He could have been.  He could have been.  I'm not for
7      sure.
8   Q.  Did you work cases with him?
9   A.  It's possible.
10  Q.  What'd he look like?
11  A.  Black male.  I think Wayne was kind of stocky.  I
12     don't -- I think.  Medium to dark complexion.  That's
13     all I can remember about him.
14  Q.  Do you remember his hair style?
15  A.  I think it was an Afro, I believe.
16  Q.  What about Anthony Jackson, did he work in Homicide
17     with you?
18  A.  Yes, he was assigned, yes, he was in Homicide.
19  Q.  Was he in Squad 7?
20  A.  It's possible.
21  Q.  Did you work cases with him?
22  A.  It's possible, yes.
23  Q.  What did he look like?
24  A.  Black male.  I think Anthony wore glasses, I do
25     believe, medium to dark complexion, same hair, Afro.

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 25–28

Page 25

| | |
|---|---|
| 1 | Q. | What about Arlie Lovier, did you work with him in |
| 2 | | Homicide? |
| 3 | A. | Who? |
| 4 | Q. | Arlie Lovier? |
| 5 | A. | Lovier, is that who you're talking about? |
| 6 | Q. | Thank you for correcting me.  Did you work with |
| 7 | | Mr. Lovier? |
| 8 | A. | Yes. |
| 9 | Q. | Was he in Squad 7? |
| 10 | A. | I don't know if Arlie was in Squad 7.  I don't know. |
| 11 | Q. | What did he look like? |
| 12 | A. | He was a white male.  I think he had brown hair, tall. |
| 13 | | That's all I can remember, ma'am.  Because he's |
| 14 | | deceased.  I don't remember. |
| 15 | Q. | What about John Faulk, did you work with him in |
| 16 | | Homicide? |
| 17 | A. | Yes. |
| 18 | Q. | Was he in Squad 7? |
| 19 | A. | He could have been.  White male, I think John had |
| 20 | | brown hair, medium height.  That's all I remember. |
| 21 | Q. | That's all you remember?  How'd you wear your hair |
| 22 | | back in 1999, Ms. Simon? |
| 23 | A. | I have no idea.  I have changed my hair hundreds of |
| 24 | | times.  I don't remember what I, how I was wearing it |
| 25 | | back in 1999. |

Page 26

| | |
|---|---|
| 1 | Q. | Are you friendly with Cathy Adams? |
| 2 | A. | I know Cathy.  We worked together.  I know Cathy.  I |
| 3 | | had, before this, I hadn't seen Cathy in several |
| 4 | | years.  I don't know, but as far as friendly, I knew |
| 5 | | her.  You know, she knows me, you know. |
| 6 | Q. | You worked a lot of cases with her? |
| 7 | A. | We worked together.  I can't tell you how many cases |
| 8 | | we worked together, you know.  We worked together. |
| 9 | Q. | Multiple cases, though, right? |
| 10 | A. | Yes.  If a case was assigned to a squad, you know, we |
| 11 | | worked the case.  I can't say, you know, how many. |
| 12 | Q. | Now, you said that it had been years since you've seen |
| 13 | | her until this.  Have you seen her recently? |
| 14 | A. | It was a few months ago when I was down here, I |
| 15 | | believe, a few months ago. |
| 16 | Q. | When you were down at the Law Department? |
| 17 | A. | Yes. |
| 18 | Q. | Did you meet with your attorneys together? |
| 19 | A. | I don't think so.  I don't believe so. |
| 20 | Q. | Did you and Cathy talk outside the presence of your |
| 21 | | attorneys? |
| 22 | A. | Yes. |
| 23 | Q. | What'd you talk about? |
| 24 | A. | Oh, Lord.  Her family, my family.  She wanted to know |
| 25 | | about my daughter.  General talk.  That's all. |

Page 27

| | |
|---|---|
| 1 | Q. | Did you talk about this case at all? |
| 2 | A. | No, ma'am. |
| 3 | Q. | No mention of the fact that you were both being sued |
| 4 | | as defendants in this case? |
| 5 | A. | She, she mentioned, you know -- we didn't sit down and |
| 6 | | talk-talk about the case, you know, no. |
| 7 | Q. | But it came up, right? |
| 8 | A. | Well, she knew why I was here and I knew why she was |
| 9 | | here.  Let me put it that way.  And after we left |
| 10 | | here, we walked to the elevator.  Like I said, she |
| 11 | | asked about my family, I asked about her family and we |
| 12 | | went down the elevator.  She went one way and I went |
| 13 | | the other way. |
| 14 | Q. | So I understand you both know that you've been sued as |
| 15 | | defendants in this case.  My question is:  Did that |
| 16 | | come up at all, even if you didn't talk about it at |
| 17 | | length when you saw her in the Law Department? |
| 18 | A. | Can you repeat that? |
| 19 | Q. | When you saw Cathy Adams in the Law Department a few |
| 20 | | months ago, did either one of you discuss at all in |
| 21 | | any way this case? |
| 22 | A. | No.  We didn't -- we did mention it, but we didn't |
| 23 | | discuss it, you know, like you sit down and discuss |
| 24 | | something. |
| 25 | Q. | What was said about it? |

Page 28

| | |
|---|---|
| 1 | A. | She was saying something.  I told her I do not |
| 2 | | remember this case.  I don't know what this case is |
| 3 | | about.  I don't remember. |
| 4 | Q. | What did she say? |
| 5 | A. | And she left it alone.  That's what she said.  We |
| 6 | | started talking about our families. |
| 7 | Q. | What did she say about the case before you said you |
| 8 | | didn't remember it? |
| 9 | A. | She just said "Oh, okay," and we started talking about |
| 10 | | our families. |
| 11 | Q. | No, before you said "I don't recall anything about |
| 12 | | this case," what did she say to you about the case |
| 13 | | that prompted you to say that? |
| 14 | A. | What she said was about this case, what -- I told her |
| 15 | | I did not remember this case, I don't, which I still |
| 16 | | don't remember the case.  She said that she was like |
| 17 | | the officer in charge, and I still told her "I don't |
| 18 | | remember any of this."  And she said "Oh, okay."  And |
| 19 | | we started talking about her son, my daughter. |
| 20 | Q. | When you and Cathy Adams worked together in the past, |
| 21 | | did you talk about your families like that? |
| 22 | A. | Well, when we worked in the past together, Cathy was |
| 23 | | not married at the time, so we talked about her mom |
| 24 | | and stuff like that because she was taking care of her |
| 25 | | mom, and she knew that I had a daughter, yes. |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 29–32

Page 29

1  Q.  Did you ever grab lunch or coffee or a drink with
2       Cathy Adams?
3  A.  At what time, ma'am?
4  Q.  At any time when you worked together at DPD.
5  A.  Yes.
6  Q.  How often?
7  A.  I don't know, ma'am.  I have no idea.
8  Q.  Many times, right?
9  A.  No, I'm not going to say many times.  I'm not going to
10      say that.  We had lunch.  We would go -- the squad
11      would go to lunch.  Our supervisor would take us to --
12      Christmas we all got together, so I can't, you know, I
13      can't sit here and tell you "Well, we went to lunch 10
14      times, 20," I don't know.
15 Q.  Have you ever been to her house?
16 A.  No, ma'am.
17 Q.  Has she ever been to your house?
18 A.  No.
19 Q.  Are you friends on social media with Cathy Adams?
20 A.  I'm not on social media, ma'am.  Get you in trouble.
21 Q.  I agree with you about that.
22         What about Wayne Pritchett, how well did
23      you know him?
24 A.  I knew him from Homicide.
25 Q.  Did you guys ever grab lunch or coffee or a drink

Page 30

1       together?
2  A.  It's possible when we were working.
3  Q.  Did you ever see him outside of work?
4  A.  No.
5  Q.  What about Anthony Jackson, did you ever see him
6       outside of work?
7  A.  I seen Anthony once or twice.  That's when he was no
8       longer at Homicide.  That's when his partner was shot
9       and killed, and I went to the memorial and to the
10      funeral, so yes, I have seen him.
11 Q.  Did you speak to him at those events?
12 A.  Yes, ma'am.
13 Q.  When was that approximately?
14 A.  This was some time ago when his partner was checking a
15      B&E at a house, and the person there shot and killed
16      him.
17 Q.  Have you ever discussed this case with Anthony
18      Jackson?
19 A.  No, ma'am.
20 Q.  When was the last time you saw or spoke with Anthony
21      Jackson?
22 A.  Once again, I just told you, at a funeral and memorial
23      service.
24 Q.  I just wanted to make sure that was the last time.
25 A.  That's the last time, yes, ma'am.

Page 31

1  Q.  When was the last time you saw or spoke with Wayne
2       Pritchett?
3  A.  I haven't talked to Wayne and seen Wayne Pritchett
4       since I left the department.
5  Q.  Have you ever discussed this case with Mr. Pritchett?
6  A.  No, ma'am.
7  Q.  So back in 1999 when you're working Homicide, you had
8       a lot of cases, right?
9  A.  Yes.
10 Q.  And there was pressure to close your cases quickly or
11      they would pile up, correct?
12 A.  We worked our cases.  I don't know what you mean under
13      pressure.
14 Q.  Okay.  Well, Officer Adams testified at her deposition
15      last week that there was pressure to close cases in
16      two or three days or you would just end up with a big
17      backlog of cases on your desk, do you agree with that?
18         MR. MULLER:  I object to that.  That's a
19      specific mischaracterization of her testimony.  She
20      specifically said she wasn't under any pressure.
21         MS. SALZMAN:  You're mischaracterizing her
22      testimony.
23         MR. MULLER:  No, I'm not.  You are
24      mischaracterizing her testimony.
25         MS. SALZMAN:  Excuse me.

Page 32

1          MR. MULLER:  Quote her testimony or don't
2       mischaracterize.
3          MS. SALZMAN:  Mike, you need to confine
4       your objections to form and foundation.
5          MR. MULLER:  I'm not going to let you lie
6       on the record.
7          MS. SALZMAN:  I'm not lying.
8          MR. MULLER:  It's not going to happen.
9          MS. SALZMAN:  And it's completely improper
10      for you to accuse me of that.  If you want to take me
11      to court, we could do that right now.  You need to
12      stop coaching your witness with speaking objections.
13         MR. MULLER:  I'm not coaching anyone.
14         MS. SALZMAN:  So conform yourself to the
15      rules which are form and foundation objections.
16 BY MS. SALZMAN:
17 Q.  Ms. Simon, can you answer my question?
18 A.  What was your question?
19 Q.  My question was:  If Officer Adams testified that you
20      had to close cases in Homicide back in 1999, you had
21      to close cases in two or three days or they would pile
22      up on a big backlog on your desk, you would agree with
23      that?
24 A.  No, ma'am.  I don't know what she testified to.  I'm
25      not going to sit here and say that's what she said,

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Pages 33–36

**Page 33**

1    no, ma'am.
2  Q.  I'm not asking you to disagree with what she said.
3    I'm asking if that was your experience as a Homicide
4    investigator.  Did you have a lot of cases?
5  A.  No, ma'am.  I was not under any pressure, and I'm not
6    going to sit here and say that Cathy Adams said that,
7    no.
8  Q.  Listen carefully to my question, Ms. Simon.
9  A.  Ma'am, I answered your question.
10 Q.  Did you have a lot of cases?
11 A.  Ma'am, I answered your question.  I had a lot of
12   cases.  I was not under any directive to close this
13   case.  You want me to say that Cathy Adams said this,
14   that and the other.  No, I'm not going to say that.  I
15   don't know what she said.
16 Q.  I'm not asking you to say that.
17        How long on average did you take to close a
18   case in Homicide in 1999?
19 A.  I have no idea.
20 Q.  Did you work long hours?
21 A.  Yes.
22 Q.  Did it feel like there weren't enough officers to do
23   the job right?
24 A.  No, I'm not going to say that, ma'am.
25 Q.  Did you feel like you did your best job in 1999?

**Page 34**

1  A.  I did my job, ma'am.
2  Q.  I'm asking did you do your best job?
3  A.  Ma'am, that's what I'm going to leave it at.  I did my
4    job.  I did the best that I could.  I'm leaving it
5    like that.
6  Q.  Did you ever feel like you wished you had time to
7    investigate other leads or explore other angles and
8    you didn't have time?
9  A.  Ma'am, I did the best I could.
10 Q.  Can you answer my question?
11 A.  I just did.
12 Q.  Did you feel like you didn't have time to explore a
13   lead or investigate an angle to a case?
14 A.  Ma'am, I did my job to the best of my ability, and I'm
15   leaving it like that.  I answered your question.
16 Q.  Do you understand my question?
17 A.  I answered your question.
18 Q.  You didn't.  Are you unable to answer it?
19 A.  Ma'am, I did my job the best of my ability, and I'm
20   going to keep saying it so you can keep asking.
21 Q.  So you're unable to answer that question, if there was
22   ever a time when you had other evidence you wished you
23   could pursue, another lead you could investigate,
24   you're not able to answer that question?
25 A.  Ma'am, I did my job the best of my ability.

**Page 35**

1  Q.  What do you remember about the murder of Lisa Kindred
2    on May 9, 1999?
3  A.  I don't remember this case at all.
4  Q.  Do you remember it was known as the Mother's Day
5    murder?
6  A.  I don't remember this case, ma'am.
7  Q.  Do you remember about some attention in the press?
8  A.  I don't remember.
9  Q.  Okay.  Let's take a look at Plaintiff's Exhibit 61.
10       MS. SALZMAN:  Do you have that, Mike?
11       MR. MULLER:  Hang on.  I have 63 through
12   73.  What would be the exhibit?
13       MS. SALZMAN:  Plaintiff's Exhibit 61 is an
14   article from the Detroit Free Press.
15       MR. MULLER:  I don't have it.
16       MS. SALZMAN:  Okay.  It's on the One Drive,
17   so I'm going to ask if you can, at the next break,
18   have that printed.  We'll move on and cover some other
19   ground until then.
20       MR. MULLER:  I will go ahead and text Pat
21   to print out -- what's 62?
22       MS. SALZMAN:  I'm not going to sit here and
23   read them all to you, but you're going to need 61
24   through 66.  If you don't have them and Pat can print
25   those out, that'd be great.

**Page 36**

1  BY MS. SALZMAN:
2  Q.  Ms. Simon, you just testified you don't have any
3    memory of this case at all?
4  A.  That's correct.
5        MS. SALZMAN:  Mike, do you have Exhibit 85?
6        MR. MULLER:  I have exhibit -- I have
7    through Exhibit 74.
8        MS. SALZMAN:  Okay, so when you text Pat,
9    ask him to print out Exhibits 61 through 66 as well
10   as 75 through 85.
11       MR. MULLER:  So that you understand, I have
12   Exhibits 63 through 74.  I have them right in front of
13   me.  I don't have 61 or 62 and I don't have anything
14   past 74, and you're telling me that there are
15   exhibits?
16       MS. SALZMAN:  Yes.
17       MR. MULLER:  After 74?
18       MS. SALZMAN:  Correct.  I'm saying that
19   when you ask Pat to print exhibits, please ask him to
20   print all the exhibits on the One Drive from 61 to 85.
21       MR. MULLER:  Okay.  Can I do this?  Can we
22   take a minute so that I can go to his office and tell
23   him I need those exhibits?
24       MS. SALZMAN:  Sure.  Do you want to take a
25   5 minute break?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                           Pages 37–40

Page 37

1              MR. MULLER:  Sure, thanks.
2         (Off the record at 11:05 a.m.)
3         (Back on the record at 11:08 a.m.)
4         MARKED FOR IDENTIFICATION:
5         DEPOSITION EXHIBIT 61
6         11:08 a.m.
7    BY MS. SALZMAN:
8    Q.  All right, Officer Simon, if you can take a look at
9         Exhibit 61.  Take a moment to read it to yourself.
10   A.  Okay.
11   Q.  Does this article refresh your recollection at all
12        about the Lisa Kindred case?
13   A.  No, ma'am.
14   Q.  Does it refresh your recollection this case got some
15        attention in the press?
16   A.  No, ma'am.  Just what I just read.  I don't remember
17        this case.
18   Q.  Do you remember any aspect of your work on this case?
19   A.  No, ma'am.
20   Q.  Now, back in May, 1999, approximately how long had you
21        been at Homicide?
22   A.  I don't remember.
23   Q.  Several years by then?
24   A.  I don't remember, ma'am.
25   Q.  It wasn't your first homicide investigation back in

Page 38

1         May, 1999, right?
2    A.  I'm quite sure it wasn't, but I don't remember how
3         long I had been in Homicide.
4    Q.  Were you involved at all in this case in the
5         interrogation of a witness named Raymond Jackson?
6    A.  Not as I can recall, no.
7    Q.  Do you have any knowledge about what happened during
8         Raymond Jackson's interrogation?
9    A.  No.
10   Q.  So you have no personal knowledge one way or the other
11        whether DPD officers used force or threats with
12        Mr. Jackson, correct?
13   A.  That's correct.
14   Q.  Were you involved at all in the interrogation of
15        Jodi Gonterman, the victim's sister?
16   A.  As I can recall, no.
17   Q.  So you don't have any personal knowledge about what
18        Ms. Gonterman told Detroit Police Department, correct?
19   A.  That's correct.
20   Q.  And you don't have any personal knowledge about what
21        was written down in her statement, correct?
22   A.  That is correct.
23   Q.  And you don't have any personal knowledge whether
24        anything was omitted from her statement, correct?
25   A.  That's correct.

Page 39

1    Q.  Did you ever speak with Will Kindred, the victim's
2         husband?
3    A.  No, not as I can recall.
4    Q.  So you don't have any personal knowledge about what he
5         might have said or not said to the Detroit Police
6         Department, correct?
7    A.  That's correct.
8    Q.  Did you ever speak to CJ Skinner, the 8 year old son
9         of the victim who was in the car when she was shot?
10   A.  Ma'am, not as I can recall.  I don't remember this
11        case at all.
12   Q.  So you don't have any personal knowledge about what
13        CJ Skinner may or may not have been asked by the
14        Detroit Police Department, correct?
15   A.  That is correct.
16   Q.  And you don't have any knowledge about what CJ Skinner
17        may or may not have said to the Detroit Police
18        Department, correct?
19   A.  That's correct.
20   Q.  Did you participate in any witness interviews in this
21        case?
22   A.  Just what we see at the top of the page with
23        Mr. Johnson.
24   Q.  Okay.  You're looking at the Justly Johnson statement
25        you testified about earlier, right?

Page 40

1    A.  That's correct.
2    Q.  Do you have a recollection of interrogating
3         Mr. Johnson or you're just looking at that piece of
4         paper?
5    A.  I'm just looking at that piece of paper, ma'am.
6    Q.  Did you help execute any search warrants in this case?
7    A.  No, I don't remember.
8    Q.  Did you help obtain any search warrants in this case?
9    A.  Not as I can recall.
10   Q.  Did you attend the trials of either Mr. Scott or
11        Mr. Johnson?
12   A.  Not as I can recall, ma'am.
13   Q.  But you did go out to the scene of the crime in this
14        case, right?
15   A.  I don't believe so.
16   Q.  You participated in canvassing the neighborhood after
17        the shooting, right?
18   A.  No, ma'am, I don't believe so.
19   Q.  Do you think you didn't do that or do you just not
20        recall one way or the other whether you did that?
21   A.  I don't think I did it.  I don't recall.
22   Q.  So you don't know one way or the other?  It could have
23        happened, it could not have happened, it's just one
24        case among many, correct?
25   A.  No, ma'am, that's what you said.  I said I don't

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Pages 41–44

Page 41

```
 1      recall.  I don't remember going out to any scene
 2      canvassing.  I don't remember.  I don't recall at all.
 3  Q.  Do you recall finding a boy named Antonio Burnett
 4      asleep in the car near the scene of this shooting?
 5  A.  No, ma'am.  I don't recall.  I don't remember this
 6      case at all.
 7              MS. SALZMAN:  Let's take a look at
 8      Exhibit 44, Mike, which we marked last week.
 9              MR. MULLER:  Let me go get those exhibits.
10      Got it.
11  BY MS. SALZMAN:
12  Q.  Take a look at that, Officer Simon, if you can.  Now,
13      this is a Preliminary Complaint Report filled out on
14      May 9, 1999, right?
15  A.  Yes.
16  Q.  Okay.  And do you see on the first page there towards
17      the bottom where it says "Writer observed the above
18      subject asleep in an unregistered vehicle parked on
19      street."  I think in front of 4468 Hurlbut, do you see
20      that?
21  A.  Yes, fell asleep in the vehicle, is that what you're
22      talking about?
23  Q.  Right.
24  A.  Are you down to the circumstances where the C is?
25  Q.  Exactly.
```

Page 42

```
 1  A.  Okay.
 2  Q.  Read through that section of the document if you can.
 3      Let me know when you've read those, it looks like 5 or
 4      6 lines.
 5  A.  Okay.
 6  Q.  Does this refresh your recollection that you were
 7      present when this juvenile witness, Antonio Burnette,
 8      was found asleep in the car on Hurlbut Street?
 9  A.  No, ma'am.  I don't believe I was there.  This report
10      was by Rodney Jackson and Kevin Littlejohn, not
11      Barbara Simon.
12  Q.  No, right.  I know you didn't write the report, ma'am.
13      I'm asking if you were there on the street --
14  A.  I do not, no, ma'am, I do not believe so, no, ma'am.
15  Q.  Did you participate in many canvassing of the scenes
16      during your time at Homicide?
17  A.  Of this particular scene?
18  Q.  No, I'm asking generally in the Homicide Department,
19      in the many years you were there, have you done a lot
20      of canvassing the scene after a shooting?
21  A.  Yes, ma'am.
22  Q.  And you're out there looking for evidence, witnesses,
23      correct?
24  A.  Correct.
25  Q.  Is it hard for you to recall the times you canvassed
```

Page 43

```
 1      the scene of a homicide?
 2  A.  Ma'am, I canvassed many, many scenes.  I don't recall
 3      this scene here.
 4  Q.  Let's take a look at Plaintiff's Exhibit 41.  Oh,
 5      that's not the right one.  I'm sorry.  I don't think
 6      that's the right one.  No.  That's Raymond Jackson.
 7              MR. MULLER:  Which one?
 8              MS. SALZMAN:  I wanted the statement of
 9      Antonio Burnette and that's the photo of Raymond
10      Jackson.  Nick, can you tell me --
11              MR. MULLER:  Wasn't 41 Burnette?
12              MS. SALZMAN:  I thought so, but I think
13      it's Jackson.  We'll pull it up.  Just give us a
14      second.
15              MR. BOURLAND:  It's Plaintiff's 47, 4-7.
16              MR. MULLER:  47?
17              MS. SALZMAN:  Yes, that's it.
18              MR. MULLER:  47.
19              MS. SALZMAN:  Yes.  Got that.
20              MR. MULLER:  Got it.
21  BY MS. SALZMAN:
22  Q.  Ma'am, take a look at Exhibit 47 and tell me if you've
23      ever seen or have any recollection of ever seeing the
24      individual in this photograph.
25  A.  I don't remember, ma'am.
```

Page 44

```
 1  Q.  Okay.  So you don't remember if you participated in
 2      arresting this individual, correct?
 3  A.  No, I don't remember.
 4  Q.  And you don't remember if you saw him being
 5      interrogated at the Homicide Department, right?
 6  A.  That's correct.
 7  Q.  And you don't recall if you participated in some way
 8      in his interrogation, correct?
 9  A.  I don't remember.
10  Q.  I'll show you one other document.
11              MS. SALZMAN:  Mike, can you give her
12      Exhibit 46, please?
13              MR. MULLER:  Statement of Burnette?
14              MS. SALZMAN:  Correct.
15  BY MS. SALZMAN:
16  Q.  And if you could take a look at that, Officer Simon,
17      and let me know when you've had a chance to review it
18      yourself and then I'll just ask you a few questions
19      about this one.
20  A.  Okay, I'm ready.
21  Q.  And does looking at this witness statement of Antonio
22      Burnette refresh your recollection that you were
23      present for his interrogation at Homicide on May 9,
24      1999?
25  A.  No, ma'am.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                           Pages 45–48

Page 45

1   Q.   You just don't recall one way or the other, correct?
2   A.   I don't, I don't remember this at all, ma'am.
3   Q.   So you don't have any personal knowledge whether any
4        Detroit Police Department officers made any threats to
5        Antonio Burnette that day, correct?
6   A.   No, ma'am.
7   Q.   And you don't have any personal knowledge whether any
8        Detroit police officers made any promises to Antonio
9        Burnette that day, right?
10  A.   No, I don't know.
11  Q.   And you don't have any personal knowledge whether any
12       force was used by Detroit Police officers
13       interrogating Antonio Burnette, correct?
14  A.   That's correct.
15  Q.   Do you see on that document the second question on the
16       first page, what does "hit a lick" mean?
17  A.   Yes.
18  Q.   Are you familiar with that expression, "hit a lick"?
19  A.   Yes.
20  Q.   What does it mean?
21  A.   Rob somebody, robbery.
22  Q.   And you're familiar with that expression from your
23       over 22 years on the force by the time May, 1999
24       rolled around, right?
25  A.   Yes.

Page 46

1   Q.   Have you heard other suspects or witnesses say that in
2        other investigations?
3   A.   Very possible, yes, ma'am.
4   Q.   Have you heard other DPD officers say that?
5   A.   Possible.
6   Q.   Have you yourself said it?
7   A.   I could have.  I don't know.
8   Q.   Have you had many cases involving that expression,
9        "hit a lick"?
10  A.   I'm quite sure.
11  Q.   Have you ever told a witness -- you can set that
12       document aside, Ms. Simon.
13  A.   Oh, it's aside.  Thank you.
14  Q.   Very good.  Have you ever told a witness, Officer
15       Simon, they had to give you a statement or they would
16       be charged with a crime?
17  A.   No, ma'am.
18  Q.   You agree with me it would be against DPD procedure to
19       tell a witness that?
20  A.   Yes.
21  Q.   You agree with me that that would be illegal coercion,
22       to tell a witness that, right?
23  A.   I haven't told a witness that, ma'am.
24  Q.   But my question is:  Do you agree that if you or any
25       other Detroit Police Department officer told a witness

Page 47

1        they would be charged with a crime if they didn't give
2        a statement, that would be illegal coercion, wouldn't
3        it?
4   A.   I can only speak for myself, ma'am.  I wouldn't do it.
5        I can't speak for other officers, what they did or
6        said at DPD.  I can only speak for one individual, me.
7   Q.   Have you ever seen other officers threaten a witness
8        with prosecution of a crime if they didn't give a
9        statement?
10  A.   I haven't, no, ma'am.
11  Q.   You don't recall one way or another?
12  A.   I haven't, no ma'am.
13  Q.   You agree with me that if an officer did threaten to
14       charge a witness with a crime, that would be illegal,
15       right?
16  A.   Yes, ma'am.
17  Q.   And that's why you wouldn't do it, right?
18  A.   I wouldn't do it, no.
19  Q.   What about, have you ever used force to get a witness
20       to sign a statement, physical force?
21  A.   No, ma'am.
22  Q.   And you agree with me that if a Detroit Police
23       Department officer used physical force to get a
24       witness to sign a statement, that would be against
25       department policy, right?

Page 48

1   A.   Yes, ma'am.
2   Q.   And you agree with me that if a Detroit Police
3        Department officer used force to get a witness to sign
4        a statement, that would be illegal, right?
5   A.   Like I said, I can only speak for me, ma'am, yes.
6   Q.   Have you ever seen --
7   A.   I wouldn't do it.
8   Q.   You wouldn't do it.
9             Have you ever seen other Detroit Police
10       officers use any force with any witnesses?
11  A.   Not as I can recall, ma'am, no.
12  Q.   You just don't recall one way or the other?
13  A.   I don't recall seeing it, no.
14  Q.   It could have happened, it could not have happened?
15       You just don't have a recollection, correct?
16            MR. MULLER:  I'm going to object.  That's
17       not what she's testified to.  She said she didn't
18       recall seeing it.
19            MS. SALZMAN:  Again, Mike, you need to
20       stop.
21            MR. MULLER:  Why do you mischaracterize her
22       answers?
23            MS. SALZMAN:  Mike, I am asking the
24       questions as I'm entitled to do.  You are entitled to
25       make a form or foundation objection.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Pages 49–52

---

**Page 49**

1        MR. MULLER:  You're mischaracterizing.  You
2  are not entitled to mischaracterize her testimony.
3        MS. SALZMAN:  You are not entitled to
4  ongoing speaking objections coaching the witness.  If
5  we have to go to the judge to tell you to stop, we
6  will do so.  Is that necessary?
7        MR. MULLER:  Do what you want to do.
8  BY MS. SALZMAN:
9  Q.  Officer Simon, is it your testimony you don't have any
10    recollection one way or the other whether you ever saw
11    an officer use force with a witness?
12  A.  Once again, I told you, ma'am, I answered this three
13    times.  I don't recall.  I don't know what other
14    officers do.  I can only speak for me.
15  Q.  Okay.  Now, back in 1999, it was Detroit Police
16    Department policy that if an officer was interviewing
17    a juvenile, a minor, they had to do so in the presence
18    of the juvenile's parent, correct?
19  A.  That was the policy, yes, ma'am.
20  Q.  And that's the policy you followed, right?
21  A.  If I was talking to a juvenile, I would have the
22    parent present to sign the form, or if the parent
23    waived it, you called them and they waived it and said
24    you could talk to them, yes, yes, ma'am.
25  Q.  So when you said you would have the parents sign the

---

**Page 50**

1    form, you mean you would have the parent sign the
2    witness statement form like Exhibit 46 we're just
3    looking at?
4  A.  Yes, ma'am, I would have the witness sign it and have
5    the parents also sign it.
6  Q.  Because you would want proof that the parents were
7    there in the room while you took that witness
8    statement, correct?
9  A.  That's why the parents would be there, ma'am, yes.
10  Q.  Okay.  And then you said if the parent waived the
11    right to be there, you could go ahead with the
12    interrogation, is that right?
13  A.  If the parent gave you permission.
14  Q.  Are you done with your answer?
15  A.  Yes.
16  Q.  All right.  If the parent gave you permission, you
17    could interrogate a juvenile without the parent being
18    there, is that your testimony?
19  A.  If the parent gave you permission, yes.
20  Q.  And where would you document that if the parent gave
21    you permission do that?
22  A.  In his statement.
23  Q.  In the witness statement?
24  A.  That's correct.
25  Q.  So on page, Exhibit 46, if you were the one writing

---

**Page 51**

1    this statement, you would have written either parents
2    were there or parents waived the right to be there,
3    right?
4  A.  That's correct.
5  Q.  Have you ever seen a Detroit Police Department officer
6    interview a juvenile without a parent present?
7  A.  It's possible, yes.
8  Q.  How many times have you seen that happen?
9  A.  Ma'am, I don't know.
10  Q.  Have you ever done it?
11  A.  It's possible.
12  Q.  How many times would you say that happened?
13  A.  I don't recall.
14  Q.  More than 10?
15  A.  Once again, I don't recall.
16  Q.  Now, you testified a moment ago, Officer Simon, that
17    you personally never threatened to charge a witness
18    with a crime if they wouldn't give you a statement,
19    right?
20  A.  When did I -- what'd you say?
21  Q.  Did you testify a few minutes ago in your deposition
22    today that you personally never threatened to charge a
23    witness with a crime if they wouldn't give you a
24    statement?
25  A.  That's correct.

---

**Page 52**

1  Q.  But that's exactly what you did with Falynn Kenner in
2    this case, isn't it, Officer Simon?
3  A.  Who?
4  Q.  You don't have any recollection of Falynn Kenner?
5  A.  No, who's that?
6        MS. SALZMAN:  Mike, do you have Exhibit 85
7    now?
8        MR. MULLER:  I should.  All right.  Here it
9    is.
10        MS. SALZMAN:  Do you have that?
11        MR. MULLER:  Answers to Interrogatories?
12        MS. SALZMAN:  Correct.
13        MARKED FOR IDENTIFICATION:
14        DEPOSITION EXHIBIT 85
15        11:32 p.m.
16  BY MS. SALZMAN:
17  Q.  Ms. Simon, Officer Simon, these are your answers to
18    the Interrogatories we served in this case, correct?
19  A.  I have no idea, ma'am.  Are you going to give me a
20    chance to read this?
21  Q.  Take your time, flip through it and I'll direct your
22    attention to certain ones I want to talk to you about,
23    and on the last page you should see your signature
24    there.
25  A.  Okay, I see my signature.

---

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Pages 53–56

Page 53

1   Q.   That is your signature on the page, on the last page
2        of this document, correct?
3   A.   That's correct.
4   Q.   Okay.  And you signed this document under penalty of
5        perjury, and that "The foregoing is true and correct
6        to the best of my knowledge, information and belief,"
7        correct?
8   A.   What page are you?
9   Q.   The very last one right above your signature.  Do you
10       see where it says "I verify under penalty of perjury
11       that the following" --
12  A.   Yes.
13  Q.   Yes?  So you agree with me you signed this document
14       under oath?
15  A.   I signed it, yes, ma'am.
16  Q.   And you signed it under oath?
17  A.   I signed it, yes.
18  Q.   But my question, Officer Simon, is whether you signed
19       it under oath?
20  A.   I'm going to tell you once again, I signed it.  It had
21       to be under oath.  I see other people's names on here,
22       a Notary Public, so I guess I did, yes.
23  Q.   And that's the same oath you took today to tell the
24       truth, correct?
25  A.   Yes.

Page 54

1   Q.   And you take that oath seriously, right, Officer
2        Simon?
3   A.   Of course.
4   Q.   Okay.  So let's take a look at Interrogatory Number 5.
5        It's on Page 3.  You were asked in Interrogatory
6        Number 5, "Describe your role in the investigation."
7        And you responded, after various objections, without
8        waiving that objection, "I was an investigator
9        involved in the investigation.  My involvement
10       included advising Justly Johnson of his Constitutional
11       Rights on May 10th, 1999, and involvement with a
12       statement by Falynn Kenner on May 11, 1999."  Do you
13       see that response, Officer Simon?
14  A.   Yes.
15  Q.   Did you review that response before you signed this
16       document under oath?
17  A.   It's possible.
18  Q.   Is it possible you signed this document under oath
19       under penalty of perjury without reading it?
20  A.   Ma'am, I signed it.  You asked me -- can I finish?
21       You asked me to go back, and I signed it in March of
22       2020, and I answered your question, yes.
23  Q.   And I'm now asking you did you read this document
24       before you signed it under oath and under penalty of
25       perjury?

Page 55

1   A.   I'm quite sure I did, ma'am.
2   Q.   Is it true what you swore to in this Interrogatory
3        response, that you "had involvement with a statement
4        by Falynn Kenner on May 11th, 1999"?
5   A.   Let me put -- okay, I see what you're saying.  The
6        statement was taken by another officer, and I was the
7        investigator then and as a supervisor, I signed the
8        officer at the bottom as you see.  I did not write out
9        this statement.  I only signed the bottom after the
10       officer presented it to me.
11  Q.   What document are you looking at right now, Officer
12       Simon?
13  A.   I'm looking at one detained, murder -- what's his
14       name?  Falynn Kenner, black female.
15            MR. MULLER:  Let me identify it for her.
16       It's a document dated May 11th, 1999 executed by
17       Antonio, I can't even read his name, some police
18       officer, and it has to do with picking Falynn Kenner
19       up at Wayne County Community College on the 11th of
20       May, and it's signed by Supervisor, Ms. Simon.
21  BY MS. SALZMAN:
22  Q.   So I'm, Officer Simon, I'm going to ask you about that
23       document and a bunch of other documents in a minute,
24       but right now I'm asking about your sworn testimony,
25       about whether you have any recollection of

Page 56

1        "involvement with a statement by Falynn Kenner?"
2   A.   Once again, ma'am, I signed it, and I will go back to
3        the PCR.  I don't see any statement.  I signed it.
4        And you keep asking me the same question over and over
5        and over and over.  Please, stop.
6   Q.   Officer Simon, you testified a minute ago that you had
7        no idea who Falynn Kenner is, correct?
8   A.   And I still don't know who she is, ma'am.  If she walk
9        in this door today, I would not know who she was.
10  Q.   Okay.  And sitting here today under oath, you have no
11       recollection of taking any kind of statement from her,
12       correct?
13  A.   How many times you want me to answer that?
14  Q.   You're going to have to answer it again so the record
15       is clear.
16  A.   I'll answer it one more time for you.  I don't
17       remember, so move on.  Don't ask me that again.
18  Q.   So when you answered your Interrogatory responses just
19       a couple months ago in March, 2020 and you swore under
20       oath that you had involvement with taking a statement
21       by Falynn Kenner, that was false?  You have no
22       recollection of that?
23            MR. MULLER:  I'm going to interpose an
24       objection.  It was true.  She just can't recall it
25       now.  I don't understand --

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Pages 57–60

Page 57

1          MS. SALZMAN:  Mike, that is improper.  You
2    are coaching been the witness.
3          MR. MULLER:  I don't understand it.  You
4    asked the question a hundred times, all right.
5          MS. SALZMAN:  And I'm entitled to make my
6    record.  You need to stop, you need to stop talking,
7    Mike, and let the witness testify.  You can state an
8    objection if you think there's something wrong with my
9    form or foundation.  Any other objections are
10   preserved.
11         MR. MULLER:  Objection, form.  Objection,
12   form, asked and answered.
13   BY MS. SALZMAN:
14   Q.   Officer Simon, in March, 2020, just a couple months
15        ago when you signed this Interrogatory response under
16        oath, was it false that you had any recollection of
17        taking a statement by Falynn Kenner?
18         MR. MULLER:  I'm going to object, form.
19   BY MS. SALZMAN:
20   Q.   You need to answer the question, Officer Simon.
21   A.   Ma'am, one more time, please don't ask me again.  I
22        don't remember, okay?  I don't remember.  So please,
23        why don't you move on?  I don't remember.
24   Q.   So it was not true to swear under oath --
25   A.   Excuse me, excuse me.

Page 58

1    Q.   -- in March, 2020 --
2    A.   Excuse me, ma'am.  I don't remember.
3    Q.   So I'm going to ask another question now.
4          MR. MULLER:  Wait a minute.  Time out.
5    This is getting out of control.  It's getting out of
6    control.  You're arguing back and forth, all right?
7    That's an objection.  Argumentative.  Form.
8    BY MS. SALZMAN:
9    Q.   Officer Simon, when you signed this Interrogatory
10        response in March, 2020 under oath, the truthful
11        answer would have been you have no recollection of
12        taking a statement from Falynn Kenner, correct?
13   A.   Ma'am, once again, I don't remember.  I don't
14        remember.  We can do this all day.  You're going to
15        get the same answer.
16   Q.   So your answer to Interrogatory Number 5 under oath --
17   A.   I don't remember.
18   Q.   -- was false?
19   A.   I don't remember.  I don't remember.
20   Q.   For the record, my question is:  Your answer to
21        Interrogatory Number 5 under oath was false, correct?
22   A.   I don't remember, ma'am.
23   Q.   Did you answer Interrogatory Number 5 by saying "I
24        don't remember what I did on this investigation"?
25         MR. MULLER:  I'm going to object.  The

Page 59

1    Interrogatory does not require that answer.  It does
2    not say "based on your independent recollection."  It
3    simply says "What role did you play?"  She had to look
4    through documents and find out her role even though
5    she doesn't remember.  That's the truth.  What is
6    going on here?
7          MS. SALZMAN:  Mike, you need to stop.  Get
8    yourself under control.  This is questioning a
9    witness.  It's a prior statement --
10         MR. MULLER:  Are we going to do this all
11   day?
12         MS. SALZMAN:  It's a prior statement she
13   made under oath.  This is standard for me to question
14   a witness like this.  I don't know why you're
15   exploding.  It's completely appropriate.
16         MR. MULLER:  Because you didn't say "based
17   on your recollection."  The Interrogatory says "What
18   role did you play?"
19   BY MS. SALZMAN:
20   Q.   Officer Simon, the truthful answer to the question of
21        what role did you play in this investigation would
22        have been "I don't recall," right?
23   A.   Ma'am, ma'am, for the what, 10th time, I don't
24        remember.
25   Q.   So the truthful answer to the Interrogatory --

Page 60

1    A.   Oh, Lord have Mercy, ma'am, please.  I don't remember.
2    Q.   I understand your testimony.
3    A.   Okay.  Why don't you --
4    Q.   I'm asking you another question which I want you to
5        listen carefully to.  When you answer it, I'll move
6        on.
7          MR. MULLER:  We're going to move on.
8    You're going to move on.  You can file a Motion to
9    Compel her to testify to that particular question.
10         MS. SALZMAN:  I am going to ask my
11   question --
12         MR. MULLER:  If you're certain that she's
13   not giving you an answer, then you can file a motion
14   in front of the judge to compel an answer.
15         MS. SALZMAN:  I'm going to ask the question
16   one last time.  Mike, if you're going to instruct the
17   witness not to answer, that's fine.  We'll have motion
18   practice.  I'm very comfortable in doing that.
19         MR. MULLER:  She's given you an answer for
20   the last 25 questions that you repeated.
21   BY MS. SALZMAN:
22   Q.   Officer Simon, when you answered Interrogatory
23        Number 5 in March, 2020, the truthful answer about
24        what role you had in this investigation would have
25        been "I don't recall," correct?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                 Pages 61–64

Page 61

1   A.   Once again, 11th time, I don't recall.  I don't
2        remember.
3   Q.   And that is not what you wrote in your Interrogatory
4        answer, correct?
5   A.   Where's this woman come in?  I don't remember, ma'am.
6        I'm done.  I don't remember.
7   Q.   Does it say "I don't remember" in the Interrogatory
8        response to Interrogatory Number 5?
9   A.   No.  I don't recall.  How's that?
10  Q.   Does it say "I don't recall" in the Interrogatory
11       response to Number 5?
12  A.   Ma'am, ma'am, ma'am.
13            MR. MULLER:  Hey, you know what, I object
14       as to form.  This is out of control.  I've never seen
15       anything like this in 40 years of practice.  I've
16       never seen anything like this.  All right.  I'm going
17       to terminate this deposition because it has come down
18       to you just being harassing.  You are harassing my
19       witness.  That's what you're doing.
20            MS. SALZMAN:  If you want to go to the
21       Court, Mike --
22            MR. MULLER:  You're harassing.  We'll read
23       this back to the judge.
24            MS. SALZMAN:  If you want to go to the
25       judge and say it's improper to ask your witness about

Page 62

1        a sworn Interrogatory response she gave three months
2        ago --
3            MR. MULLER:  It's improper to ask --
4            MS. SALZMAN:  -- that is very different
5        than what she answered today.
6            MR. MULLER:  It's very improper to ask her
7        15 or 20 times and then argue about it.
8            MR. MUELLER:  Mike, you don't have to yell.
9        We can hear you.
10           MS. SALZMAN:  No, I'm literally 7 feet away
11       from the microphone.
12           MR. MUELLER:  Well, we can hear you in a
13       regular voice.  Just speak in that regular voice.
14           MR. MULLER:  Well, okay.  I thought I had
15       to raise my voice to get across.
16  BY MS. SALZMAN:
17  Q.   Let's look at some other documents, Officer Simon,
18       because I think it's very clear you did not review
19       that Interrogatory response before you signed it.
20       Let's move on to Plaintiff's Exhibit 64, please.
21           MR. MULLER:  When were you sworn in to
22       testify?
23           MS. SALZMAN:  Mike, if you don't contain
24       yourself and stop talking.  I cannot imagine that this
25       is the record you want for this deposition.

Page 63

1            MARKED FOR IDENTIFICATION:
2            DEPOSITION EXHIBIT 64
3            11:47 p.m.
4   BY MS. SALZMAN:
5   Q.   Officer Simon, do you have Exhibit 64?
6   A.   I have 64.
7   Q.   This is a statement by Falynn J. Kenner given on
8        May 9th, 1999, correct?
9   A.   Yes.
10  Q.   Did you have any involvement in this statement?
11  A.   No, ma'am.
12  Q.   Did you ever review this statement before today?
13  A.   Not as I can recall, no.
14  Q.   And do you see that it says that Falynn Kenner is
15       16 years old?
16  A.   That's what it says, yes, ma'am.
17  Q.   And you see that beneath her signature is the
18       signature of her mother, Candy Brown?
19  A.   I see a signature here, yes, ma'am.
20  Q.   And you see at the top it says her mother is Candy
21       Brown?
22  A.   Yes.
23  Q.   Now, this statement was typed, right?
24  A.   Yes.
25  Q.   And it was typed up by an Officer Richard Ivey?

Page 64

1   A.   Yes.
2   Q.   Do you recall Mr. Ivey?
3   A.   Yes.
4   Q.   What did he look like?
5   A.   Black male, average built.
6   Q.   Tall?
7   A.   I think so.
8   Q.   Was he bald?
9   A.   Not as I can recall.  He's deceased now, ma'am.  I
10       don't know.
11  Q.   Okay.  Now, if Officer Ivey typed this up, does that
12       mean he had a typewriter with him when he took the
13       statement, or does that mean he took some notes and
14       then he used them to type up a statement after?
15  A.   Evidently he must have had a typewriter.
16  Q.   Did Falynn Kenner say anything in this statement about
17       Kendrick Scott giving her a gun?
18  A.   I don't know.  Ma'am, you want me to read the
19       statement?
20  Q.   Sure.
21  A.   What was your question?
22  Q.   Does this statement say anything about Kendrick Scott
23       giving Falynn Kenner a gun?
24  A.   I don't see anything in here about anyone giving
25       anyone a gun.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                      Pages 65–68

**Page 65**

1   Q.  I'm sorry, can you say that again?  I didn't hear you.
2         You don't see anything in here about anyone
3         giving anyone a gun?
4             MR. MULLER:  That's what she said.
5             THE WITNESS:  Yes.
6   BY MS. SALZMAN:
7   Q.  Okay.  It's a little hard to hear you.
8         And you agree with me there's nothing in
9         this statement that Falynn, on May 9, 1999, at 4:45
10        p.m., that in any way implicated Kendrick Scott in a
11        crime, correct?
12  A.  What name did you say?
13  Q.  Kendrick Scott.
14  A.  I don't know Kendrick Scott's name in this statement.
15  Q.  After she gave the statement, Falynn Kenner went home,
16        correct?
17  A.  Ma'am, I was not there.  That statement was taken by
18        Investigator Ricky Ivey.  I don't know.
19             MARKED FOR IDENTIFICATION:
20             DEPOSITION EXHIBIT 65
21             11:52 a.m.
22  BY MS. SAZIMAN:
23  Q.  Take a look at plaintiff's Exhibit 65.
24             MR. MULLER:  She's got it.
25  BY MS. SALZMAN:

**Page 66**

1   Q.  Okay.  This is the document you were describing
2         looking at a few moments ago, correct?
3   A.  Yes.
4   Q.  You signed this document, right?
5   A.  As a supervisor checking the report, yes, ma'am.
6   Q.  Okay.  And this report is dated May 11th, 1999 at 7:25
7         p.m., correct?
8   A.  Correct.
9   Q.  And it documents the arrest of Falynn Kenner, correct?
10  A.  Yes.
11  Q.  It says she was arrested at Wayne County Community
12        College, correct?  Do you see that at the top?
13  A.  Oh, yes, yes, yes.
14  Q.  So she was at school, right?
15  A.  I believe so.
16  Q.  And she was arrested there at your direction, correct?
17  A.  I don't know if I directed them to pick her up.  They
18        got my name on it, but I don't recall.
19  Q.  You see on the form about, in the sort of bottom
20        section of the form, where it says Info Follow-Up, I
21        can't read the next part, Investigator Simon?
22  A.  Yes, I see that.
23  Q.  What does that say?
24  A.  What you just said.
25  Q.  What's the word before Investigator Simon?

**Page 67**

1   A.  I have no idea.
2   Q.  Okay.  So does that refresh your recollection she was
3         arrested at your direction?
4   A.  No, ma'am.
5   Q.  Do you think that's what this form means, even if you
6         don't recall it?
7   A.  If she was arrested, I don't, I don't remember it.  I
8         don't remember.
9   Q.  My question is:  What this form says is that these
10        officers went out and arrested Falynn Kenner at your
11        direction, correct?
12  A.  I couldn't say if I gave them the information or
13        someone else gave the information.  I don't know.
14  Q.  They said, according to this paperwork, they got the
15        information from you, right?
16  A.  It's possible.
17  Q.  That's what the paperwork says.  I understand you
18        don't recall one way or the other, but that's what the
19        paperwork says, right?
20  A.  That's what the paperwork says.  I don't recall.
21  Q.  And you don't have any basis to dispute the paperwork,
22        right?
23  A.  Right.  I don't recall, ma'am.
24  Q.  And the paperwork also says Kirk wanted for homicide,
25        right?

**Page 68**

1   A.  Where you see Kirk wanted?
2   Q.  Next line?
3   A.  Yes.
4   Q.  So according to this paperwork, that's also
5         information that these officers got from you, right?
6   A.  I can't say that, ma'am.  I don't know.
7   Q.  But that's what the paperwork says, right?
8   A.  That's what the paperwork says, but I don't know if I
9         gave the information or not.
10  Q.  But again, you don't have any basis to dispute the
11        paperwork that was prepared back in 1999, right?
12  A.  Ma'am, I don't remember.
13  Q.  And then it says "The writers made location and
14        detained Kirk.  Conveyed to Homicide without incident,
15        Squad 7," right?
16  A.  Yes.
17  Q.  According to this paperwork again, you sent these guys
18        out to pick up Falynn Kenner at Wayne County Community
19        College and bring her back down to Homicide, correct?
20  A.  Once again, I don't remember.  That was back in 1999.
21        I don't remember.
22  Q.  But you agree with me that's what the paperwork says,
23        right?
24  A.  That's what it says.
25  Q.  Why was she picked up at school?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020

**Page 69**

1  A.  Ma'am, I don't know.  Why you asking me something -- I
2      don't know.  I don't know.  I have no idea.
3  Q.  Did you want her picked up at school because her mom
4      wouldn't be with her?
5  A.  Once again, I have no idea.
6  Q.  Okay.  And did you try to have Falynn Kenner arrested
7      earlier?
8  A.  Once again, I have no idea.
9  Q.  You wanted Falynn arrested because you wanted her to
10     give a new statement, correct?
11 A.  Once again, I have no idea.
12 Q.  Since she was last questioned on May 9th, Squad 7 had
13     gotten a new statement from Raymond Jackson, correct?
14 A.  I have no idea.
15 Q.  Well, let's take a look at Plaintiff's Exhibit 49 and
16     see if that refreshes your recollection.
17               MR. MULLER:  49, is that from Cathy's dep,
18     Cathy Adams?
19               MS. SALZMAN:  Yes, correct.
20               MR. MULLER:  This has got to be it.  I hope
21     it's it
22               MS. SALZMAN:  It's Raymond Jackson's
23     statement from may 10th, 1999.
24               MR. MULLER:  6 o'clock p.m.?
25               MS. SALZMAN:  Right.

**Page 70**

1                MR. MULLER:  It's the only one that's not
2      marked.
3                MS. SALZMAN:  I think it's marked on the
4      second page, Mike.  Turn to the second page, you'll
5      see Exhibit 69.
6                MR. MULLER:  Yes.
7  BY MS. SALZMAN:
8  Q.  So Officer Simon, take a minute to look at that
9      statement.  And I'm going to ask you if it refreshes
10     your recollection about Raymond Jackson's statement
11     that's memorialized here.
12 A.  Okay.
13 Q.  Does this refresh your recollection about a statement
14     that Raymond Jackson gave to the Detroit Police
15     Department on May 10, 1999?
16 A.  No, ma'am.
17 Q.  Do you see on the first page in the second paragraph
18     about 6 lines down, "I saw Snooky down by his
19     girlfriend's.  Her name is Falynn, and she lives about
20     4 days doors away from me towards Canfield.  Him and
21     Falynn were on her porch and I saw him pass her
22     something long which was wrapped up in something that
23     looked like clothing."  Do you see that?
24 A.  Yes.
25 Q.  Do you recall learning that during the course of your

**Page 71**

1      work on this case?
2  A.  No, ma'am, I don't remember none of this at all.
3  Q.  Okay.  You had Falynn Kenner arrested to try to
4      corroborate that statement, correct?
5  A.  I don't remember this at all, ma'am.
6  Q.  You wanted Falynn to tell you that Kendrick Scott had
7      handed her a gun, correct?
8  A.  I don't remember this at all, ma'am.
9  Q.  Now, Raymond Jackson didn't say anywhere in this
10     statement that Falynn had anything to do with the
11     murder, did he?
12 A.  Ma'am, I don't know anything.  I did not take this
13     statement.  Sergeant Lovier took this statement.  I do
14     not know.  I have no idea.  I don't know.
15               MARKED FOR IDENTIFICATION:
16               DEPOSITION EXHIBIT 66
17               12:02 p.m.
18 BY MS. SALZMAN:
19 Q.  Okay.  So let's take a look at Plaintiff's Exhibit 66.
20     You got that one?
21 A.  Yes.
22 Q.  This is a Constitutional Rights Certificate of
23     Notification, correct?
24 A.  Yes.
25 Q.  Standard Department of, Detroit Police Department

**Page 72**

1      form, right?
2  A.  Yes.
3  Q.  And you signed it, correct?  That's your signature at
4      the bottom?
5  A.  Yes.
6  Q.  And it's for Falynn Kenner, correct?
7  A.  Yes.
8  Q.  From May 11, 1999 at 7:35 p.m., right?
9  A.  Yes.
10 Q.  And you gave Ms. Kenner her rights when she was
11     conveyed down to Homicide after you had her arrested,
12     right?
13 A.  That's what the form says, I gave her her
14     Constitutional Rights.
15 Q.  And you did that before you proceeded to interrogate
16     her, correct?
17 A.  Yes.
18 Q.  And when you interrogated her, you asked her if
19     Kendrick Scott gave her a gun, correct?
20 A.  I don't remember that, ma'am.  I don't remember that
21     at all.  No, I don't remember that.
22 Q.  Okay.  And her mother was with her again, right, Candy
23     Brown, signed next to Falynn Kenner on the form there?
24 A.  That's correct.
25 Q.  So by the time they got Falynn Kenner down to Homicide

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 73–76

---

**Page 73**

1   to meet with you, her mother had joined her, correct?
2   A.   Her mother had to be there.  She signed the form.
3   Q.   Okay.  And you asked -- when you asked Ms. Kenner if
4   Kendrick Scott gave her a gun, she said no, right?
5   A.   Ma'am, that's a Constitutional Rights form.  I don't
6   know what you're talking about.  I don't remember.
7   This is a Constitutional Rights form that I have here.
8   It's not a statement or anything.  So I don't
9   remember.  I don't recall.
10  Q.   Well, you didn't write a statement documenting your
11  interview of Falynn Kenner on May 11, 1999, did you?
12  A.   I don't remember.  I don't have the statement in front
13  of me.
14  Q.   Well, let's take a minute, and let me tell you that
15  having reviewed the entire Homicide file produced in
16  this case, there's no witness statement authored by
17  you for your interrogation of Falynn Kenner on May 11,
18  1999.  Do you have any basis to dispute that?
19  A.   You want me to take your word for it.  I don't
20  remember.  I don't know, ma'am.  I don't remember.
21  That's you stating.
22  Q.   You don't have any recollection of filling out a
23  witness statement form for Falynn Kenner on May 11,
24  1999, right?
25  A.   I don't recall any of this, no, ma'am.

---

**Page 74**

1   Q.   So you interrogated a witness without writing a
2   witness statement for them, correct?
3   A.   Ma'am, third time, I don't remember.  I don't recall.
4   Q.   Well, is it possible that you interviewed a witness
5   without writing a witness statement for her just in
6   your general practice and experience?
7   A.   Ma'am, I don't remember.  I don't recall.
8   Q.   Okay.  As an investigator who was with the department
9   for how many years total?
10  A.   Ma'am, I know where you're going.  I don't remember.
11  I don't recall.  I was with the department for a
12  number of years.  I'm not going to -- I don't have a
13  statement in front of me, and you're not going to get
14  me to say something that I don't, I don't remember.
15  Q.   Well, by May, 1999, you told me you had 22 years on
16  the force, correct?
17  A.   No, you said that.  You added it up, so.
18  Q.   Well, you agree with me, right?  It's 22 years from
19  1977 to 1999?
20  A.   Yes, ma'am, and I still don't recall.
21  Q.   So what I'm asking -- I understand you don't recall
22  with this particular witness in this particular case.
23  I'm asking about your general practice right now.
24  As an investigator on the Homicide
25  Department around that time, May, 1999, was it your

---

**Page 75**

1   practice not to necessarily write a witness statement
2   every time you interviewed a witness?
3   A.   It's possible.
4   Q.   Okay.  Because you're not like a Court Reporter, hired
5   to write down every word a witness says, right?
6   A.   If I take a witness statement I write it down as the
7   witness tell me what happened.  The witness has the
8   opportunity to read it and make any corrections.  And
9   no, I'm not a Court Reporter.
10  Q.   Okay.  You didn't write a witness statement here
11  because it wouldn't have helped build a case against
12  Kendrick Scott, correct?
13  A.   Ma'am, I don't recall.  I don't remember writing a
14  statement.
15  Q.   You agreed with me if Falynn Kenner told you that
16  Kendrick Scott didn't give her a gun, that'd be
17  exculpatory information, right?
18  A.   Ma'am, if she had told me, gave a statement, I would
19  have wrote it down.
20  Q.   But I'm asking a different question.
21        If she told you that Kendrick Scott did not
22  give her a gun, that would be exculpatory evidence,
23  correct?
24  A.   Ma'am, if she told me that, I would have wrote it down
25  and had her sign it.

---

**Page 76**

1   Q.   Do you know what exculpatory evidence is?
2   A.   You know what, I don't remember this case.  I don't
3   remember this woman, and you can't make me remember
4   something I don't remember.
5   Q.   I understand.  I'm asking you a different question
6   now, Officer Simon.  If you could listen to my
7   questions and just try to answer my questions as I'm
8   asking them, it'll speed this up for you, okay?  What
9   I'm asking right now is whether --
10  A.   Excuse me.  Excuse me.  Excuse me.  Can I take a break
11  so I can go to the restroom, please?
12        MR. MULLER:  She needs to go to the
13  restroom.
14        MS. SALZMAN:  There's a pending question,
15  so I'd like you to answer it.  And once that's
16  answered, you can go to the restroom and take a break.
17        MR. MULLER:  That sounds really weird.  It
18  sounds like you're Mother Hubbard giving her
19  permission to go to the bathroom.
20        MS. SALZMAN:  When there's a pending
21  question, Mike, the witness needs to answer the
22  pending question before she takes a break.  It'll take
23  her all of 5 minutes to answer the question and she
24  can take a break.
25        MR. MULLER:  Wait a minute.  What was the

---

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Pages 77–80

Page 77

1      question?
2  BY MS. SALZMAN:
3      Q.   The question was:  Was it your general practice -- I'm
4           sorry, no.  I forgot my own question.
5                     Here's the question.  The question is:  Do
6           you know what exculpatory evidence is?
7      A.   What's exculpatory evidence, ma'am?  Why don't you
8           explain it to me again.
9      Q.   Again, Officer Simon, you just have to answer my
10          question, yes or no.
11     A.   No, no, no, no.
12     Q.   You don't know what exculpatory evidence is?
13     A.   No, no, no, no.
14               MS. SALZMAN:  Okay.  You can take a break.
15               THE WITNESS:  Thank you.  Lord, this woman.
16               (Off the record at 12:09 p.m.)
17               (Back on the record at 12:20 p.m.)
18  BY MS. SALZMAN:
19     Q.   Do you know what Brady evidence is, Officer Simon?
20     A.   I heard of Brady evidence.  I don't remember.  I don't
21          recall exactly what Brady is.  I don't remember.
22     Q.   What's your general understanding of what Brady
23          evidence is?
24     A.   I don't recall.
25     Q.   You have no understanding at all?

Page 78

1      A.   No, I heard it.  I don't remember.
2      Q.   Did you get training on that when you were at the
3           department?
4      A.   It's possible.  I don't remember.
5      Q.   Were you trained that the prosecutor had to turn over
6           to defense counsel any evidence that might help build
7           a defense?
8      A.   I don't remember.  I don't recall that.
9      Q.   Did you understand that if you had a statement from a
10          witness that said she didn't give a gun to a suspect,
11          that is evidence that would have to be turned over to
12          defense counsel?
13     A.   My understanding, ma'am, it has to be turned, the
14          prosecutor has to turn everything over to the defense
15          counsel, not DPD.
16     Q.   So DPD turns it over to the prosecutor first, correct?
17     A.   If it's a case, yes.
18     Q.   And then the prosecutor turns the file over to defense
19          counsel, right?
20     A.   From my understanding, yes.
21     Q.   And if you had written up a statement for Falynn
22          Kenner that said Kendrick Scott did not give her a gun
23          and that statement was in the file, it would have been
24          turned over to defense counsel, right?
25     A.   By the prosecutor.

Page 79

1      Q.   First to the prosecutor and then to defense counsel,
2           correct?
3      A.   That's my understanding.
4      Q.   That's why you didn't write a statement for Falynn
5           Kenner, because you knew it would go to defense
6           counsel, right?
7      A.   No, ma'am.  I don't remember about taking a statement.
8           I don't remember any of that, and you're not going to
9           have me sit here and say that's correct.  No, I don't
10          remember.
11     Q.   You don't remember why you didn't write a statement
12          for Falynn Kenner that night, correct?
13     A.   That's correct.
14     Q.   Okay.  Now, you did threaten to charge Falynn Kenner
15          with murder if she didn't give you a statement saying
16          Kendrick Scott gave her a gun, right?
17     A.   I didn't threaten anyone, ma'am.
18     Q.   You did actually charge Falynn Kenner with murder,
19          didn't you?
20     A.   I didn't charge anyone, ma'am.
21     Q.   Well, let's take a look at Plaintiff's Exhibit 67.
22               MR. MULLER:  Look, police officers don't
23          charge anyone.
24               MS. SALZMAN:  Mike, you're not testifying
25          today, so you can say objection if you don't like my

Page 80

1      question, that's it.
2               Will you give the witness Exhibit 67.
3               MR. MULLER:  Fine, fine, fine.  Objection.
4               MS. SALZMAN:  It's going to go a lot faster
5           for everybody if we stop fighting about that, Mike.
6               Can you give the witness Exhibit 67,
7           please?
8               MR. MULLER:  Okay.  I got 67.  It's a
9           Complaint, Request For Action?
10              MS. SALZMAN:  Correct, 2 pages?
11              MR. MULLER:  Correct.
12              MS. SALZMAN:  Great, thank you.
13              MR. MULLER:  That's what I have.
14              MARKED FOR IDENTIFICATION:
15              DEPOSITION EXHIBIT 67
16              12:23 p.m.
17  BY MS. SALZMAN:
18     Q.   This is a Complaint, Request For Action signed by you,
19          Officer Simon, correct?
20              MR. MULLER:  I can't tell.  It looks like
21          yours.
22              THE WITNESS:  It looks like mine, yes, it
23          looks like mine.
24              MR. MULLER:  Our copy of the exhibit is
25          really very, very difficult to see the signature, but

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 81–84

**Page 81**

1   it looks like hers.
2          MS. SALZMAN:  Again, I need the witness to
3   testify, not you, Mike.  It's not admissible evidence
4   if you say it looks like her.
5   BY MS. SALZMAN:
6   Q.   Take a look at the statement --
7   A.   Ma'am, excuse me.  It's very, very light.  It's
8        possible, yes, it could be my signature.
9   Q.   And that's your name beneath it, right, Investigator
10       Barbara Simon?
11  A.   Yes.
12  Q.   You don't have any basis to dispute you signed this,
13       correct?
14  A.   My name is at the bottom, but it's typed in, yes.
15  Q.   And as far as you can tell, it looks like your
16       signature, correct?
17  A.   Yes.
18  Q.   And this is a complaint against Falynn Kenner,
19       correct?
20  A.   Yes.
21  Q.   And it says the Basis For Referral, do you see that
22       section on the first page?  It says "Murder.
23       Defendant was given a gun that was used in a homicide
24       on May 9th, 1999.  Defendant stated that she was not
25       going to tell where she put the gun," right?

**Page 82**

1   A.   That's what it says.
2   Q.   You wrote that, right?
3   A.   I don't remember this, writing this, ma'am, no.
4   Q.   If you signed this form, you either wrote it or you
5        approved it before you signed it, right?
6   A.   I don't remember writing it, but my signature's at the
7        bottom, yes, ma'am.
8   Q.   So you either wrote it or someone else wrote it for
9        you and you approved it before you put your signature
10       on the form, correct?
11  A.   My signature is on the form, yes, ma'am.
12  Q.   So that was your statement to the Court, right, about
13       Falynn Kenner?
14  A.   It's a statement, ma'am.  I don't know if it went to
15       the Court or what.  I was not the officer in charge of
16       the case.
17  Q.   Well, you see that this is a form, a State of
18       Michigan, County of Wayne Probate Court, what does it
19       say?  What does it say up there on the side?  It's
20       hard to read, but it's the Juvenile Division of
21       the court, correct?
22  A.   It says -- where you see Juvenile Court?
23  Q.   Very top of the page.
24  A.   Yes, yes.
25  Q.   So it was a complaint that was filed with the Court,

**Page 83**

1   correct?
2   A.   As far as I know, yes, ma'am.
3   Q.   And I mean this is a standard form you filled out
4        countless times as a DPD, correct?
5   A.   I'm not going to say countless times, ma'am.  It could
6        have been -- I'm not going to say countless times.  I
7        have filled them out, yes.
8   Q.   And when you filled them out, you understood they were
9        getting filed with the Court, correct?
10  A.   Yes, ma'am.
11  Q.   What's the purpose of this form?
12  A.   That's part of the form, that Homicide form, so --
13  Q.   The purpose is to charge a juvenile with homicide?
14  A.   No, I didn't say that.  I said it's part of the
15       Homicide file.
16  Q.   But my question is:  Why did you fill out this form?
17  A.   I don't remember, ma'am.  I don't know.
18  Q.   Why would you generally fill out this standard form as
19       a DPD officer?
20  A.   I don't remember, ma'am.
21  Q.   What action could you get the Court to take when you
22       filled out a form like this?
23  A.   It all depends on the Court, ma'am.  The Court can see
24       it and blame the person for it or they can deny it, so
25       I don't know.

**Page 84**

1   Q.   So what are your options?
2   A.   It's -- I wasn't the officer in charge of the case.
3   Q.   What are the options, when the Court gets this form,
4        what do they do?
5   A.   They can bring this person forward or they can deny
6        it.
7   Q.   What does bring the person forward mean?
8   A.   In front of the juvenile judge.  She went to, here it
9        say she went to Wayne County Youth Home.
10  Q.   Where are you reading from?
11  A.   Second page?
12  Q.   Yes, at the bottom there, "Detention:  Alternative
13       placement"?
14  A.   Yes.
15  Q.   So was the purpose of this paperwork to place Falynn
16       in a group home?
17  A.   It's possible, yes.  I don't remember, ma'am.
18  Q.   I understand you don't remember, but I'm just asking
19       as an officer familiar with this kind of paperwork
20       who's filled it out multiple times.
21  A.   It could be to place her in the Wayne County Youth
22       Home.
23  Q.   Is that what it looks like to you from looking at this
24       paperwork?
25  A.   Yes.  She was placed in a Wayne County Youth Home,

Case 2:19-cv-12331-PDB-EAS   ECF No. 24-11, PageID.1380   Filed 04/07/21   Page 23 of 33

**Page 85**

1     yes, and it was authorized by Ms. Norcross.

2  Q.  And do you see the section above Section 29, Custody,
3     same page of the exhibit?

4  A.  What number?

5  Q.  29.  It says Custody in the header.

6  A.  Yes.

7  Q.  Okay.  Do you see it's the box checked off, it says
8     "It was reasonably believed the child was evading
9     legal custodian"?

10  A.  "Condition endangering the child's health, safety and
11     welfare," yes, ma'am.

12  Q.  But you didn't check that box off.  You checked the
13     box off above it.  It was "Reasonably believed the
14     child was evading legal custodian"?

15  A.  That's correct.

16  Q.  What does that mean?

17  A.  It could mean a lot of things.  It could mean she was
18     endangered -- something happened at home, things that
19     wasn't going right at home.  I don't remember, ma'am.

20  Q.  What basis did you have to believe on May 11, 1999,
21     that Falynn Kenner was evading her legal custodian?

22  A.  I don't remember.

23  Q.  Her legal custodian would be her mother, right, who
24     attended two police interviews with her?

25  A.  Yes, and her mother was also notified.

**Page 86**

1  Q.  Did you see any evidence in the papers we've looked at
2     so far that Falynn Kenner was evading her mother's
3     custody?

4  A.  It could be.  I don't remember, ma'am.  I don't
5     remember why she was conveyed to the juvenile home.  I
6     don't remember.

7  Q.  You wanted her in a juvenile home so you could get her
8     away from her mother, right?

9  A.  Ma'am, I don't want anybody in juvenile home, no one.
10     I don't remember, and you're not going to sit here and
11     make me say "Oh, yes, I wanted her from her mother."
12     I don't remember.

13  Q.  But you asked the Court to separate her from her
14     mother, according to this paperwork, right?

15  A.  I don't remember, ma'am.

16  Q.  I understand you don't remember, but according to the
17     paperwork you're looking at here, you asked the Court
18     to take action and put her in a youth home away from
19     her mother, correct?  That's what the paperwork says?

20  A.  The paperwork says she was conveyed to Wayne County
21     Youth Home.  The paperwork doesn't say she was taken
22     away from her mother.

23  Q.  Well, if she was in a youth home, she was away from
24     her mother, right?

25  A.  She was in the Wayne County Youth Home, ma'am.

**Page 87**

1  Q.  And that's not her mother's house, correct?

2  A.  I don't think so.

3  Q.  Different place entirely, Wayne County Youth Home,
4     right?

5  A.  You know it is, yes.

6  Q.  And you know so, too, right?

7  A.  I just answered your question.  Are you listening?
8     Are you listening?

9  Q.  I'm listening very carefully, Officer Simon, don't you
10     worry about that.

11  A.  I said you know it is, and yes.  So you asked me the
12     same thing over again.  Yes, it's the Wayne County
13     Youth Home.

14  Q.  So was the Request For Action, according to this
15     paperwork -- I understand you don't recall anything
16     about this case, but according to the paperwork we're
17     looking at now, is it your understanding that this
18     Request For Action, the action that was being
19     requested by you, was that the Juvenile Court placed
20     Falynn Kenner in the Wayne County Youth Home?

21  A.  She was in the Wayne County Youth Home, ma'am, yes.

22  Q.  Was that the request you asked the Court, was that the
23     action you requested the Court to take?

24  A.  Ma'am, she was in the Wayne County Youth Home, yes.

25  Q.  Are you listening to me now, Officer Simon?  I'm

**Page 88**

1     asking a different question.

2  A.  Are you listening to me?  Are you listening to me?
3     You asked me that, but you changed the wording.

4  Q.  No, I'm asking a different question now, so listen
5     carefully.  I think you're misunderstanding me.  I
6     understand she ended up in the Youth Home.  I'm on the
7     same page with you about that, but I'm asking, this
8     form is called a Request For Action, right?

9  A.  Once again, yes.

10  Q.  Okay.  And my question, listen carefully, was the
11     action you were requesting Juvenile Court take, was
12     that action to place Falynn Kenner in the Youth Home?

13  A.  She was, yes, she was placed in the Wayne County Youth
14     Home.

15  Q.  And was that the purpose of submitting this paperwork
16     to the Court?

17  A.  We had to submit this report to the Wayne County Youth
18     Home.

19  Q.  And why did you write at the top of the paperwork that
20     she was a murder defendant?

21  A.  I don't remember writing that, ma'am.  As a matter of
22     fact, it was typed.  I don't remember typing that.

23  Q.  Well, why did you sign the form that says she was a
24     murder defendant?

25  A.  Ma'am, I don't remember.  I don't remember.

SIMON, OFFICER BARBARA JEAN
07/20/2020

---

**Page 89**

1  Q.  What would be the purpose in informing the Juvenile
2      Court that she was a murder defendant?
3  A.  Ma'am, I don't remember.  You have to talk to the
4      officer in charge of the case.  I don't remember.
5  Q.  Okay.  We did talk to the officer in charge of the
6      case, but this is paperwork you filled out, right?
7  A.  Yes, right.  I signed it.  I'm not going to say I
8      typed that in there.  I signed it.  I don't remember.
9  Q.  So sitting here today under oath, you don't recall at
10     all one way or the other whether you had Falynn Kenner
11     placed in a group home, is that your testimony?
12 A.  That's my testimony, I don't remember.
13              MARKED FOR IDENTIFICATION:
14              DEPOSITION EXHIBIT 68
15              12:34 p.m.
16 BY MS. SALZMAN:
17 Q.  Okay.  Take a look, please, at Exhibit 68.  You got
18     that one?
19 A.  Yes.
20 Q.  This is another standard court form, correct?
21 A.  Yes.
22 Q.  And it's dated May 12th, 1999, right?
23 A.  Dated what?
24 Q.  May 12th, 1999.  That's the date at the very top?
25 A.  Yes.

**Page 90**

1  Q.  Okay.  So it's the very next day after you signed that
2      Request For Action form, correct?
3  A.  No, I didn't sign this form.
4  Q.  No.  My question is:  It's the very next day after you
5      signed the Request For Action form, Plaintiff's
6      Exhibit 67 that we were just looking at, right?
7  A.  Yes, yes.
8  Q.  And you got this from the Court, correct?
9  A.  I don't remember this file, ma'am, this paper.  I
10     don't remember it.
11 Q.  Well, it's addressed "Dear Barbara Simon, Homicide,"
12     right?
13 A.  Yes, but that don't mean I remember it.  I don't
14     remember it.
15 Q.  So it's addressed to you, but you're not sure if you
16     got it, correct?
17 A.  That's correct.
18 Q.  And it says that it's about Falynn Kenner, right?
19 A.  Yes.
20 Q.  And it says "Charge:  Murder," right?
21 A.  That's what it says.
22 Q.  And that's because you had told the Court in your
23     paperwork the day before that she was a murder
24     defendant, right?
25 A.  I don't remember saying she was a murder defendant,

**Page 91**

1      ma'am.  And you're not going to make me say that.  I
2      don't remember.
3  Q.  Well, the form you signed, Plaintiff's Exhibit 67,
4      said she was a murder defendant, right?
5  A.  The form said it, but I don't remember putting
6      anything like that on the form, ma'am.  I didn't type
7      that form.
8  Q.  Are you disputing the accuracy of that form, or are
9      you just telling me "It says what it says but I don't
10     remember"?
11 A.  I don't remember.
12 Q.  But you're not disputing that that is, in fact, the
13     form you signed, correct?
14 A.  I signed it, but I don't remember the form.
15 Q.  Okay.  And the action the Court took on your Request
16     For Action was petition dismissed, denied, right?
17 A.  It says "Petition dismissed, denied.  Reason:
18     Investigation continuing."  That's what it says.
19 Q.  So the Court found you had no evidence to charge
20     Falynn Kenner with murder, correct?
21 A.  It says investigation continuing, ma'am.  It does not
22     say you have no information.  No, that's not what it's
23     saying, no.
24 Q.  But your position to have her charged with murder at
25     this time was dismissed, correct?

**Page 92**

1  A.  Continue, investigation continuing.
2  Q.  Sitting here today under oath, you don't have any
3      reason to think you had probable cause charging Falynn
4      Kenner with murder, do you?
5  A.  Ma'am, I don't remember this.  I'm reading what's on
6      the paper.  The investigation's continuing.  What part
7      of this, what part of this that you don't understand?
8      It says investigation continuing.  You want me to
9      say -- I don't even know -- you know what, wait a
10     minute.  Let me calm down.  I don't remember this
11     case.  I do not remember this person, and I'm not
12     going to agree with you on something that I don't
13     remember.
14 Q.  It's possible you arrested Falynn Kenner without
15     probable cause, right?
16 A.  I don't remember.
17 Q.  It's possible, right?
18 A.  I don't remember.
19 Q.  Back in 1999 it was commonplace for Detroit Police
20     officers to detain people without probable cause,
21     correct?
22 A.  Say what?
23 Q.  Back in 1999 it was commonplace for Detroit Police
24     officers to detain people without probable cause,
25     right?

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 93–96

Page 93

1   A.   I don't recall that.
2   Q.   You don't know one way or the other?
3   A.   I don't recall it.
4   Q.   How long did Falynn Kenner spend in the Youth Home?
5   A.   I have no idea.
6   Q.   Never checked into that?
7   A.   I don't recall.
8   Q.   Did you make any other efforts to prosecute her for
9        murder?
10  A.   I don't recall.
11  Q.   You're aware that the Department of Justice found, a
12       year after this case in 2000, that the Detroit Police
13       Department had a problem with seizing individuals
14       without reasonable suspicion, you've heard of that?
15            MR. MULLER:  I'm going to interpose an
16       objection based on form and foundation.
17  BY MS. SALZMAN:
18  Q.   Officer Simon, you can answer the question.
19  A.   I don't remember.  I don't recall, ma'am.
20  Q.   You don't recall that a consent judgment was entered
21       into between the Department of Justice and the City of
22       Detroit?
23  A.   No, ma'am.
24  Q.   When you interrogated Falynn Kenner and had her sign
25       that Constitutional Rights Notification form, she was

Page 94

1        in handcuffs, right?
2   A.   I don't recall, but I believe so, ma'am.  I don't
3        recall.
4   Q.   She would have been placed in handcuffs when she was
5        arrested, right?
6   A.   You would have to ask the arresting officers that.  I
7        don't know.
8   Q.   But that's standard DPD practice, right, to place
9        someone in handcuffs when they're arrested?
10  A.   She could have been.  I can't recall if she was, if
11       they put handcuffs on her.  I don't know.
12  Q.   What was your training, when you arrested someone as a
13       DPD officer, did you put them in handcuffs?
14  A.   It all depends, ma'am.
15  Q.   And she was conveyed downtown to Homicide in a police
16       squad car, right?
17  A.   It could have been a plain car.  It could have been a
18       police car.  I don't know.
19  Q.   It was definitely a police car, right?
20  A.   I beg your pardon?
21  Q.   It was definitely a police car, right?
22  A.   It could have been marked or unmarked.
23  Q.   But marked or unmarked, it was a police vehicle,
24       correct?
25  A.   As far as I know, yes, ma'am.

Page 95

1   Q.   Let's go back to your Interrogatory response, 85,
2        please.  Do you have that in front of you?
3   A.   Yes, I do.
4   Q.   And we're back to Interrogatory Number 5, the one we
5        were discussing before, Page 3.  Do you see where you
6        said that your involvement included advising Justly
7        Johnson of his Constitutional Rights on May 10th,
8        1999?
9   A.   Yes.
10  Q.   And you did more than just advise Justly Johnson of
11       his Constitutional Rights, didn't you, Officer Simon?
12  A.   It's possible.
13  Q.   You also interrogated him, right?
14  A.   Only thing I see, I took information from him, ma'am.
15  Q.   You're looking at that witness statement now?
16  A.   Yes.
17            MARKED FOR IDENTIFICATION:
18            DEPOSITION EXHIBIT 63
19            12:43 p.m.
20  BY MS. SALZMAN:
21  Q.   Okay.  So let's take a look at that.  Actually, before
22       we get to that, let's look at Plaintiff's Exhibit 63.
23            MR. MULLER:  Constitutional Rights
24       Notification?
25            MS. SALZMAN:  Yes.

Page 96

1            MR. MULLER:  There you go.
2            THE WITNESS:  Yes, ma'am.
3   BY MS. SALZMAN:
4   Q.   This is the same standard Constitutional Rights
5        Notification paperwork, correct?
6   A.   Yes, it's a copy of a Constitutional notification
7        right.
8   Q.   And this one is for Justly Johnson on May 10th, 1999
9        at 7:45 p.m., right?
10  A.   Yes.
11  Q.   And you signed this, right?
12  A.   Yes, I did.
13  Q.   Okay.  And you gave Mr. Johnson his Constitutional
14       Rights because you were going to question him, right?
15  A.   That's correct.
16  Q.   Okay.  And by the time you got to questioning
17       Mr. Johnson on May 10th at 7:45 in the evening, he'd
18       been locked up for a good part of the day, right?
19  A.   I have no idea.
20  Q.   Was it your practice, before you interrogated a
21       witness, to go back and look through the file and see
22       if they'd made any statements before?
23  A.   I don't know if I did or not, ma'am.  I don't know.
24  Q.   Well, let's take a look at Justly Johnson's earlier
25       statement.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 97–100

**Page 97**

1      MS. SALZMAN:  Mike, that's Defense
2  Exhibit B.  Do you have that?
3      MR. MULLER:  I have a generic copy of it.
4      MS. SALZMAN:  That's fine.
5      THE WITNESS:  I have it.
6  BY MS. SALZMAN:
7  Q.  Okay.  So do you see that this is a witness statement
8      for the same witness, Justly Johnson, signed earlier
9      that day on May 10th, 1999 at 10:55 a.m.?
10 A.  Yes.
11 Q.  Were you involved in taking this statement at all?
12 A.  No, ma'am.
13 Q.  Had you reviewed it before you read him his rights
14     8 hours later?
15 A.  I don't remember.
16 Q.  Was it your practice to review something like this
17     before you read someone their rights and started
18     questioning them?
19 A.  It could be possible.
20 Q.  Now, after Mr. Johnson gave his statement in defense
21     Exhibit B at 10:55 a.m., he was locked up on the 9th
22     floor of Homicide, right?
23 A.  I have no idea.
24 Q.  Well, when you went and got him to read him his
25     rights, you got him out of a cell, right?

**Page 98**

1  A.  I don't remember.
2  Q.  Okay.  Let's take a look at Defense Exhibit C.
3  A.  Who?
4  Q.  C as in Charlie?
5      MR. MULLER:  What is it?
6      MS. SALZMAN:  It's the one she was looking
7      at before where she wrote out the information for
8      Justly Johnson and then it's black.
9      THE WITNESS:  Okay.
10     MR. MULLER:  We've got it.
11 BY MS. SALZMAN:
12 Q.  Okay.  So this is your handwriting, Officer Simon, on
13     Defense Exhibit C, correct?
14 A.  Correct.
15 Q.  And you filled out this form on May 10th, 1999 at 7:47
16     p.m.?
17 A.  Yes.
18 Q.  And so you did that right after reading Justly Johnson
19     his rights, correct?  Plaintiff's Exhibit 63 is the
20     rights notification?
21 A.  Yes, ma'am.
22 Q.  Just a minute later, right?
23 A.  Yes.
24 Q.  And you filled that out because you were going to
25     interrogate Justly Johnson and you were going to take

**Page 99**

1      a statement from him, right?
2  A.  I believe so, yes.
3  Q.  And you didn't write anything down, correct?
4  A.  Correct.
5  Q.  Didn't write down a single question you asked him,
6      correct?
7  A.  I didn't take a statement from him.
8  Q.  But my question is:  You didn't write down any
9      questions you asked him, correct?
10 A.  I didn't take any, write down any questions, or I
11     didn't take a statement from him.
12 Q.  Okay.  And that's because what Justly Johnson told you
13     at 7:47 p.m. on May 10th, 1999, is he didn't have
14     anything to do with this murder, right?
15 A.  I don't remember.
16 Q.  And you didn't want to write that down because it
17     wasn't helpful for the case that the Detroit Police
18     Department was building, right?
19 A.  I don't remember.
20 Q.  Justly Johnson told you over and over again that night
21     that he didn't have anything to do with this murder,
22     didn't he?
23 A.  I'm telling you over and over again, I don't remember.
24 Q.  You didn't write that down on this witness statement,
25     did you?

**Page 100**

1  A.  I wrote nothing down.  I don't remember.
2  Q.  Okay.  And Justly Johnson told you over and over again
3      that night that he had an alibi, didn't he?
4  A.  I'm telling you over and over again, I don't remember.
5  Q.  And you didn't write that down on this witness
6      statement either, did you?
7  A.  I wrote nothing down.  I don't remember.
8  Q.  You told Justly Johnson he should confess to second
9      degree murder and that he could go home, right?
10 A.  I don't remember saying anything.  I don't remember
11     this case at all.
12 Q.  Okay.  So you just don't know what you told Justly
13     Johnson that night, is that right?
14 A.  I don't remember.  I don't remember this case at all.
15 Q.  Sitting here today, Officer Simon, do you have any
16     recollection at all of advising Justly Johnson of his
17     Constitutional Rights?
18 A.  No, ma'am, I don't remember this case at all.  I don't
19     remember anything about this case.
20 Q.  So when you answered Interrogatory Number 5 and said
21     that you had advised Justly Johnson of his rights,
22     that's not a truthful statement, correct?
23 A.  I evidently had advised him of his rights.  I just
24     don't remember, ma'am.  I have a Constitutional Rights
25     form in front of me that he signed and I signed.  I

SIMON, OFFICER BARBARA JEAN
07/20/2020

Page 101

1  just don't remember this case, and it's nothing you
2  can say that's going to make me remember this case. I
3  don't remember it.
4  Q.  Okay. So when you answered the Interrogatory, your
5  truthful answer should have been "I just don't
6  remember anything about this case," correct?
7  A.  I don't remember this case at all, ma'am.
8  Q.  And that's not what you said in the Interrogatory,
9  correct?
10         MR. MULLER: She based that on documents.
11  She had no independent recollection. I mean, how many
12  times do we have to go over --
13  BY MS. SALZMAN:
14  Q.  Did you say that in your Interrogatory response,
15  Officer Simon, "I have no recollection of this case"?
16         MR. MULLER: You know what, answer whatever
17  you want to answer. I don't know what to say to you.
18         THE WITNESS: I don't remember. I don't
19  remember.
20  BY MS. SALZMAN:
21  Q.  You don't remember what you said in your Interrogatory
22  response? You're looking at your Interrogatory
23  response right now, right?
24  A.  Would you let me read this, please? What's --
25  Q.  What are you reading."

Page 102

1  A.  Nothing, I'm not reading anything. I don't remember.
2  I don't remember. I don't remember. I'm not reading
3  anything. Nothing. Go ahead.
4  Q.  Well, take a minute again to read Interrogatory
5  Number 5 in Exhibit 85 and tell me, after reading it
6  again, if you agree with me, it doesn't say "I don't
7  recall."
8  A.  No, it don't say that, but you're not going to make me
9  remember this case either. I don't remember this
10  case. This was 20 some years ago. I don't remember.
11  Q.  Officer Simon, I just want to be totally clear about
12  this.
13         Now that we have looked at all of these
14  documents in your deposition today, has your
15  recollection about your work on this case been
16  refreshed at all?
17  A.  Ma'am, what's your name?
18  Q.  Can you answer my question, Officer Simon?
19  A.  What's your name?
20  Q.  I'm asking the questions. I told you my name at the
21  beginning. It's a simple question --
22  A.  Miss, I don't remember. I don't remember. I was
23  going to say Miss whoever. I don't remember. So
24  you're asking me the same thing. I don't remember.
25  What part of "I don't remember" you don't understand?

Page 103

1  I don't remember. I don't remember this case at all.
2  Q.  Is there anything else I could show you today to help
3  refresh your recollection further?
4  A.  No, ma'am.
5         MS. SALZMAN: Give me just a minute to
6  check in with my team. I may be done.
7         THE WITNESS: Thank you.
8         MS. SALZMAN: Do you want to take a break,
9  use the restroom?
10         THE WITNESS: I want you to check your
11  notes so we can be done.
12         MR. MULLER: We're not going to be done.
13  Wolf has a bunch of questions.
14         THE WITNESS: Better than her.
15         (Off the record at 12:52 p.m.)
16         (Back on the record at 12:53 p.m.)
17         MS. SALZMAN: Mike, if you're trying to
18  have a privileged conversation with your client,
19  you're doing it in front of us, so the privilege is
20  waived and I'm going to have to ask her about that.
21  Please stop coaching her. It's just not proper, okay?
22         MR. MULLER: I'm not coaching anybody.
23  BY MS. SALZMAN:
24  Q.  I do have a few more questions, Officer Simon, and
25  then I'm going to turn it over to Mr. Mueller who --

Page 104

1  A.  Go ahead, honey, go ahead.
2  Q.  Okay. Have you ever been disciplined at the Detroit
3  Police Department?
4  A.  Yes.
5  Q.  Okay. What for?
6  A.  When my weapon was stolen.
7  Q.  When your weapon was stolen?
8  A.  Yes, ma'am.
9  Q.  Anything else?
10  A.  Not that I can recall.
11  Q.  I want to ask you about one other exhibit.
12         MS. SALZMAN: Mike, do you have Exhibit 69
13  there?
14         MR. MULLER: I'm sure I do. Hang on. What
15  the heck are you doing with this? Did my colleague
16  produce it?
17         MS. SALZMAN: Yes.
18         MR. MULLER: This is privileged.
19         MS. SALZMAN: I don't think so. It was
20  produced to us and it was subject to a motion with
21  redactions.
22         MR. MULLER: Do you want to go to the
23  second page? What page do you want to go on in that
24  exhibit?
25         MS. SALZMAN: Yes, the second page. Is

Page 105

1               that -- can you hear me now, Mike?
2                     MR. MULLER:  Yes.
3                     MS. SALZMAN:  Okay, second page, please,
4      the section Investigator Barbara Simon.
5                     THE WITNESS:  Yes, ma'am, and I got 5 days
6      suspension, too.
7  BY MS. SALZMAN:
8  Q.  I want to direct your attention -- you see the section
9      that says Old History, File Number 000187?
10  A.  Yes.
11  Q.  Okay.  And you see it says "Officer Simon received an
12      official reprimand on March 15th, 2000 for violation
13      of Homicide standard procedures interview,
14      interrogation of defendant.  Charges dismissed on
15      May 9th, 2000 by COP," do you see that?
16  A.  Yes.
17  Q.  What was the official reprimand for?
18  A.  I have no idea.
19  Q.  Did it have anything to do with the Lisa Kindred case?
20  A.  I have no idea.
21  Q.  Do you have any recollection of this discipline?
22  A.  No.
23              MR. MULLER:  Well, it was, the charges
24      were dismissed.
25  BY MS. SALZMAN:

Page 106

1  Q.  That was going to be my next question, what was your
2      defense?
3  A.  I don't even remember this, ma'am.
4  Q.  Do you know how you got the charged dismissed?
5  A.  I do not know.  I don't know what COP is.
6              MR. MULLER:  I've never heard of COP.
7              MS. SALZMAN:  Chief of Police, maybe.
8              MR. MULLER:  Oh, yes.
9              THE WITNESS:  Oh, okay.
10  BY MS. SALZMAN:
11  Q.  You don't know what this incident is, correct?
12  A.  No, I don't.
13  Q.  Do you have any documents that would refresh your
14      recollection about what this incident was?
15  A.  No, ma'am.
16             MS. SALZMAN:  I'm going to turn it over to
17      Mr. Mueller now.  Thank you, Officer Simon.
18                 EXAMINATION
19  BY MR. MUELLER:
20  Q.  Thank you.  Let me just ask you a few questions.  I
21      represent Justly Johnson here.  I wanted to ask just a
22      couple of clean-up questions.
23         If we look at Exhibit 64, I think we talked
24      about that earlier, of Falynn Kenner's statement taken
25      by Richard Ivey on May 9th at 4:45 p.m., do you see

Page 107

1      that?
2  A.  Yes.
3  Q.  You read that over.  Maybe just take a quick glance at
4      it to look it over again, but you've had a lot of
5      training in your career and know what probable cause
6      is, correct?
7  A.  Yes.
8  Q.  You understand that before somebody can be arrested,
9      you need probable cause to arrest them, correct?
10  A.  Are you asking me if this is in this statement?
11  Q.  No, just a general question.
12  A.  Oh, yes.
13  Q.  You need probable cause for an arrest?
14  A.  Yes, I see what you're saying.  I thought you were
15      asking about what's in the statement.
16  Q.  People have a Constitutional right not to be seized
17      without probable cause, correct?
18  A.  Correct.
19  Q.  And as you look at Exhibit 64, Falynn Kenner's
20      statement of May 9th, is there anything in here that
21      you read that would suggest that there would be
22      probable cause for her to be arrested for murder, just
23      this statement?
24  A.  You want me to answer something that's, speculate on
25      something that Investigator Rick Ivey wrote, sir?

Page 108

1  Q.  No, ma'am.
2  A.  I don't know what was in his mind at the time or why,
3      but I don't see anything, but I can't give you "Oh,
4      yes," "oh, no," because I didn't do this statement.
5  Q.  I understand, but you've read countless witness
6      statements in your career as a homicide investigator,
7      correct?
8  A.  That's correct, but I can't, I can't say what was in
9      Investigator Ivey's, you know, mind or something, sir.
10      Only he can answer that, and he can't answer that
11      because he's deceased, so I can't, I can't answer
12      that.
13  Q.  Okay.  Listen to my question very, very carefully.  My
14      question is:  You've been a homicide investigator for
15      probably 20 years, correct?
16  A.  Yes.
17  Q.  You were officer in charge of countless cases in
18      Homicide, correct?
19  A.  That's correct.
20  Q.  Okay.  You have read witness statements countless
21      times in determining whether or not you had probable
22      cause to charge somebody, correct?
23  A.  That's correct.
24  Q.  So if you read this witness statement, you don't need
25      to know what Richard Ivey had in mind because all this

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 109

1    is just a question, answer, question, answer,
2    question, answer, right?
3  A.  That's correct.
4  Q.  So as you read this statement of Falynn Kenner's, is
5    there anything that would suggest in this statement
6    that there's probable cause to arrest her for murder?
7  A.  Not in this statement, no, sir.
8  Q.  Okay.  Then if we go to Exhibit Number 49 that I
9    believe Mr. Muller --
10        MR. MUELLER:  Mike, do you have a copy of
11   that, that's Raymond Jackson's statement, Number 2?
12        THE WITNESS:  Okay.
13 BY MR. MUELLER:
14 Q.  That's the one where he said he saw, if you read
15   through that, I'm paraphrasing, but basically he saw
16   Kendrick Scott give something long wrapped up in what
17   looked to be clothing to Falynn Kenner on her porch,
18   do you see that?
19 A.  Where he passed her something?
20 Q.  Right.  Do you see that?
21 A.  Yes.
22 Q.  Okay.  He doesn't mention a gun, correct, in terms of
23   what is being passed from Kendrick Scott to Falynn
24   Kenner?
25 A.  Well, I didn't read the whole statement.  I don't know

Page 110

1    if a weapon, if a gun was mentioned.  On that little
2    part where you say he passed her something, it doesn't
3    say what it was.
4  Q.  It doesn't mention a gun specifically, correct?
5  A.  Not in that part of the paragraph you asking me to
6    look at.  I don't know what else is in this statement.
7  Q.  Well, you can read the whole statement.  It's pretty
8    short.
9  A.  Oh, okay.  What was your question?
10 Q.  The question is:  Do you see anything where, in that
11   whole statement, Raymond Jackson mentioned the gun
12   being passed from Kendrick Scott to Falynn Kenner?
13 A.  No.
14 Q.  In fact, there's no mention of any weapon being passed
15   from Kendrick Scott to Falynn Kenner, correct?
16 A.  No.
17 Q.  Am I right?
18 A.  You're right.
19 Q.  So that statement would not give you any probable
20   cause to charge Falynn Kenner with murder, would it?
21 A.  I did not write the statement, sir.  I don't know what
22   other evidence they had.  I don't know.
23 Q.  Listen to my question very carefully.  That statement
24   from Raymond Jackson wouldn't give anybody probable
25   cause to charge Falynn Kenner with murder, would it?

Page 111

1  A.  I can only speak for Barbara Simon.  I can't speak for
2    other people.  Not for me, no.  Other people, I don't
3    know.  You have to ask them.
4  Q.  You, as an experienced Homicide detective reading that
5    statement, would not have probable cause to charge
6    Falynn Kenner with murder, correct?
7  A.  Once again, I said I wouldn't, but I can't speak for
8    other people.
9  Q.  If you look at Exhibit Number 67, that complaint that
10   we talked about --
11        MR. MULLER:  Hang on:  She's got it.
12 BY MR. MUELLER:
13 Q.  Okay.  That's for the Juvenile Court, correct?
14 A.  Correct.
15 Q.  All right.  And that says Complainant's Signature,
16   which you said is your signature.  It looks like your
17   signature, right?
18 A.  Correct.
19 Q.  Typically that would be your signature because right
20   under that is your printed name, correct?
21 A.  No, it's my name typed, not printed.
22 Q.  I'm sorry.  Your name is typed, correct?
23 A.  Yes.
24 Q.  And it looks like your signature right above it,
25   correct?

Page 112

1  A.  Like I said, it looks like it, correct.
2  Q.  It says complainant.  What is a complainant?
3  A.  Like a complainant, like a complainant, defendant,
4    complainant.
5  Q.  What does that mean in terms of a police officer?
6  A.  Okay, let's start over.  A defendant, say someone --
7    you're a complainant, someone robbed you and shot you,
8    you are the complainant.
9  Q.  Then why are you the complainant in this Complaint?
10 A.  I don't remember.  I don't know, sir.
11 Q.  Would the complainant be the person who's bringing the
12   request or the charge?
13 A.  It could.  The person that -- I don't remember typing
14   this.  I signed it.  I don't remember this, but she
15   went to the Wayne County Youth Home and I was the
16   complainant.  I don't know why she went.  It could
17   have been on somebody else's order.  I don't know.
18 Q.  Well, it was on your order as a murder, charging her
19   with murder, requesting that she be arrested for
20   murder and sent to the juvenile home, correct?
21 A.  No, no, no, no, no.  Like, again, like I told your
22   other colleague, whatever her name was, I don't
23   remember this.  I didn't charge anyone with murder.
24   You have to ask the, talk to the officer in charge of
25   the case.  I don't remember this, sir.

SIMON, OFFICER BARBARA JEAN
07/20/2020

**Page 113**

1　Q.　Okay.  You would have been the person who would have
2　　　brought this complaint to the attention of the
3　　　Juvenile Court, wouldn't you?
4　A.　Once again, she went to the Wayne County Youth Home.
5　　　I don't know if I conveyed her.  I don't remember
6　　　typing this up.  I don't remember this at all, sir.
7　Q.　I understand you don't have any specific recollection
8　　　of this case, you've told us that 100 times probably
9　　　today.  Is this case, as you look back on this case,
10　　　would you think you did a good job?
11　A.　Well, I did, I believe so.
12　Q.　Would this case be typical of how you handled all your
13　　　investigations that you were part of?
14　A.　No, I'm not going to say that, sir.  I was not the
15　　　officer in charge of this case.
16　Q.　I asked investigations that you were a part of, is
17　　　this typical of how you would have handled all your
18　　　investigations as a Homicide detective?
19　A.　And once again, I told you, no, I was not the officer
20　　　in charge of the case.  All cases are handled
21　　　differently.
22　Q.　I'm just talking about --
23　A.　All homicides, excuse me, all homicides are different.
24　　　I'm going to speak for me, okay?  No, I don't remember
25　　　this case.  I probably could have handled it, if it

**Page 114**

1　　　was my case, differently.  I am not the officer in
2　　　charge of the case.  I don't know.
3　Q.　Well, you agree you participated in the investigation.
4　　　We've seen your name on plenty of documents, right?
5　　　　　　MR. MULLER:  I'm going to object to the
6　　　word "plenty."  If plenty means 2 or 3, yes.
7　BY MR. MUELLER:
8　Q.　We've seen your name on documents.  You have no reason
9　　　to disagree that you participated in this homicide
10　　　investigation, would that be correct?
11　A.　You've seen my name on a couple documents.  I could
12　　　have had some part, they asked me to do something.  I
13　　　don't remember this case, and I'm going to keep saying
14　　　it.  If I said it 100 times, it's 105 so far.  I don't
15　　　remember this case.
16　Q.　You have no reason to think that this case is atypical
17　　　for how you participated in other investigations,
18　　　right?
19　A.　Sir, I can't speak, I can't answer that because I
20　　　don't know what was going on with this case.  I don't
21　　　know what the officer in charge was doing with this
22　　　case.  I can't speak on that.
23　　　　　　MR. MUELLER:  Okay.  I don't have any other
24　　　questions for you.
25　　　　　　THE WITNESS:  Thank you.

**Page 115**

1　　　　　　MS. SALZMAN:  Let me just double-check real
2　　　quick on my end.  Mike, you go if you have anything,
3　　　but I'm just going to double-check I don't have
4　　　anything on my end.  Mike, you doing anything?
5　　　　　　　　　　EXAMINATION
6　BY MR. MULLER:
7　Q.　Ms. Simon, there was a lot to-do about your
8　　　Interrogatory answer where it said, it said "Describe
9　　　your role in the investigation," okay?
10　　　　　And it said "My involvement," your answer
11　　　to Number 5, "My involvement included advising Justly
12　　　Johnson of his Constitutional Rights on May 10th, 1999
13　　　and involvement with the statement by Falynn Kenner on
14　　　May 11, 1999."  Now, first of all, you've testified
15　　　that you have no independent recollection of any of
16　　　that, correct?
17　A.　Correct.
18　Q.　Okay.  But we did show you documents where you did, in
19　　　fact, do something, correct?
20　A.　Right, but I don't --
21　Q.　And that's why you answered it the way you did and
22　　　signed those under oath, correct?
23　A.　Right.
24　　　　　　MS. SALZMAN:  Objection to form.
25　BY MR. MULLER:

**Page 116**

1　Q.　Okay.  So you had no independent recollection of
2　　　having worked on it, but we showed you documents that
3　　　you had duly signed which indicated that you did have
4　　　that involvement, so you put it down and signed that
5　　　under oath as a complete and truthful answer to the
6　　　Interrogatories, is that fair?
7　　　　　　MS. SALZMAN:  Objection to form.  And Mike,
8　　　I'm going to warn you, you're waiving the privilege
9　　　here.  I'm going to go back over that.
10　　　　　　MR. MULLER:  You can.  Why not?  You
11　　　already spent a couple hours on it.
12　BY MR. MULLER:
13　Q.　Do you have any independent recollection of Raymond
14　　　Jackson at all?
15　A.　Of Raymond Jackson, no.
16　Q.　Let me -- do you need the question repeated?
17　　　　　　MS. SALZMAN:  I think she said no.
18　　　　　　THE WITNESS:  I said no.  I do not know who
19　　　Raymond Jackson is at all.  I do not know who Raymond
20　　　Jackson is.
21　BY MR. MULLER:
22　Q.　Okay.  So you're unaware whether he's alive or dead
23　　　right now?
24　A.　No.
25　Q.　Do you know who Antonio Burnette is, do you recall him

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                      Pages 117–120

| Page 117 | Page 119 |
|---|---|

**Page 117**

1    at all?
2  A.  No.
3  Q.  Do you know whether or not he's alive or dead?
4  A.  No.
5  Q.  Do you know that Mr. Johnson and Mr. Scott had their
6    cases dismissed by the judge, their convictions
7    dismissed, were you aware of that?
8  A.  I was told, yes.  And then he asked me who told me.
9    Well, to be honest with you, how I found out, well,
10    how I found out was I guess the attorney I just
11    finished talking to, sent papers to a house that I did
12    not stay at.  He sent it to my sister's house.
13  Q.  When he was trying to serve you with the Complaint?
14  A.  Right.
15  Q.  That's when you found out?
16  A.  That's when I found out, because whoever the server
17    was insisted my sister -- it was me, and I did not
18    stay there.  They went to a house that I owned where
19    my sister stay at.  That's when I found out.  And then
20    it was -- he went to the news media.  It was in the
21    paper.  It was in the paper, and my supervisor from
22    the State called me and told me about it also.  That's
23    how I found out, because he went to the paper.
24  Q.  Are you familiar with people that do long stents of
25    prison, and by law I'm talking anywhere from 10 to

**Page 118**

1    30 years, and then get out?  Have you encountered that
2    situation before as a Homicide detective?
3        MS. SALZMAN:  Objection to form and to
4    soliciting expert testimony from this witness.
5  BY MR. MULLER:
6  Q.  Go ahead, you can answer.
7  A.  Yes.
8  Q.  In over 20 years, you would agree with me that over
9    20 years, a lot of critical evidence for retrying the
10    case disappears, is that fair?
11        MS. SALZMAN:  Objection to form.
12        THE WITNESS:  Yes.
13  BY MR. MULLER:
14  Q.  In other words, witnesses die?
15  A.  Yes.
16        MS. SALZMAN:  Objection.
17  BY MR. MULLER:
18  Q.  Witnesses' memories fade, correct?
19        MS. SALZMAN:  Objection.
20        THE WITNESS:  Yes.
21  BY MR. MULLER:
22  Q.  And a lot of times it becomes very difficult for a
23    prosecutor to retry someone after 20, 30 years for a
24    murder, is that fair?
25        MS. SALZMAN:  Objection.

**Page 119**

1        THE WITNESS:  That's fair.
2  BY MR. MULLER:
3  Q.  So a lot of times when these cases are dismissed,
4    there's never an adjudication of whether they were
5    really guilty, is that correct?
6        MS. SALZMAN:  Objection to form.
7        THE WITNESS:  True.
8  BY MR. MULLER:
9  Q.  Do you have any independent recollection -- I know you
10    answered this a million times, but I just want to be
11    clear -- of this Falynn Kenner?
12  A.  No, I do not.  If she walked through that door right
13    now, I wouldn't know who she was.  I have no idea.
14  Q.  Let me ask you something:  We asked, we asked Cathy
15    Adams, former Commander Adams about, about being
16    present at an interview with Antonio Burnette, and you
17    were asked the same thing, and she testified the same
18    way as you, she has no recollection of having been
19    present.  You don't either, right?
20  A.  No.
21        MS. SALZMAN:  Objection to the form of the
22    question.
23  BY MR. MULLER:
24  Q.  Then she was asked whether or not, in her time as a
25    police officer, she was ever present at an interview

**Page 120**

1    where a witness was beaten, physically beaten so that
2    he's bleeding to get, as a form of coercion, to get
3    statements out of him.  Let me ask you that same
4    question.  Have you ever been present at an
5    interrogation where fellow police officers or yourself
6    have beaten a witness physically to get testimony from
7    them?
8        MS. SALZMAN:  Objection to form.
9  BY MR. MULLER:
10  Q.  If, if you were present and two or three police
11    officers started pounding on a witness, beating him in
12    the face, and his face was bleeding, what would you
13    do?
14  A.  Number 1, I would advise the supervisor if it was a
15    homicide.  After that, I would have went and got the
16    officer in charge or the supervisor, and they would
17    have dealt with the officers and rendered medical aid
18    to the injured person.
19  Q.  All right.  So you wouldn't have let it slide?
20  A.  No.
21        MS. SALZMAN:  Objection to form.
22        MR. MULLER:  Thank you.  I have no further
23    questions.
24        RE-EXAMINATION
25  BY MS. SALZMAN:

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 121–124

**Page 121**

1  Q.  All right.  Ms. Simon, I have a few more.
2          First of all, are you being paid for your
3  proprietary interests and your expert opinions by the
4  City of Detroit?
5  A.  Say what?
6          MR. MULLER:  She's asking --
7  BY MS. SALZMAN:
8  Q.  Are you getting paid by the City of Detroit to give
9  opinions in this case?
10 A.  No, ma'am.
11 Q.  And if I asked you to give your expert opinions in
12 this case, would you do that without me paying you?
13 A.  I gave you every opinion you asked me.
14 Q.  But you're not testifying as an expert in this case,
15 correct?
16 A.  No.
17 Q.  Now, you just testified with your lawyer about a
18 meeting you had with him to look at your Interrogatory
19 responses.  Do you recall that testimony?
20 A.  Yes.
21 Q.  Okay.
22          MR. MULLER:  You can inquire about it, but
23 I'm interposing the privilege.
24          MS. SALZMAN:  Pardon me?
25          MR. MULLER:  It's your privilege.  I can't

**Page 122**

1  waive it.
2          She's the only one that can waive it.
3          MS. SALZMAN:  Oh, she waived it, too.  She
4  answered questions about it, Mike.
5  BY MS. SALZMAN:
6  Q.  Officer Simon, who was present for that meeting?
7  A.  What meeting?
8  Q.  The meeting you just described between you and your
9  lawyers to look at your Interrogatory responses.
10 A.  I don't know all these people, people's name down
11 here, ma'am.  The attorney here.
12 Q.  Mr. Muller --
13          MR. MULLER:  No, I wasn't there.
14 BY MS. SALZMAN:
15 Q.  Mr. Muller is sitting next to you?  No?
16          MR. MULLER:  I was not there.
17 BY MS. SALZMAN:
18 Q.  Mr. Cunningham, Pat Cunningham?
19          MR. MULLER:  The tall, good looking guy.
20          THE WITNESS:  Yes.
21          MR. MULLER:  Pat Cunningham.
22          THE WITNESS:  Yes.
23 BY MS. SALZMAN:
24 Q.  Was anyone else?
25          MR. MULLER:  Probably my legal assistant.

**Page 123**

1          MS. SALZMAN:  You're not testifying.
2          THE WITNESS:  A lady.  I don't know who she
3  is.
4  BY MS. SALZMAN:
5  Q.  And did your lawyer show you typed-up answers to those
6  Interrogatories that he had typed up in advance?
7  A.  I believe I seen it.  I don't, I believe so, ma'am.
8  Q.  Did you tell Mr. Cunningham what you told us here
9  today under oath, that you have no independent
10 recollection of your role in this case?
11 A.  Yes, ma'am.
12 Q.  Did you tell him you were concerned about signing a
13 document under oath that said you had a recollection
14 of your role in this case when, in fact, you didn't?
15 A.  I don't remember that, ma'am.  I don't know.
16 Q.  Did you sign this document because he put it in front
17 of you and told you to?
18          MR. MULLER:  Wolf, don't go to sleep.
19          THE WITNESS:  I don't remember, ma'am.
20 BY MS. SALZMAN:
21 Q.  Did it matter to you that this document was being
22 sworn to under oath by you?
23 A.  Ma'am, all I know is, I don't know.  I don't know.  I
24 don't recall.
25 Q.  You don't recall if it mattered to you that you were

**Page 124**

1  signing it under oath?
2  A.  All I remember signing -- ma'am --
3  Q.  Sorry, if you answered.  I didn't hear you.  You're
4  going to have to say it again.
5  A.  I don't know, ma'am.
6  Q.  You don't know if it mattered to you?
7  A.  Ma'am, you're going to -- I don't remember this case.
8  Q.  I don't know.  Please, I don't remember.
9  Q.  Okay, but I'm not asking you about the case now.  I'm
10 asking you about the meeting with your lawyers back in
11 March, 2020 that you just answered.  Do you remember
12 that meeting?
13 A.  No, I don't remember that meeting.
14 Q.  So when Mr. Muller asked you all those questions about
15 what happened in that meeting and the documents said
16 that, you don't remember any of that?
17          MR. MULLER:  Are you eavesdropping on us,
18 counsel?  Don't assume.  You were listening in.
19          MS. SALZMAN:  You just did this all on the
20 record, Mike.
21          MR. MULLER:  No, it's not on the record.
22 You asked the Court Reporter if it was on the record.
23 She said no.  So what you are doing, you eavesdropped
24 on me and you're trying to say, because you
25 eavesdropped, we somehow waived the privilege.

SIMON, OFFICER BARBARA JEAN
07/20/2020

Pages 125–127

Page 125

```
1              MS. SALZMAN:  No, I'm asking about the
2     questions you just asked the witness on the record,
3     Mike.  It was also me who warned you that you were not
4     muted when you were talking before.
5   BY MS. SALZMAN:
6   Q.  So Ms. Simon, again my question is:  Is it your
7     testimony now that, in fact, you do not remember the
8     March, 2020 meeting with your lawyers?
9   A.  No, ma'am, I do not remember the meeting.  Ma'am, you
10    have -- let me explain something to you right now.
11    When this meeting came up, I came down here.  I was
12    just getting out of the hospital with pneumonia and I
13    came down here.  I don't remember.
14             MS. SALZMAN:  Very good.  Thank you.
15             MR. MULLER:  Is there anything else today?
16             MS. SALZMAN:  Wolf, do you have any other
17    questions?  You're on mute.
18             MR. MULLER:  You're on mute.
19             MR. MUELLER:  I am finished.
20             MS. SALZMAN:  So Officer Simon is done.  We
21    can go off the record and talk about the schedule for
22    the rest of the depositions, Mike.
23             MR. MULLER:  All right.
24             (The deposition was concluded at 1:22 p.m.
25             Signature of the witness was not requested by
```

Page 126

```
1   counsel for the respective parties hereto.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
1                    CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                     ) SS
4   COUNTY OF OAKLAND )
5
6          I, SABRINA SMITH, certify that this
7     deposition was taken before me on the date
8     hereinbefore set forth; that the foregoing questions
9     and answers were recorded by me stenographically and
10    reduced to computer transcription; that this is a
11    true, full and correct transcript of my stenographic
12    notes so taken; and that I am not related to, nor of
13    counsel to, either party nor interested in the event
14    of this cause.
15
16
17
18
19
20
21
22             SABRINA SMITH, CSR 2129
23             Notary Public,
24             Oakland County, Michigan.
25    My Commission expires: August 16, 2024
```