UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTLY JOHNSON,

                Plaintiff,                   Case No. 19-cv-12331

v.                                  Paul D. Borman
                                  United States District Judge

CATHERINE ADAMS, in her individual
capacity, and BARBARA SIMON, in her
individual capacity,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 20)

Based on post-conviction investigation, culminating in a 2018 Michigan Supreme Court decision reversing convictions, and the prosecution's decision not to re-prosecute, Plaintiff Justly Johnson was released from prison in November 2018 after serving over two decades in prison for the 1999 murder of Lisa Kindred. Kendrick Scott, also convicted of the murder of Lisa Kindred, whose conviction was also reversed, was also released from prison the same day.

Plaintiff Justly Johnson filed this suit under 42 U.S.C. § 1983 against two City of Detroit police officers, Catherine Adams and Barbara Simon, alleging violations

1

of his constitutional rights based upon alleged coercion of witness testimony to falsely inculpate Plaintiff Johnson and Kendrick Scott, and withholding of exculpatory and impeachment evidence. Kendrick Scott filed a separate lawsuit against four City of Detroit Police officers (the two defendants in this case, as well as officers Anthony Jackson and Wayne Pritchett), alleging essentially the same violations of his constitutional rights. (Case No. 19-cv-12718.) Defendants filed a Motion for Partial Summary Judgment (ECF No. 20), and Plaintiff Johnson has filed a Response in opposition (ECF No. 24). Defendants did not file a reply brief. The Court held a hearing on Defendants' motion on Thursday, December 9, 2021. For the reasons that follow, Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Lisa Kindred is murdered between midnight and 1:00 a.m. on Sunday, May 9, 1999

On May 8, 1999, William Kindred, his wife Lisa Kindred, Mr. Kindred's eight-year-old stepson, Charmous (C.J.) Skinner, Jr., and the Kindreds' daughter Shelby (two years old) and son Dakota (a 10-day-old newborn), who lived in Roseville, Michigan, went to see the movie "Life" at a drive-in theater in Dearborn,

Michigan. (ECF No. 24-2, Transcript of Post-trial Evidentiary Hearing 5/15/15 (testimony of Charmous (C.J.) Skinner) (Evid. Hrg. Tr.- Skinner) at pp. 9-10, PageID.971-72.) After the movie ended, at approximately 11:30 p.m., Mr. Kindred announced that he wanted to stop by the home of his sister, Lillie Harris, who lived on Bewick Street on the east side of Detroit, to talk to her boyfriend, Verlin Miller, about purchasing a motorcycle. (*Id.*) (ECF No. 20-3, William Kindred Witness Statement (Kindred Statement) at p. 1, PageID.227.) (ECF No. 20-2, Investigator's Report at p. 1, PageID.216.) When the Kindred family arrived on Bewick Street, Lisa, who was driving, parked their minivan across the street from Miller's home and waited in the van with the three children while Mr. Kindred went inside the house. (Evid. Hrg. Tr. – Skinner at pp. 9-10, PageID.971-72.) (Kindred Statement at 1, PageID.227.)

After about 20 to 30 minutes, Lisa Kindred grew impatient, walked up to the house, and spoke with Mr. Kindred about returning to the van. (Evid Hr. Tr. – Skinner at p. 11, PageID.973.) Mr. Kindred said that he would be out shortly, and Lisa then returned to the minivan. (*Id.*) (Kindred Statement at PageID.227) (ECF No. 24-4, Preliminary Examination Tr. 5/26/99 (Prelim. Exam Tr. – Kindred) at pp. 13-14, PageID.1045-46.) As Lisa was opening the minivan's driver's-side door, her son C.J., Jr., who was in the front passenger seat, saw a man standing behind and to

3

the side of Lisa. (Evid Hr. Tr. – Skinner at pp. 12-13, PageID.974-75.) At the May 15, 2015 post-trial evidentiary hearing before the state trial court, C.J., Jr., who was not called as a witness in either trial, described that man as African-American and in his "mid thirties, short, short hair, big beard, big ass nose." (*Id.*) C.J., Jr. then heard a loud bang and saw a flash and the driver's side window's glass shattered. (*Id.* at p. 14, PageID.976.) Lisa Kindred had been shot, but she managed to put the car in gear and speed up the street to a nearby gas station. (*Id.* at p. 15, PageID.977.) Lisa then got out of the minivan and collapsed. (*Id.*) She was later pronounced dead at the hospital. (Investigator's Report at p. 1, PageID.216.)

According to Mr. Kindred, a few minutes after he told Lisa that he would be right out, he heard a noise that sounded like a car-door slamming. (Kindred Statement at p. 1, PageID.227) When he and Mr. Miller opened the door of the house, they saw the minivan quickly speeding away and Mr. Kindred states that he saw an individual running across a vacant lot adjacent to where the van had been parked. (*Id.*) Mr. Kindred chased this fleeing person but failed to catch him or her. (*Id.*) At the same time, Mr. Miller got in his pickup truck and drove around the area first looking for the individual who ran, and he then went to the gas station on the corner of Bewick and East Warren, where the minivan was parked. (ECF No. 20-3, Verlin Miller Witness Statement (Miller Statement) at 1-2, PageID.229-30.)

4

The medical examiner's report revealed that Lisa's death was caused by a single gunshot wound to the chest, and that there were several small superficial wounds "consistent with the decedent being shot through an intermediate target," (i.e., the driver's-side window). (ECF No. 24-3, Autopsy Report, PageID.1039.) The minivan's driver's side window had been shattered, but nothing had been stolen from the minivan, and the children were not harmed, but were still in the vehicle when the police arrived at the scene. (ECF No. 24-13, Homicide Scene Investigation Report at p. 3, PageID.1451.) A .22 caliber spent casing and broken glass were found in the street at the scene of the shooting on Bewick Street. (*Id.* at p. 4, PageID.1452.)

## 2. Plaintiff Justly Johnson and Kendrick Scott - at the time of the shooting

### a. Kendrick Scott

Somewhere between 11:00 p.m. on May 8, 1999 and 12:00 a.m. on May 9th, Kendrick Scott walked from his home on Hurlbut Street to his girlfriend Falynn Kenner's house on Bewick to obtain a cell phone. (ECF No. 20-4 Deposition of Kendrick Scott (Scott Dep.) at pp. 33-34, PageID.276-77.) Once at Ms. Kenner's house, Mr. Scott saw two persons, one of whom was carrying a rifle, walking in the alley near Ms. Kenner's home. (*Id.* at pp. 35-37, PageID.278-80.) Ms. Kenner let

5

Mr. Scott into her home, and the two individuals with the rifle were seen walking by the home, toward the site of the shooting. (*Id.* at pp. 39-41, PageID.282-84.)

Mr. Scott then left Ms. Kenner's home and went in the opposite direction of the two men, to the home of his nephew, Quinton Billingslea, and Billingslea's girlfriend, Lakeniya Hicks, on Hurlbut, the street immediately west of Bewick. (*Id.* at p. 43, PageID.286.)[1] Mr. Scott stated that he went there because of the two suspicious men walking through the alley carrying a rifle. (*Id.*) (ECF No. 20-5, Deposition of Lakeniya Hicks (Hicks Dep.) at pp. 8-9, PageID.369-70.)

While Mr. Scott was inside Ms. Hicks's and Mr. Billingslea's home, they all heard the gunshot and then a car speed off. (Hicks Dep. at pp. 10-12, PageID.371-73) (Scott Dep. at p. 44, PageID.287.) Mr. Scott and Mr. Billingslea got into Mr. Billingslea's car and drove down to Bewick to see what had happened. (Scott Dep. at pp. 45-46, PageID.288-89) (Hicks Dep. at p. 11, PageID.372.) They stopped and spoke with Mr. Kindred's sister, Lillie Harris, who was pacing back and forth outside

---

[1] This information that Mr. Scott visited Mr. Billingslea's house at the time of the murder is not in Mr. Scott's statement to the police. (See ECF No. 20-7, Kendrick Scott Witness Statement, 5/9/1999, PageID.526-27.) According to Defendants, Mr. Scott never told anyone with the Detroit Police Department that he was at the home of Mr. Billingslea at the time of the shooting, and this information instead was first revealed during Mr. Scott's March 12, 2020 deposition in this case. (Defs.' Mot. at pp. 2-3, PageID.141-42.)

of her house. (Scott Dep. at pp. 45-46, PageID.288-89.) Mr. Scott testified at his deposition that he could not remember what Ms. Harris said at that time (*id.*), but stated in his May 9, 1999 witness statement to the police that she had reported that one of her relatives had been kidnapped in a van with her kids. (Scott Statement, PageID.526.) Mr. Scott and Mr. Billingslea then drove around the block and Mr. Scott was dropped off at his home on Hurlbut. (Scott Dep. at p. 50, PageID.293.)

Mr. Scott next walked first to Ms. Kenner's house and then went four to five houses down the street to the home of Raymond Jackson. (Scott Dep. at pp. 54-55, PageID.297-98.) The two men walked to the gas station where Lisa Kindred had driven the minivan to see what was going on, and then walked to Mr. Scott's house. (*Id.* at pp. 56-57, PageID.299-300.) According to Mr. Scott, Plaintiff Justly Johnson and Antonio Bernette arrived at Scott's home shortly thereafter. (*Id.* at pp. 59-60, PageID.302-03.)

**b.    Plaintiff Justly Johnson**

Plaintiff Justly Johnson testified that he was away from the neighborhood at the time of the shooting, driving around and attending several parties with his friends Antonio Bernette and Mike (last name unknown), starting at a little before midnight. (ECF No. 20-6, Deposition of Justly Johnson (Johnson Dep.) at pp. 29-33, PageID.448-52) (ECF No. 24-12, Deposition of Antonio Bernette 8/11/2020

(Bernette Dep. II) at pp. 18-20, PageID.1396.) Around 1:15 am, Mike dropped Plaintiff Johnson and Mr. Bernette off near the gas station where Lisa Kindred had driven the minivan after the shooting. (Johnson Dep. at pp. 32-33, PageID.452-53.) The two men approached the gas station, but were told by police to get back, so they ended up walking to Mr. Scott's home on Hurlbut. (*Id.* at p. 33, PageID.452.)

When Plaintiff Johnson and Mr. Bernette got to Mr. Scott's house, they told Scott that something was occurring at the gas station, and Scott responded that something happened on Bewick and ended up at the gas station. (*Id.* at p. 34, PageID.453.) Plaintiff Johnson then called his girlfriend to come and pick him up and take him home, and Mr. Bernette crawled into Mr. Scott's car parked in front of Scott's house and went to sleep. Mr. Scott and Mr. Jackson went back to Mr. Jackson's house. (*Id.*) (Scott Dep. at pp. 61-62, PageID.304-05.)

### 3.    The Detroit Police Department (DPD) responds and investigates Lisa Kindred's murder

At approximately 1:00 a.m. on May 9, 1999, DPD Officer Frank Scola and his partner responded to the scene of the shooting. (ECF No. 24-7, Deposition of Frank Scola (Scola Dep.) at pp. 16-17, PageID.1186-87) (Homicide Scene Investigation Report at p. 1, PageID.1449.) Upon their arrival at the gas station and seeing Lisa Kindred's body, the officers notified the dispatcher and EMS

8

immediately, and then secured the scene until the homicide detectives could arrive. (Scola Dep. at pp. 24-25, PageID.1188-89.)

After the other units arrived on the scene, Officer Scola left the gas station and canvassed the neighborhood, where he eventually saw Kendrick Scott and Raymond Jackson, who were standing in front of Mr. Jackson's house on Bewick. (*Id*. at pp. 33-35, PageID.1191) (Scott Dep. at p. 63, PageID.306.) During this time period, the DPD is alleged to have had a practice of "rounding up witnesses, arresting them, [and] keeping them even though there might not be probable cause for their arrest." (ECF No. 24-18, Deposition of Defendant Catherine Tuttle (formerly Adams), April 15, 2019 (Adams Dep. I), at pp. 17-18, PageID.1471.) Defendant Adams explained: "if somebody were at the scene where somebody got killed, everybody would go to jail." (ECF No. 24-10, Deposition of Defendant Catherine Tuttle (formerly Adams), July 16, 2020 (Adams Dep. II), at pp. 273-274, PageID.1342-43.) Seemingly consistent with that practice, DPD rounded up Mr. Scott and Mr. Jackson and took them to headquarters around 1:30 a.m. (Scola Dep. at pp. 35, 39-41, PageID.1191-93) (Scott Dep. at p. 63, PageID.306) (Homicide Scene Investigation Report at p. 1, PageID.1452.) Mr. Scott "never got released again." (Scott Dep. at p. 63, PageID.306.)

### a.   Raymond Jackson's First Witness Statement, Sunday May 9, 1999 at 5:10 a.m.

Once at DPD headquarters, Mr. Jackson was interviewed and he gave a witness statement to Sgt. John Falk at around 5:00 a.m. (ECF No. 24-6, Raymond Jackson Statement, May 9, 1999, 5:10 a.m. (Jackson Statement No. 1), PageID.1179-81.) Mr. Jackson stated that he was sleeping in the front living room of his house when he heard a gunshot and a car "squeal off." (*Id.*) He put on his clothes, and went outside around 1:05 to 1:10 a.m., and the police were already there. (*Id.*) Jackson told the police that he heard one gunshot, but that he did not see anyone with a gun. (*Id.*) He stated that he saw Mr. Scott at his girlfriend, Ms. Kenner's, house and that Mr. Scott then came over to his house and told him about seeing the two men with a rifle before the shooting (*Id.*)

Mr. Jackson was allowed to go home after giving his statement, along with Mr. Kindred and Mr. Miller. (ECF No. 20-11, Prelim. Exam. Tr. Vol. II, 6/4/1999, at p. 21, PageID.672.)

### b.   Kendrick Scott's Witness Statement, Sunday May 9, 1999 at 6:55 a.m.

Mr. Scott gave his witness statement to an Officer Kirk at about 6:55 a.m. on May 9th. (Scott Statement, PageID.526-27.) Mr. Scott denied any involvement in the crime and explained that while he was outside of his girlfriend's house, he saw

10

two men walking in the alley and that the taller man had a rifle down by his side.
(*Id.*) He stated that he had been waiting for a ride at his girlfriend's house and when
the ride showed up and he went outside, he found out that a neighbor's relative had
been kidnapped in a van with kids in it. (*Id.*) Mr. Scott stated that he had seen the
white van earlier parked on Bewick, with its parking lights on. (*Id.*)

### c. Antonio Bernette's Witness Statement, Sunday May 9, 1999 at 2:20 p.m.

Later in the morning of May 9th, DPD officers found juvenile Antonio
Bernette sleeping in a car parked in front of Mr. Scott's house. (ECF No. 20-8,
Preliminary Complaint Record (Bernette), 5/9/99, 11:20 a.m., PageID.538)
(Bernette Dep. II at pp. 21, 25, PageID.1397-98.)[2] Officers searched the car and

---

[2] Mr. Bernette is sometimes referred to in the record, and in some pleadings, as
"Antonio Burnette" or "Antonio Barnett." Mr. Bernette's exact age at the time he
was questioned is a bit unclear on the record. As the Michigan Supreme Court noted
in its opinion:

> Burnette testified at Scott's trial that he was 14 years old when the
> shooting occurred and was 15 years old at the time of the trial.
> However, at the evidentiary hearing, Burnette testified that he was born
> in 1982, which would have made him 16 or 17 years old when the
> shooting occurred and 17 or 18 years old at the time of the trial. Jackson
> was 22 years old at the time of the preliminary examination. Johnson
> was 24 years old at the time of the shooting, and Scott was 20 years old.

*People v. Johnson*, 502 Mich. 541, 549 n.2 (2018).

found some marijuana and crack cocaine. (Bernette Dep. II at pp. 31-32, PageID.1399.) Mr. Bernette was detained, handcuffed, and taken to headquarters for questioning in connection with Lisa Kindred's murder. (PCR (Bernette) at 1, PageID.538) (Bernette Dep. II at pp. 34-35, PageID.1400.) Mr. Bernette testified that he had consumed large quantities of alcohol and marijuana the night before and was so "drunk and high" that he was still intoxicated when he was arrested, and that he reeked of alcohol when he was questioned at headquarters. (Bernette Dep. II at pp. 23-25, 32, PageID.1397-99)

At headquarters, officers took Mr. Bernette to a small interrogation room where he was handcuffed to a table. (Bernette Dep. II at pp. 35-36, PageID.1400.) He was only a middle school student (*id*. at p. 60, PageID.1406), but he testified post-trial that he was forced to spend seven or eight hours in the interrogation room (*id*. at pp. 39-40, PageID.1401), where he was interrogated by multiple officers. (*Id*. at pp. 35-37, PageID.1400-01.) Mr. Bernette told the officers that he was a juvenile, he did not understand what was going on, he could not read, and that he wanted his

mother and father, but Officer Wayne Pritchett told Mr. Bernette that his parents "can't help you here." (Bernette Dep. II at pp. 35, 37-38, PageID.1400-01.)[3]

Mr. Bernette testified that during his interrogation, Defendants Simon and Adams and Officer Pritchett threatened him and told him he would be charged with murder if he did not tell them what they wanted to hear and sign a statement. (Bernette Dep. II at pp. 48-52, 78-79, PageID.1403-04, 1411.) Mr. Bernette further testified that Officer Pritchett punched him eight to ten times in his lower body and that Defendant Simon slapped him, and that not a single officer tried to intervene to stop the abuse. (*Id.* at pp. 53-55, PageID.1405.) At 2:15 p.m. on May 9th, Mr. Bernette signed a notification of rights form, even though he has testified that he could barely read or write. (*Id.* at pp. 57-58, 60, PageID.1406)

Mr. Bernette subsequently signed a witness statement drafted by Officer Pritchett. (*Id.* at pp. 62-66, PageID.2307-11) (ECF No. 24-14, Antonio Bernette Witness Statement, 5/9/99, 2:15 p.m., PageID.1454-55.) Mr. Bernette did not write anything on this form; Officer Pritchett wrote it all. (Bernette Dep. II at pp. 62-64, PageID.1407.) Mr. Bernette testified that he "couldn't read" the statement. (*Id.*)

---

[3] Defendants Adams and Simon both testified that it was DPD policy for parents of minors to be contacted before questioning. (Adams Dep. II at p. 154, PageID.1313) (ECF No. 24-11, Deposition of Barbara Simon (Simon Dep.) at p. 49, PageID.1371.)

The witness statement said that Mr. Scott (whom Mr. Bernette refers to as "Snoopy") told Mr. Bernette the previous night at 2:30 a.m. that he had shot a woman named Lisa after trying to "hit a lick" (i.e., rob her) with Plaintiff Johnson because he was "trying to get some money. He had a phone bill to pay." (Bernette Statement, PageID.1454-55.)[4] The statement then added that "Stank [Plaintiff Johnson] and Snoop agreed to kidnap this bitch named Lisa. She owed Snoop some money. Snoop sells rocks (crack cocaine)," and that Mr. Scott told Mr. Bernette that they had a "rifle and a AK." (*Id.*)

Mr. Bernette later testified at his deposition, however, that he never said "hit a lick," that he had never heard of "Lisa" before Defendant Simon told him that name, and that the officers "wrote up everything, and [] just had [Mr. Bernette] sign and initial" the statement. (Bernette Dep. II at pp. 63-66, PageID.1407-08.) After signing the statement, Mr. Bernette was transferred to juvenile detention, where he was held for about a year, until sometime just before Mr. Scott's jury trial. (*Id.* at pp. 34, 45-46, PageID.1400, 1403.)

---

[4] While Mr. Bernette's statement said that he talked to Mr. Scott at around 2:30 a.m. on the 9th, records show that Mr. Scott was already in police custody at that time. (Scola Dep. at pp. 39-41, PageID.1192-93.)

14

> **d.** **Plaintiff Johnson is arrested around 4:00 p.m. on Sunday, May 9, 1999, and gives a Witness Statement on Monday, May 10, 1999 at 10:55 a.m.**

Sometime on Sunday, May 9th, after Mr. Jackson returned to his grandmother's house from being questioned by the police, Plaintiff Justly Johnson went to Mr. Jackson's grandmother's house to see him. (Johnson Dep. at pp. 37-38, PageID.456-57.) The police subsequently showed up at Mr. Jackson's house at around 4:00 p.m. (after Mr. Bernette made his witness statement implicating Johnson and Scott), handcuffed Plaintiff Johnson, took him downtown to homicide for questioning, interrogated him, and then placed him in cell until the following day. (*Id.* at pp. 37-41, PageID.456-59.)

Plaintiff Johnson subsequently made a witness statement the next day, on May 10, 1999, to Officer Anthony Jackson. (ECF No. 20-7, Justly Johnson Witness Statement, 5/10/99 at 10:55 a.m., PageID.531-34.) Plaintiff Johnson denied knowing anything about the shooting on Bewick and said that he was with Mr. Bernette (aka "Shorty") and Mr. Bernette's friend Mike from around midnight to 1:00 a.m. on the 9th, riding around in Mike's car. (*Id.*) Plaintiff Johnson stated that, after being dropped off by Mike near the gas station where the minivan ended up, he and Mr. Bernette went to Mr. Scott's house, and they talked about the police and the minivan. (*Id.*) Plaintiff Johnson stayed there until his girlfriend picked him up around 2:00

15

a.m. (*Id.*) He stated that Mr. Bernette went into the car in front of Mr. Scott's house and went to sleep. (*Id.*)

> ### e. Jodi Gonterman's Witness Statement, Monday May 10, 1999 at 12:10 p.m.

At the time of Lisa Kindred's death, her sister, Jodi Gonterman, lived in Albuquerque, New Mexico, where she worked as a police officer. (ECF No. 20-14, Deposition of Jodi Gonterman (Gonterman Dep.) at p. 22, PageID.796) She flew to Detroit on May 9, 1999, after learning of Lisa's murder. (*Id.* at p. 37, PageID.811.) (ECF No. 24-15, Affidavit of Jodi Gonterman (Gonterman Aff.), ¶ 5, PageID.1460.) The next day, Ms. Gonterman went to DPD headquarters, where she was interviewed by Officer Anthony Jackson. (Gonterman Dep. at p. 39, PageID.813.) (ECF No. 20-13, Jodi Gonterman Witness Statement (Gonterman Statement), PageID.772-73.)

Ms. Gonterman testified that she went to the Homicide Section that day with one specific goal: she wanted to tell the police about a phone conversation she had with her sister Lisa a year prior. (Gonterman Dep. at pp. 39-40, PageID.813-14.) (Gonterman Aff. ¶¶ 4, 6, PageID.1460.) She told Officer Jackson that her sister, Lisa Kindred, told her during a phone conversation in 1998 that William Kindred should be a suspect if anything ever happened to her. (Gonterman Dep. at p. 48, PageID.822.) (Gonterman Aff. ¶ 7, PageID.1460.) As a police officer herself, Ms.

Gonterman testified that she knew this information was "important and [she] needed to relay that information to [the DPD]." (Gonterman Dep. at pp. 40-41, PageID.814-15.) The "detectives on the case" told Ms. Gonterman that they had already found out who killed her sister, and that Will did not have anything to do with it. (Gonterman Aff. ¶ 8, PageID.1461.) Ms. Gonterman stated that she was "very upset and emotional" when talking about Lisa's death to Officer Jackson, and "[b]ecause the police wrote this statement in front of [her], and because [she] was very upset, [she] signed the statement without reviewing its contents." (Gonterman Aff. ¶ 9, PageID.1461.)

However, the information about Lisa's warning in 1998 was not included in Ms. Gonterman's written witness statement. (See Gonterman Statement, PageID.772-73.) As a result, this information was never turned over to the prosecutor or the defense, Ms. Gonterman never spoke with anyone in the prosecutor's office, and she was not called as a witness at either Mr. Scott's or Plaintiff Johnson's trials, by the government or either defendant. (Gonterman Dep. at pp. 67, 70, PageID.841, 843) (See ECF No. 24-19, Deposition of Prosecutor Elizabeth Walker (Walker Dep.) at pp. 62-63, PageID.1504) (ECF No. 24-27, Deposition of Defense Attorney Sanford Schulman (Schulman Dep.) at pp. 14-17, PageID.1619.)

Ms. Gonterman's statement did state that Will Kindred had hit C.J., and this was reported to the police, that Mr. Kindred had previously attempted suicide by taking pills, and that Mr. Kindred does not use drugs. (Gonterman Statement PageID.772-73.) The statement further provided that Mr. Kindred was "distanced from [Lisa's] family after he hit C.J.," and that Mr. Kindred had been accused of sexual assault by two different babysitters. (*Id.*) When asked "[d]o you think that [Mr. Kindred] had knowledge of what might happen prior to the incident," Ms. Gonterman responded that she "can't say for sure." (*Id.*)

> **f.   Raymond Jackson's Second Witness Statement, Monday May 10, 1999 at 6:00 p.m.**

Later in the day on May 10, 1999, DPD officers picked up Mr. Jackson again and brought him downtown a second time for more questioning. (See ECF No. 24-15, Raymond Jackson Witness Statement No. 2, 5/10/99, 6:00 p.m. (Jackson Statement No. 2), PageID.1457-58.) According to Mr. Jackson, he had consumed three 40-ounce bottles of beer and smoked a $20 bag of marijuana before he was questioned the first time, and he and Johnson were both drunk when he was picked up for questioning the second time. (Prelim. Exam. Tr. Vol. II, at pp. 51-53, 55, PageID.702-04, 706.) He also testified that his "mind is bad" and he has severe

18

mental health issues and that his medications makes him forget things. (*Id.* at pp. 18, 31-33, 35 PageID.669, 682-84, 686.)

DPD Officer A. Lovier wrote out a second witness statement for Mr. Jackson at 6:00 p.m. on the 10th, which differed from his first statement the day before. (Jackson Statement No. 2, PageID.1457-58.) In this second statement, made 36 hours after his first statement and about a day after Mr. Bernette's statement, Mr. Jackson stated that it took him about ten minutes to go outside after he heard the gunshot and a vehicle drive off. (*Id.*) Once outside, he stated he saw Mr. Scott on the porch at his girlfriend Falynn Kenner's house, and he saw Scott pass something long to Falynn that looked like it was wrapped up in clothing, and that Falynn took the object inside her house and she did not come back outside. (*Id.*) Mr. Scott came down to Mr. Jackson's house a short time later. (*Id.*) Mr. Jackson's second statement further stated that "Stank" (Plaintiff Johnson) had come to Mr. Jackson's house the day before (on May 9th), about 15 to 20 minutes before the police arrived to pick up Plaintiff Johnson, and told Mr. Jackson "we hit a lick last night and I fucked up and had to shoot" outside by the field next to Mr. Jackson's house. (*Id.*) Plaintiff Johnson told Mr. Jackson that he was with "Snoky" (Mr. Scott) at the time of the shooting. (*Id.*)

19

### 4.   Plaintiff Johnson and Kendrick Scott are tried and convicted for Lisa Kindred's murder in separate trials

Plaintiff Johnson and Mr. Scott were tried separately before Wayne County Circuit Judge Prentis Edwards for Lisa Kindred's murder, with Plaintiff Johnson electing a bench trial and Mr. Scott choosing to be tried before a jury.

### a.   Plaintiff Johnson's Bench Trial

In January of 2000, Plaintiff Justly Johnson was tried before Judge Prentis Edwards. Mr. Bernette and Mr. Jackson were the key prosecution witnesses; Plaintiff Johnson also testified on his own behalf. (ECF No. 20-9, J. Johnson Trial Tr. (Closing), 1/12/2000, at pp. 10-12, 21, 24-26, 28, PageID.549-51, 560, 563-65, 567 (Judge Edwards stating "The question here is of credibility. And again, the key witnesses are Jackson and Barnett [sic].").) Prosecutor Elizabeth Walker stressed in her closing argument that Mr. Bernette and Mr. Jackson had not been coerced or forced into giving their testimony:

> Now, what's curious is, both Antonio Barnett and Raymond Jackson, who don't appear to have any connection with each other whatsoever other than through Snoop and Stank, both say these individuals hit a lick or told them that they had, and that there was a shooting that occurred in connection with hitting that lick. Both these individuals make reference to the statements being made after the shooting on Bewick, the evening, early morning hours of the shooting and the next one the next day after the shooting. That's the crux of this case, that's what connects this defendant to the shooting on Bewick, his own lips, his own words he says to friends of his under circumstances which he

20

> has no reason to lie to them. It's not a question of any kind of police coercion, nobody's forced him to make these statements. He's talking to people that he believes for one reason or another he can trust. Why would he say this if it wasn't so?

(Johnson Trial Tr. at p. 11, PageID.550.) Judge Edwards found Plaintiff Johnson guilty of first degree murder, assault with intent to rob while armed, and carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm). (*Id.* at pp. 30-31, PageID.569-70.) Plaintiff Johnson was sentenced to spend the rest of his life in prison without the possibility of parole.

### b.     Kendrick Scott's Jury Trial

In June of 2000, Kendrick Scott had a jury trial in the Wayne County Circuit Court, before Judge Prentis Edwards. (ECF No. 20-10, Kendrick Scott Jury Trial Tr., PageID.701-78.) The trial lasted two days and the jury found Mr. Scott guilty of the murder of Lisa Kindred. (*Id.* at pp. 74-78, PageID.645-49.) Mr. Scott was sentenced to life in prison without the possibility of parole. The prosecutor, Elizabeth Walker, again stressed the importance of Mr. Bernette's and Mr. Jackson's credibility in her closing argument, claiming they were the key witnesses who had not been coerced:

> We have the testimony of Raymond Jackson and Antonio Burnette and it's no secret.  I told you at the beginning those were going to be some of the key players, some of the key witnesses in this case.

21

\*\*\*

Though Antonio and Raymond may not be the nicest people you've ever seen, the question you have to ask is whether or not the testimony they have given to you is reliable and credible. Now, if you find that it is, then there's not going to be a whole lot of talk. If so then it means he's telling you the truth about Snook – they're telling you the truth about what Snook and Stank said. Now, why would they say it if it wasn't so. They're not under any compulsion. This is not some TV type police rubber hose interrogation out of a 1930 late night movie. These are people [Plaintiffs Johnson and Scott] talking to their friends in what they believe is a safe and secured environment.

(*Id.* at pp. 26, 34-35, PageID.598, 606-07.)

Plaintiff Johnson and Mr. Scott spent the next 19 years of their lives incarcerated for the murder of Lisa Kindred.

### 5.    Post-conviction proceedings/events

Following years of unsuccessful appeals,[5] the University of Michigan Innocence Clinic took over the Plaintiff Johnson's and Mr. Scott's cases and filed

---

[5] Both Johnson and Scott appealed by right. The Michigan Court of Appeals affirmed Mr. Johnson's convictions. *People v. Johnson*, Case No. 228547, 2002 WL 484610 (Mich. Ct. App. Mar. 26, 2002). The same Court of Appeals panel vacated on double-jeopardy grounds Mr. Scott's conviction of assault with intent to rob while armed, but otherwise affirmed his convictions and sentences. *People v. Scott*, Case No. 228548, 2002 WL 483420 (Mich. Ct. App. Mar. 26, 2002). The Michigan Supreme Court denied both defendants' applications for leave to appeal. *People v. Johnson*, 467 Mich. 911 (Table) (2002); *People v. Scott*, 467 Mich. 911 (Table) (2002).

Plaintiff Johnson thereafter filed three motions for relief from judgment. In his second motion for relief from judgment, Johnson presented, as a claim of newly

motions for relief from judgment (Plaintiff Johnson's fourth such motion and Mr. Scott's first), and sought a new trial based, in large part, on newly discovered evidence in the form of the eyewitness testimony of Lisa Kindred's son, Charmous (C.J.) Skinner, Jr., who was eight years old and in the vehicle at the time Lisa's death, as well as Mr. Bernette's recantations, testimony that Mr. Jackson had lied at the trials, and the police reports regarding domestic violence disputes between William and Lisa Kindred. The trial court denied Plaintiffs' motions for relief from judgment, and the Michigan Court of Appeals denied leave to appeal. The Michigan Supreme Court granted leave to appeal and reversed the Court of Appeals' decision and ordered the case remanded for an evidentiary hearing. *People v. Johnson*, 497 Mich. 897 (2014); *People v. Scott*, 497 Mich. 897 (2014).

---

discovered evidence, Mr. Bernette's recantation and an affidavit from Mr. Jackson's relative that Mr. Jackson lied at the trials. The trial court denied the motion, and the Court of Appeals and the Michigan Supreme Court denied leave to appeal. *People v. Johnson*, unpublished order of the Court of Appeals, entered February 11, 2009 (Docket No. 287529); *People v. Johnson*, 485 Mich. 893 (2009). Plaintiff Johnson's third motion for relief from judgment presented additional newly discovered evidence, which included police reports regarding domestic violence disputes between William and Lisa Kindred. Again, the trial court denied the motion, and the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal. *People v. Johnson*, unpublished order of the Court of Appeals, entered December 2, 2010 (Docket No. 298189); *People v. Johnson*, 489 Mich. 990 (2011).

The trial court held an evidentiary hearing in the spring of 2015. Newly discovered evidence presented to the judge included Lisa Kindred's now-adult son, C.J., Jr., who testified that he could not forget the face of the man who shot his mother and that he was sure that Justly Johnson and Kendrick Scott were not the shooters. *People v. Johnson*, 502 Mich. 541, 558-59 (2018). C.J. testified that he was never contacted by the police, the prosecution, or defense counsel regarding the shooting until years later, when Innocence Project investigator, Scott Lewis, contacted him. *Id.* at 550-60.

Defendant Adams testified in her July 2020 deposition that she did speak with C.J., Jr. at his house, the morning after the shooting. (Adams Dep. II, at pp. 228-29, PageID.2895-96.) She testified that C.J. said he was sleeping when the shooting occurred. (*Id.*) Defendant Adams did not write down what C.J. said, or make a note in her record that she had spoken with him. (*Id.* at pp. 229-31, PageID.2896-98.)

Antonio Bernette also testified at the evidentiary hearing. *People v. Johnson*, 502 Mich. at 561. He recanted his prior identification and testimony that Plaintiff Johnson and Mr. Scott confessed to robbing and shooting a woman, and also recanted his previous testimony that the police had not threatened him, saying he was threatened by the police into falsely implicating Johnson and Scott. *Id.*

24

Further, although Raymond Jackson had died in 2008, his cousin, Lameda Thomas, testified that Mr. Jackson had told her, on two separate occasions, that he had lied on the stand out of fear of prosecution, and specifically lied about Plaintiff Johnson telling him he "hit a lick" and had to shoot. *Id.*

Following the evidentiary hearing, the trial court denied both Scott's and Johnson's motions for relief from judgment, concluding that there was no reasonable probability of a different result if C.J. Skinner, Jr., testified on retrial. *Johnson*, 502 Mich. at 561-62. The trial judge discredited CJ Skinner, Jr's testimony, finding that C.J. was likely asleep, and that he could not have seen the outside of the minivan where the shooter stood because the dome light was illuminating the interior of the vehicle. *Id.* The trial court stated that the prior trial testimony by Mr. Bernette and Mr. Jackson were consistent, and the allegation that Mr. Bernette was "coached by the police" was "illogical, reasoning that the police would not be able to predict what would be asked of Burnette." *Id.* The trial court then concluded that "it could not find 'any reasonable probability that there would be a different result in this case, even if Mr. Skinner was allowed to give testimony in regard to this matter, nothing.'" *Id.*

On May 31, 2016, the Michigan Court of Appeals affirmed the trial court's denial of relief from judgment. *People v. Johnson*, Nos. 311625, 317915, 2016 WL

25

3067684 (Mich. Ct. App. May 31, 2016) The Michigan Supreme Court granted leave to appeal and, in an opinion authored by Justice Richard Bernstein on July 23, 2018, reversed the lower courts and vacated the convictions, granting a new trial based on the newly discovered evidence. *People v. Johnson*, 502 Mich. 541 (2018). The Michigan Supreme Court held that the trial court clearly erred in finding that C.J. Skinner, Jr., was asleep during the shooting and in concluding that C.J.'s testimony regarding witnessing both the shooting and the shooter was entirely incredible, and found that C.J.'s testimony would make a different result probable on retrial. *Id.*

On November 28, 2018, the Wayne County Prosecutor's Office dismissed the criminal charges against Justly Johnson and Kendrick Scott.

### B.    Procedural History

In 2019, Plaintiff Justly Johnson and Kendrick Scott filed separate lawsuits asserting that defendant DPD officers were liable to them for violating their civil rights. Specifically, Plaintiff Johnson brought this suit against Defendant DPD Officers Catherine Adams and Barbara Simon on August 6, 2019, asserting claims under 42 U.S.C. § 1983 against both defendants for fabrication of evidence and malicious prosecution, and against Defendant Adams for withholding material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. (ECF No. 1, Compl.) Plaintiff Johnson alleges that the defendants

26

manufactured probable cause by and through coercing Mr. Bernette's testimony through physical abuse and threats, and Mr. Jackson's testimony through threats. Plaintiff further alleges that Defendant Adams failed to disclose such manufactured evidence and also withheld exculpatory evidence given by Ms. Gonterman to Officer Jackson.

Defendants filed a motion for partial summary judgment after the close of discovery. (ECF No. 20, Defs.' Mot.)

Defendants argue that they are entitled to summary judgment on Plaintiff's malicious prosecution claim because they had probable cause to initiate and pursue a criminal case against Plaintiff Johnson based on the statements of Mr. Bernette and Mr. Jackson. Defendants argue that even though Mr. Bernette has since recanted his testimony, because Mr. Jackson died in 2008, any testimony or evidence that he has recanted his testimony is inadmissible hearsay that cannot create a question of fact defeating summary judgment.

Defendants argue that Plaintiff's *Brady* claim against Defendant Adams fails because Ms. Gonterman's statement that Lisa told her, if anything ever happened to her, people should look at her husband Will as a suspect, is not exculpatory because Mr. Kindred had an "airtight alibi," and the alleged statement is inadmissible hearsay.

27

Finally, Defendants contend that Defendant Adams is entitled to qualified immunity on Plaintiff's *Brady* claim because only Officer Jackson took down the statement from Ms. Gonterman, and there is no evidence that Officer Jackson told Defendant Adams that he omitted anything from Ms. Gonterman's statement.

Defendants did not move for summary judgment on Plaintiff Johnson's fabrication of evidence claim (Count I), or Plaintiff's *Brady* claim related to the alleged fabrication or manufacture of Mr. Bernette's and Mr. Jackson's statements (Count III).

Plaintiff Johnson filed a response in opposition to Defendants' motion. (ECF No. 24, Pl's. Resp.) Plaintiff argues that Defendants are not entitled to qualified immunity. Plaintiff first asserts that his federal malicious prosecution and *Brady* violation claims were clearly established in 1999. Plaintiff next contends that Defendants are liable for malicious prosecution because they lacked probable cause to prosecute Plaintiff absent the fabricated witness statements by Mr. Bernette and Mr. Jackson. Plaintiff argues that a reasonable jury could infer under that, given the totality of the circumstances, Mr. Jackson's second statement, which is inconsistent with his first statement provided the day before, and made following Mr. Bernette's now coerced statement inculpating Plaintiff, came about as a result of police coercion and threats. Plaintiff further asserts that Mr. Jackson's recantations are not

28

inadmissible hearsay, for the reasons set forth in Plaintiff Scott's Response to Defendants' Motion for Summary Judgment in Case No. 19-12718, discussed *infra* at pp. 39-49. Finally, Plaintiff argues that Defendant Adams is liable for Plaintiff's *Brady* claim because Adams, as the officer-in-charge, would have known what her investigators (i.e., Officer Anthony Jackson) knew, and that the Court must analyze the cumulative effect of all of the alleged *Brady* evidence, not each piece in isolation.

Defendants did not file a reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

29

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

30

party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III. ANALYSIS

### A.   Plaintiff Johnson's Constitutional Malicious Prosecution Claim (Count II)

Plaintiff Johnson asserts a malicious prosecution claim under the Fourth Amendment to the United States Constitution against both Defendant Adams and Defendant Simon. (Compl., Count II, PageID.21-23.) Plaintiff Johnson alleges that Defendants Adams and Simon "influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly fabricated evidence to secure Plaintiff's arrest and continued detention." (*Id.* ¶ 83, PageID.21.) Plaintiff further alleges that Defendant Adams "influenced the prosecution by falsely stating on the Investigator's Report/Warrant Request that Jackson and Burnette identified Plaintiff as the murderer, which was material to a finding of probable cause," and that she "knowingly omitted material facts (that the Burnette and Jackson statements implicating Plaintiff were the result of physical violence, threats and coercion) in her warrant request to the warrant prosecutor and judge who signed the arrest warrant."

31

(*Id.* ¶¶ 83-84, PageID.21-22.) Plaintiff alleges that but for the fabrication of evidence and material omissions, probable cause would have been lacking. (*Id.* ¶ 85, PageID.22.)

### 1. Constitutional malicious prosecution claim

A claim for malicious prosecution under the Fourth Amendment "encompasses wrongful investigation, prosecution, conviction, and incarceration," *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (internal quotation marks and citation omitted), and has four elements: (1) the defendant "made, influenced, or participated in the decision to prosecute" the plaintiff; (2) the prosecution lacked probable cause; (3) the proceeding caused the plaintiff to experience a deprivation of liberty; and (4) the proceeding was "resolved in the plaintiff's favor." *Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020) (quoting *Sykes*, 625 F.3d at 308-09); *see also Sykes*, 625 F.3d at 310 (explaining that the constitutional malicious prosecution claim is distinct from the similarly named state law tort and may be better described as a claim for "unreasonable prosecutorial seizure" (citation omitted)); *Lester v. Roberts*, 986 F.3d 599, 606-07 (6th Cir. 2021) (criticizing the "malicious-prosecution label" and suggesting that the court "focus on the *seizure* … rather than the *prosecution*") (emphasis in original). Although actual "malice" is not required to succeed on a constitutional malicious prosecution claim, the defendant's

participation "must be marked by some kind of blameworthiness," i.e., the defendant must have made "deliberate or reckless falsehoods," and "mere negligence" will not create liability. *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). A police officer violates a person's clearly established right to be free from malicious prosecution when the officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).

### 2. Whether Defendants had probable cause

In their motion for partial summary judgment, Defendants dispute the second prong of the constitutional malicious prosecution claim – that there was a lack of probable cause. (See Defs.' Mot. at pp. 11-15, PageID.276-80.) Defendants assert that "[p]robable cause is created by the statements of Antonio Bernette and Raymond Jackson." (Defs.' Mot. at p. 11, PageID.150, citing Investigator's Report, PageID.216-17).) Plaintiff responds that, under the totality of the circumstances, a reasonable jury could conclude that both Mr. Bernette's and Mr. Jackson's statements were coerced and that Defendants therefore lacked probable cause. (Pl.'s Resp. at pp. 17-18, PageID.952-53.)

33

A warrantless arrest violates the Fourth Amendment if no "probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Defendants cannot rely on "information obtained as a result of a coerced statement to furnish probable cause." *United States v. Whitlock*, 418 F. Supp. 138, 142 (E.D. Mich. 1976), *aff'd*, 556 F.2d 583 (6th Cir. 1977). As the United States Supreme Court long ago explained, "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

The Supreme Court defines probable cause as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S at 37; *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (adding that probable cause "depends on the *totality of the circumstances*" (emphasis added)). The Sixth Circuit cautions that neither "a bare allegation of criminal wrongdoing," *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008), nor "an individual's mere presence at a crime scene," *Harris v. Bornhorst*, 513 F.3d 503,

515 (6th Cir. 2008), constitutes probable cause for arrest. And the Sixth Circuit requires an officer to consider "both the inculpatory *and* exculpatory evidence[ ] before determining if he has probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis original); *see also Parsons*, 533 F.3d at 501 ("Police officers may not make hasty, unsubstantiated arrests with impunity, nor simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." (internal citations and quotation marks omitted)).

The United States Supreme Court has explained that probable cause "is not a high bar," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (internal citations and quotation marks omitted). And, the Sixth Circuit has held that "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). "But once a police officer *has* sufficient probable cause to arrest, he need not investigate further." *Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) (emphasis original)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire*, 205 F.3d at 315). However, the Sixth Circuit has recently

35

clarified that "the ultimate question of probable cause (separate from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020).

Defendants in this case assert that "[p]robable cause [to prosecute Plaintiff Johnson] is created by the statements of Antonio Bernette and Raymond Jackson." (Defs.' Mot. at p. 11, PageID.150, citing Investigator's Report, PageID.216-17.) Defendants note that these two witnesses "also testified at the Preliminary Examination wherein 36th District Court Judge Claudia Gartin found probable cause an[d] bound over the case for trial." (*Id.* citing Prelim. Exam. Tr. Vol. II, at pp. 68-69, PageID.719-20.) Defendants acknowledge that Mr. Bernette has since recanted his testimony and that he has testified that his prior statement and testimony were coerced when Defendants physically beat and threatened him, and Defendants concede that, for purposes of this summary judgment motion, Mr. Bernette must be believed and his statement must be removed from the investigator's report as a basis for probable cause. (*Id.* at p. 12, PageID.151.)

Defendants assert that the issue then is whether Mr. Jackson's statement and testimony, alone, is sufficient to create probable cause justifying the prosecution of Plaintiff Johnson. Defendants state that because Mr. Jackson died in August of 2008,

36

"all that is left is his signed statements given to DPD, his Preliminary Examination testimony, and [his] testimony at the trials of plaintiffs." (*Id.*)

Plaintiff Johnson asserts first in his Response brief that, construing all the evidence in the light most favorable to Plaintiff, and considering the "totality of the circumstances," a jury could reasonably conclude that Mr. Jackson's statement and testimony were coerced, like Mr. Bernette's. (Pl.'s Resp. at p. 18, PageID.953.) Plaintiff argues that the "totality of the circumstances" include that (1) Mr. Jackson's first statement, made hours after the shooting, mentioned nothing about the shooting, (2) Mr. Jackson's second statement, inculpating Plaintiff, was made <u>after</u> Mr. Bernette's now-admittedly fabricated statement, (3) Mr. Bernette said that Defendants Adams and Simon were present while he was being physically assaulted, and (4) while Mr. Bernette's statement names Kendrick Scott as the shooter, Mr. Jackson's statement names Mr. Johnson as the shooter. (*Id.* at pp. 17-18, PageID.952-53.) In addition, as discussed below, Defendants concede that Mr. Jackson's alleged statements to Ms. Hicks and Ms. Thomas that he lied when he testified at trial may be admissible under Rule 804(b)(3) as a statement against interest, even if his testimony as to *why* he lied is not. Considering all of this evidence in the light most favorable to Plaintiff Johnson, as required on summary judgment,

37

whether Defendants still had sufficient probable cause to proceed against Plaintiff Johnson could be a fact issue for the jury to decide.

Defendants state that probable cause was based on the statements of Mr. Bernette and Mr. Jackson. Defendants do not point to any physical evidence in the record connecting Plaintiff Johnson or Mr. Scott to Lisa Kindred's murder. Now that Mr. Bernette's statement "has to be removed from the investigator's report," and Mr. Jackson stated that he lied when he made his second statement, there is little left. If Mr. Jackson's recantations of his trial testimony are admissible evidence, there is nothing left to support probable cause.[6]

Turning to the admissibility of Mr. Jackson's alleged recantations, in Plaintiff's response to Defendants' partial motion for summary judgment, he argues only that Mr. Jackson's recantations are admissible "for the reasons set forth in Plaintiff, Kendrick Scott's Response to Motion for Summary Judgment." (Pl.'s Resp. at p. 19, PageID.954.) A party generally may not simply refer to or incorporate arguments made in pleadings by a different party in a separate case. However, because these cases are related, the Court will address this issue.

_____

[6] The Michigan Supreme Court noted in *People v. Johnson*, 502 Mich. at 579, that "[e]ven if Jackson's recantation is not presented, considering Jackson's previous testimony in light of the other evidence that would be presented at retrial, we believe that defendants have a reasonably likely chance of acquittal."

Mr. Jackson allegedly recanted his testimony three times before he died in 2008. First, Lakeniya Hicks has provided sworn testimony that, just before Mr. Scott's June 2000 trial, Mr. Jackson came over to Mr. Billingslea's and Ms. Hicks's house and that "he was kind of nervous" because the prosecutor wanted him to testify as to his second statement, and she overheard Mr. Jackson tell Mr. Billingslea that his witness statement "was a lie and he wanted to recant but he, he was scared because the prosecutor was going to put him in jail," and that the police had "coerced him to talk." (Hicks Dep. at pp. 14-16, 33, PageID.375-77, 394.) Mr. Billingslea, who is alive, was not deposed by Plaintiff. (*See id.* at pp. 24-25, PageID.385-86.)

Plaintiff further contends that Mr. Jackson also recanted two more times to his cousin, Lameda Thomas – at a family gathering or barbeque at Ms. Thomas's mother's house in June or July of 2002, and at a birthday party at a relative's house in 2006. Mr. Jackson allegedly told Ms. Thomas that he "messed up and he lied" when he made his statement and testified, which "weren't true," and explained that "[h]e was scared because he was under a lot of pressure from the police, who told him he and his grandmother could go to jail if he did not cooperate with [them]." (ECF No. 20-12, Deposition of Lameda Thomas (Thomas Dep.) at pp. 10-14, PageID.732-36.) Ms. Thomas testified that Mr. Jackson said that the police "were

39

yelling at him and threatening him," but she does not remember him saying that the police were physically abusing him. (*Id.* at pp. 17-18, PageID.739-40.)

Defendants argue that Ms. Hicks' and Ms. Thomas's testimony regarding Mr. Jackson's alleged recantations constitutes inadmissible hearsay. (Defs.' Mot. at pp. 13-15, PageID.152-54.) Defendants assert in their motion that they believe Plaintiff will contend that the testimony is admissible as an admission against penal interest under Fed. R. Evid. 804(b)(3). (*Id.*) Defendants argue that, as explained by the United State Supreme Court in *Williamson v. United States*, 512, U.S. 594, 600-01 (1994), Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Following this analysis, Defendants concede that "Mr. Jackson's self-inculpatory comments that he lied at trial may be admissible FRE 804(b)(3)," but argue that his self-exculpatory statements immediately thereafter that the "police pressured me, threatened me etc…." are inadmissible hearsay. (Defs.' Mot. at p. 14, PageID.153.)

As Defendants concede, Mr. Jackson's alleged statement that he testified falsely against Plaintiff Johnson could clearly subject him to perjury charges or a civil lawsuit from Plaintiff Johnson. (*Id.*) *See Beckett v. Ford*, 384 F. App'x 435, 444 (6th Cir. 2010) (holding that a declarant's statement that he "had no prior

knowledge of the involvement of Dale Beckett in the murder he now stands convicted of" clearly subjected the declarant to perjury charges or civil lawsuit by Beckett because the declarant "testified at Beckett's murder trial implicating Beckett in the murder") (punctuation modified). By contrast, Mr. Jackson's alleged statements as to *why* he lied – that the police coerced or threatened him to lie – is not a statement against interest. (Defs.' Mot. at p. 14, PageID.153.) *See Beckett*, 384 F. App'x at 444 (holding that the declarant "did not incur any criminal or civil liability by stating that he was threatened by Forrester[, a police officer], that Forrester and Anderson[, the prosecutor] coached his testimony, or that Anderson promised that he would be released from prison in exchange for testifying falsely"). Defendants state that coercion or duress is a defense to perjury, and thus Mr. Jackson's self-exculpatory statements that he was threatened or coerced into making the false statements do not expose him to criminal liability. (Defs.' Mot. at p. 14, PageID.153.) Defendants argue that because Mr. Jackson's self-exculpatory statements that the police "pressured or threatened" him are inadmissible hearsay, they cannot be used to create a fact issue defeating summary judgment, and that Mr. Jackson's statements that Plaintiff Johnson told him that he and Mr. Scott were "hitting a lick" and had to "shoot the woman" are sufficient, alone, to create probable

41

cause to prosecute Plaintiff Johnson even without the statement of Mr. Bernette. (*Id.* at pp. 14-15, PageID.153-54.)

As discussed in the Court's Opinion and Order in *Kendrick Scott v. Wayne Pritchett, et al.*, Case No. 19-cv-12718, Mr. Scott did not argue that Mr. Jackson's alleged recantations are admissible under Rule 804(b)(3), and instead argued only that the statements are admissible under the Residual Exception to hearsay, Fed. R. Evid. 807 – a rule Defendants do not address in their motion.

The Sixth Circuit has held that, "the analysis of a hearsay statement should not end when a statement" is inadmissible under the hearsay exceptions in Rule 803 or 804, "but should be evaluated under the residual hearsay exception" in Rule 807. *United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001); *see also Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013) (noting that Rule 807 allows the admission of a hearsay statement that does not fall under the exception to hearsay found in Rules 803 and 804, if certain criteria are met). Like in Kendrick Scott's case, Defendants in this case did not file a reply brief, and thus did not specifically address the admissibility of Mr. Jackson's recantations under Rule 807. Defendants' counsel likewise did not address the admissibility of Mr. Jackson's recantations under Rule 807 at the hearing on this motion.

A hearsay statement is admissible under Rule 807 if:

> (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Plaintiff bears the burden of proving that the hearsay fits within Rule 807's residual hearsay exception. *United States v. Kendrick*, 853 F.2d 492, 496 n.3 (6th Cir. 1988) ("[T]he proponent of a hearsay statement bears the burden of proving that the statement fits squarely within a hearsay exception or exclusion.") (citation omitted). While the residual hearsay exception "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice," "[d]istrict courts have considerable discretion in applying the residual exception to the hearsay rule[.]" *Sims v. United States*, Nos. 04-70474, 99-80102, 2006 WL 8435527, at *7 n.14 (E.D. Mich. Jan. 18, 2006), *Magistrate Judge's Report and Recommendation adopted*, 2006 WL 800844 (E.D. Mich. Feb. 28, 2006); *see also United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) ("Trial courts have a 'considerable measure of discretion' in determining whether evidence should be admitted under Rule 807.") (citations omitted).

43

As the Court notes in its Opinion and Order addressing Defendants' partial motion for summary judgment in the *Kendrick Scott* case, Case No. 19-cv-12718, Mr. Scott provided a lengthy discussion supporting the admissibility of Mr. Jackson's three recantation statements under Rule 807 in his response brief filed in his separate case. (Case No. 19-12718, ECF No. 39, Pl. Scott's Resp. at pp. 10-15, PageID.1063-68.) Scott first argued that the recantations are supported by sufficient guarantees of trustworthiness. "Most courts apply a '[b]road inquiry,' looking to the totality of the circumstances that surround the statement when determining whether it possesses the requisite guarantees of trustworthiness." *Wright v. Beard*, No. 14 Civ. 90, 2016 WL 7173787, at *5 (W.D. Ky. Dec. 8, 2016) (citation omitted). "In assessing the totality of the circumstances, the Court may consider the declarant's relationship to the parties, the motive of the declarant in making the statement, the extent to which the statement reflects the declarant's personal knowledge, and the consistency of any past statements by the declarant." *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2020 WL 614698, at *2 (S.D. Ohio Feb. 10, 2020) (citing *United States v. Barlow*, 693 F.2d 954, 961-63 (6th Cir. 1982)); *see also Wright*, 2016 WL 7173787 (discussing seven factors considered by the Seventh Circuit, including "(1) the probable motivation of the declarant in making the statement, (2) the circumstances under which the statement was made, (3) the

44

knowledge and qualifications of the declarant, (4) the existence of corroborating evidence, (5) the character of the declarant for truthfulness and honesty and the availability of evidence on the issue, (6) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury, and (7) whether the witness ever recanted his testimony.") (internal quotation marks omitted) (quoting *United States v. Hall*, 165 F.3d 1110-11 (7th Cir. 1999). However, the Advisory Committee Notes to Rule 807 provide that "[t]he credibility of the witness relating the statement is not a part of either inquiry" under the Rule because "[t]o base admission or exclusion of a hearsay statement on the witness's credibility would usurp the jury's role of determining the credibility of testifying witnesses." Fed. R. Evid. 807, 2019 Advisory Committee Notes.

There is also a requirement that the statement contain sufficient indicia of reliability or trustworthiness. Scott argued that the statements are supported by "sufficient guarantees of trustworthiness." He explained that Mr. Jackson made essentially the same statements recanting his testimony on three separate occasions to two different people: first to Mr. Billingslea, in Ms. Hicks' presence, in 2000, and two more times to Ms. Thomas, in 2002 and 2006, and that this frequency lends credibility to the statements that Mr. Jackson's earlier statements were coerced. (Pl. Scott's Resp. at p. 11, PageID.1064.) *See United States v. Vretta*, 790 F.2d 651, 659

45

(7th Cir. 1986) ("[Declarant] told a number of people about [defendant's] threats toward him, thus lending credibility to the fact that [declarant] made the statements concerning the threats.") (citing *United States v. Howard*, 774 F.2d 838, 845 (7th Cir. 1985) (noting that the defendant made the same statement "not only once, but twice" to witnesses)). And as Scott further contends, Mr. Bernette's testimony that he was coerced and threatened by the same officers into making a very similar statement (that Scott and Johnson "hit a lick") to inculpate Scott and Plaintiff Johnson, after Mr. Jackson's first statement but prior to his second statement, further lends credibility to Mr. Jackson's recantations. (Pl. Scott's Resp. at pp. 11-12, PageID.1064-65.) *See F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993) (noting that "[t]he fact that [the letters] all reported roughly similar experiences suggests their truthfulness.").

Scott also contends that Mr. Jackson's statements had circumstantial guarantees of trustworthiness because Mr. Jackson made the statements to persons with whom he had a close relationship – Ms. Thomas was Mr. Jackson's cousin, and Mr. Jackson was close friends with Mr. Billingslea and his girlfriend Ms. Hicks. (Pl. Scott's Resp. at pp. 12-13 & fn. 7, PageID.1065-66.) *See Brumley*, 727 F.3d at 578 ("[T]he statements should be considered more reliable than not given that Brumley, Sr. and Brumley, Jr. are father and son and not strangers."); *Kiniun v. Minnesota Life*

46

*Ins. Co.*, No. 3:10cv399, 2013 WL 12146384, at *2 (N.D. Fla. Jan. 14, 2013) (out-of-court statement by deceased declarant to a long-time friend in whom she confided was trustworthy and admissible under Rule 807). Thus, it appears that Mr. Jackson was close with the persons in whom he confided, lending further support to the circumstances of trustworthiness of the statements. Further, the first statement to Mr. Billingslea, overheard by Ms. Hicks, was made about a year after Mr. Jackson made the inculpatory statements to police and around the same time as he was supposed to testify at Mr. Scott's jury trial, and the second and third statements in 2002 and 2006 were consistent, and appear to be voluntary. There is no indication that Mr. Jackson was under any duress to recant his earlier statement, or that he had an improper motivation to tell his cousin and friends that he lied and his statement had been coerced. *See Vretta*, 790 F.2d at 659 ("[T]he fact that [the declarant] informed these disinterested third parties of the threats rebuts and contradicts [defendant's] argument that [the declarant] could have been making these statements to gain sympathy from those who were investigating him.").[7] The Court therefore finds, as

_____

[7] Scott also argued in his response brief that "Mr. Kindred's invocation of the Fifth Amendment at his deposition further corroborates Mr. Jackson's recantations." (Pl. Scott's Resp. at p. 12, PageID.1065.) A non-party's invocation of the Fifth Amendment can give rise to an adverse inference against a party to a civil action. *See Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 384-85 (6th Cir. 1993) ("The refusal of these two witnesses to answer any questions about actions they had

it did in Kendrick Scott's case, based on all of the above, that Mr. Jackson's alleged statements to Ms. Hicks and Ms. Thomas are supported by sufficient guarantees for trustworthiness, as required by Rule 807.

Scott further argued in his response brief in his case that Mr. Jackson's recantations are more probative than other evidence that can be obtained through reasonable efforts. Mr. Jackson's statements to Ms. Hicks and Ms. Thomas were relayed, under oath, during two separate depositions, at which the declarants were subject to Defendants' cross-examination, and they and are the only evidence of Mr. Jackson's recantations of his statements because of coercion by the police, because Mr. Jackson is deceased. Mr. Jackson's out-of-court statements to Ms. Hicks and Ms. Thomas thus are "more probative on the point for which [the] [are] offered than any other evidence that [Plaintiff] can obtain through reasonable efforts," and thus consider these statements at the summary judgment stage. Fed. R. Evid. 807(a)(2).

Therefore, considering Mr. Bernette's and Mr. Jackson's recantations of their witness statements, the Court finds that there is a material question of fact as to

---

taken on behalf of FIA support a rational inference that they had participated in activity that they feared would subject them to liability."). In the instant case, the Court questions the application of the adverse inference because Mr. Kindred had many reasons for invoking his Fifth Amendment right at his deposition, including allegations regarding how he spent settlement proceeds recovered from an automobile accident, and how he treated Lisa and his stepson C.J., Jr. in the past.

whether Defendants had probable cause to arrest and prosecute Plaintiff Johnson,

defeating Defendants' motion for partial summary judgment on Plaintiff's malicious

prosecution claim. *See Gregory v. City of Louisville*, 444 F.3d 725, 749 n.11 (6th

Cir. 2006) ("It is not our job to find whether or not probable cause would have been

dissolved had Katz revealed the exculpatory evidence; this is the precise province of

the jury.").[8]

## B. Plaintiff's *Brady* Violation Claim Against Defendant Adams Arising Out of the Gonterman Statement

Plaintiff Johnson asserts a cause of action, against Defendant Adams only, for

withholding material exculpatory evidence in violation of his rights established by

*Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. (Compl., Count III,

PageID.24-25.) Specifically, Plaintiff alleges that Defendant Adams deliberately and

knowingly chose not to disclose to the prosecutor or defense before trial that (1) "she

fabricated evidence by manufacturing the Antonio Burnette and Raymond Jackson

statements, which were material to a finding of probable cause," and (2) "she knew

---

[8] The Court notes that, "[a]s with any hearsay statement offered under an exception, the court's threshold finding that admissibility requirements are met merely means that the jury may consider the statement and not that it must assume the statement to be true." Fed. R. Evid. 807, 2019 Advisory Committee Notes. Defendants will have an opportunity at trial to discredit Mr. Jackson, and introduce evidence, under Fed. R. Evid. 806, to attack his credibility.

49

Jodi Gonterman made a statement to police that Lisa Kindred said if anything had happened to her, Will Kindred would be the culprit." (*Id*. ¶¶ 96-97, PageID.24-25.)

Defendants argue in their motion that Defendant Adams is entitled to qualified immunity on Plaintiff's *Brady* claim arising out the second claim only – the alleged failure of Officer Jackson to write down Ms. Gonterman's statement regarding Lisa Kindred's warning. (Defs.' Mot. at p. 19, PageID.158.) Defendants do not argue that Defendant Adams is entitled to qualified immunity on Plaintiff's *Brady* claim regarding Mr. Bernette's and Mr. Jackson's statements. Defendants argue that it is undisputed that Ms. Gonterman's statement was taken by Officer Jackson, no other defendants were present when the statement was taken, and there is no evidence that Officer Jackson told Defendant Adams that he omitted anything from the statement of Ms. Gonterman. (*Id.*)

Plaintiff argues in response that, viewing the cumulative effect of all of the *Brady* evidence withheld by Defendants – the omission of Ms. Gonterman's statement pointing to Will Kindred as an alternate suspect and the fabricated statements of Mr. Bernette and Mr. Jackson – that a reasonable jury could find that Defendant Adams is liable for the *Brady* violations alleged. (Pl.'s Resp. at pp. 21-25, PageID.956-60.) Plaintiff argues that because "Adams has admitted that, as [Officer-in-charge], she would have known what her investigators knew, a

50

reasonable jury could conclude that Adams knew about the 'Jodi Gonterman evidence' and knowingly chose not to disclose it." (*Id.* at p. 24, PageID.959.)

### 1. Qualified immunity

Qualified immunity protects federal and state officials performing discretionary functions from liability for civil damages for constitutional violations. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, a plaintiff must show that the official violated a constitutional right that was "clearly established at the time" of the official's conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 608-09 (6th Cir. 2015) (alteration in original) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252, 256 (1986)). When determining whether a right was clearly established, the court examines whether the law was "sufficiently clear that a reasonable official would [have understood] that what he [was] doing violate[d] that right." *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) (internal quotation marks and citation omitted).

In cases with multiple defendants, the court assesses qualified immunity "in the context of each individual's specific conduct." *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (internal quotation marks and citation omitted); *see also Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (reversing a denial of qualified immunity where "there [was] no evidence that [the officer] personally participated in or directed" the alleged constitutional violation).

### 2. Defendant Adams is entitled to qualified immunity on Plaintiff's *Brady* claim related to the Gonterman statement

Defendants concede in their motion that "[s]ince it is clearly established that people have a right to only be arrested/prosecuted when probable cause exists, and not have exculpatory/impeachment evidence withheld from them, it becomes the courts duty to determine whether, in light of the totality of circumstances, the officer's [sic] violated plaintiff's 4th Amendment rights and/or due process rights under the 14th Amendment." (Defs.' Mot. at p. 18, PageID.157.) Although Defendants' counsel argued at the hearing on this motion that it was not "clearly established" that Officer Jackson had a duty to record or pass along Ms. Gonterman's statement regarding Lisa Kindred's warning, the Court finds that it is clearly established law, well before 1999, that a police officer could be held liable under *Brady* for withholding exculpatory evidence. *See Jackson v. City of Cleveland*, 925

F.3d 793, 823-24, 826-27 (6th Cir. 2019); *Moldowan v. City of Warren*, 578 F.3d 351, 378-79 (6th Cir. 2009).

Thus, the issue to be determined is whether Defendant Adams is liable to Plaintiff Johnson for the alleged suppression of Ms. Gonterman's statement regarding Lisa Kindred's fear of her husband.

As the Sixth Circuit recently explained in *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775145 (6th Cir. Oct. 13, 2021), when a plaintiff alleges a *Brady* claim against multiple defendants, stemming from different instances, the court must consider whether summary judgment was proper as to each defendant for each alleged incident. *Id.* at *6 (concluding that an individual defendant was entitled to qualified immunity for the first of two separate incidents because there was no evidence connecting that defendant with the first incident). This is because, as discussed above, a § 1983 plaintiff must show that a defendant was personally involved in unlawful conduct in order to hold the defendant individually liable. *Falk*, 946 F.3d at 315 ("[t]o establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in [unlawful conduct].") (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)). Like in *Ricks*, there are two separate *Brady* incidents alleged against Defendant Adams in this case – the suppression of the Gonterman statement and the

53

coercion of the Bernette and Jackson statements. (Compl. ¶¶ 96-97, PageID.24-25.) Defendants' motion focuses solely on the suppression of the Gonterman statement, and thus the second incident – the alleged fabrication of the Bernette and Jackson statements – are not at issue here. Defendants assert only that Defendant Adams is entitled to qualified immunity because she was not present during the taking of the Gonterman statement and that there is no evidence that she knew anything about the alleged omitted statement. (Defs.' Mot. at p. 19, PageID.158.)

Plaintiff does not name Officer Jackson as a defendant in this case. And, in his Response, Plaintiff fails to offer any summary judgment evidence that Defendant Adams participated in the taking of the Gonterman statement or the alleged omission of Lisa Kindred's warning, or that she was otherwise involved in the alleged suppression of that evidence. In fact, Defendant Adams testified in her deposition that while she is sure she reviewed Ms. Gonterman's completed witness statement, she did not speak with Ms. Gonterman when she came in to make her statement, she was not present when Ms. Gonterman was being interviewed by Officer Jackson, that Officer Jackson did not discuss Ms. Gonterman's statement with her, and she did not know whether Officer Jackson had omitted anything from Ms. Gonterman's statement. (Adams Dep. II at pp. 242, 256, PageID.1335, 1338.)

Plaintiff instead makes only a passing conclusory allegation that "[s]ince Adams has admitted that, as [Officer-in-charge], she would have known what her investigators knew, a reasonable jury could conclude that Adams knew about the 'Jodi Gonterman evidence' and knowingly chose not to disclose it." (Pl.'s Resp. at p. 24, PageID.959.) Plaintiff's counsel made a similar argument at the hearing. This claim does not "track." On this record, there is no basis for the jury to reasonably make that inferential leap, beyond mere speculation or conjecture, which is not permitted. Plaintiff "may not ... rely solely on the doctrine of respondeat superior in order to defeat a supervisor's assertion of qualified immunity." *Harris v. City of Cleveland*, 7 F. App'x 452, 457 (6th Cir. 2001) (noting a plaintiff "must establish with particularity that a defendant *himself* has violated some clearly established statutory or constitutional right in order to strip that person of qualified immunity"); *Meeks v. City of Detroit, Michigan*, 727 F. App'x 171, 179 (6th Cir. 2018) (finding that "Schmelter, as the officer-in-charge of the Citgo carjacking investigation" was entitled to qualified immunity because he "was not involved in either the creation or administration of the photo array" and that "Schmelter's lack of diligence is troubling and, given his role as the officer-in-charge of the investigation, likely negligent, but it does not amount to recklessness").

Plaintiff therefore simply cannot sustain his summary judgment burden to show that Defendant Adams is *not* entitled to qualified immunity on Plaintiff's *Brady* claim related to the Gonterman statement. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) ("When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.").

Accordingly, the Court finds that Defendant Adams is entitled to qualified immunity with regard to Plaintiff's *Brady* claim based on the suppression of the Gonterman statement, because there is no evidence that she personally participated in or directed the alleged constitutional violation. Defendant Adams continues to be liable for Plaintiff's *Brady* claim based on the alleged coercion of Mr. Bernette and Mr. Jackson in making their statements, which claim has not been challenged by Defendants.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Partial Summary Judgment.

Specifically, the Court **GRANTS** Defendants' motion with respect to Defendants' contention that Defendant Catherine Adams is entitled to qualified immunity with regard to Plaintiff's *Brady* claim based on the suppression of the

56

Gonterman statement only, because there is no evidence that Defendant Adams personally participated in or directed the alleged constitutional violation.

The Court otherwise **DENIES** Defendants' motion for summary judgment with respect to the remaining arguments.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: December 28, 2021

57